IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PHYLLIS M. DETTMER                        *

      Plaintiff                         *

v.                                        *

CONSTELLATION POWER SOURCE                *           Civil Action No. MJG02-2595
GENERATION, INC.
                                          *
      Defendant
                    *    *    *    *    *    *    *    *

**MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT OF
DEFENDANT CONSTELLATION POWER SOURCE GENERATION, INC.**

Defendant, Constellation Power Source Generation, Inc., ("CPSG"), by its undersigned attorney, pursuant to F.R.C.P. 12(b)(6) and 56(b), moves this Court to Dismiss and/or enter Summary Judgment in its favor as to the Plaintiff's Complaint, on the grounds that Plaintiff has failed to state a cause of action and/or there is no dispute of any material fact and that Defendant Constellation Power Source Generation, Inc. is entitled to judgment as a matter of law.  The Defendant makes reference to the attached Memorandum and Exhibits in support of its Motion.

                                      **_/s/ Barbara A. Gaughan_**
                                         Barbara A. Gaughan
                                         Trial Bar No. 05050
                         17th Floor, Gas and Electric Building
                                         P. O. Box 1475
                                   Baltimore, Maryland  21203
                                         410-234-6869
                                     410-234-5840 (fax)
                                       Attorney for Defendant,
                  Constellation Power Source Generation, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PHYLLIS M. DETTMER                      *

        Plaintiff                      *

    v.                                          *

CONSTELLATION POWER SOURCE     *          Civil Action No. MJG02-2595
GENERATION, INC.
                                  *

        Defendant

                    *    *    *    *    *    *    *    *

**<u>REQUEST FOR HEARING</u>**

      Defendant Constellation Power Source Generation, Inc. requests a hearing on its Motion to Dismiss and/or for Summary Judgment.

                        ***<u>/s/ Barbara A. Gaughan</u>***
                        Barbara A. Gaughan
                        Trial Bar No. 05050
              17th Floor, Gas and Electric Building
                      P. O. Box 1475
                 Baltimore, Maryland  21203
                      410-234-6869
                   410-234-5840 (fax)

                    Attorney for Defendant
         Constellation Power Source Generation, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of March, 2003, a copy of the foregoing Motion to Dismiss and/or for Summary Judgment, Request for Hearing, Memorandum, Exhibits and Order was electronically mailed to Ralph E. Hall, Jr., Esquire, 224 North Adams Street, Rockville, Maryland 20850, Attorney for Plaintiff.

***/s/ Barbara A. Gaughan***

## *TABLE OF CONTENTS*

**Page**

Motion to Dismiss and/or for Summary Judgment of Defendant Constellation
Power Source Generation, Inc. ................................................................................ i

Table of Contents ...................................................................................................... iv

Table of Authorities .................................................................................................. vi

Memorandum in Support of Constellation Power Source Generation, Inc.'s
Motion to Dismiss and/or for Summary Judgment ............................................ 1

I.     Statement of the Case .................................................................................... 1

II.    Facts ................................................................................................................ 2

III.   A.  Summary Judgment .................................................................................. 20

       B.  Failure to State a Cause of Action ........................................................... 21

IV.    Argument ........................................................................................................ 22

       A.     Plaintiff is not entitled to ADA protection because she is not a "qualified
              individual" with a "disability," has failed to prove her latenesses and absences
              were caused by a qualifying disability, and has not shown that CPSG's reason
              for terminating her was pretextual ............................................................. 22

              i.   Ms. Dettmer is not a "qualified individual" under the ADA because she
                   did not satisfy the requisites for the job or perform the essential functions
                   of the job due to her consistent tardiness and absences ........................... 23

              ii.  Ms. Dettmer is not a qualified individual with a "disability" within the
                   meaning of the ADA because she does not have a mental impairment that
                   substantially limits a major life activity ................................................. 26

       B.     CPSG reasonably accommodated Ms. Dettmer by allowing flexibility, giving her
              two grace periods, and waiting over one year before terminating her ........... 32

       C.     Plaintiff has failed to state a cause of action for age discrimination under
              29 U.S.C. § 623 because she did not exhaust her administrative remedies
              and has produced no evidence to support her claim .................................... 33

D.    Plaintiff is not eligible for FMLA leave as her condition not within the definitions of "serious health condition" or "incapacity."  Her request fails to meet the FMLA notice and certification requirements, would unduly disrupt the operations of CPSG, and was not directed to foreseeable leave or planned medical treatment ......................35

E.    There is no private cause of action under Md. Ann. Code, Art. 49B § 14....................43

F.    Since Plaintiff was an at-will employee, there can be no breach of contract.................44

G.    Plaintiff failed to identify experts and has failed to prove damages ...........................46

Conclusion ...............................................................................................................................48

Appendix of Exhibits ........................................................................................................App. 1

Order ...................................................................................................................................App. 3

**Phyllis Dettmer v. CPSG**
**Civil Action No. MJG02-2595**
<u>**Table of Authorities**</u>

<u>**Cases**</u>                                                                                                 **Page**

<u>A.S. Abell Co. v. Chell,</u>
  412 F.2d 712 (4th Cir. 1969) ................................................................21

<u>Adams v. Rochester General Hospital,</u>
  977 F. Supp. 226 (W.D.N.Y. 1997) .........................................................23

<u>Alderdice v. American Healthholding Inc.,</u>
  118 F. Supp. 2d 856 (S.D. Oh. 2000) ..........................................25, 27, 32

<u>Anderson v. Liberty Lobby, Inc.,</u>
  477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986) ..........................20

<u>Bailey v. Amsted Inds. Inc.,</u>
  172 F.3d 1041 (8th Cir. 1999) ............................... 22, 24, 31-32, 43

<u>Basith v. Cook County,</u>
  241 F.3d 919 (7th Cir. 2001) ................................................................32

<u>Beale v. Hardy,</u>
  769 F.2d 213 (4th Cir. 1985) ................................................................20

<u>Bond v. Abbott Laboratories,</u>
  417 F. Supp. 2d 967 (N.D. Oh. 1998) ............................................... 36-38

<u>Brookins v. Indianapolis Power & Light Co.,</u>
  90 F. Supp. 2d 993 (S.D. In. 2000) ....................................................25, 29

<u>Carson v. Giant Food, Inc.,</u>
  187 F. Supp.2d 462 (D. Md. 2002) ..........................................................44

<u>Carter v. Rental Uniform Svc. of Culpeper Inc.,</u>
  977 F.Supp. 753 (W.D. Va. 1997) .......................................................38, 43

<u>Cash v. Smith,</u>
  231 F. 3d 1301 (11th Cir. 2000) ...........................................................28

<u>Castiglione v. Johns Hopkins Hospital,</u>

69 Md. App. 325, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325 (1987)...................................45

Celotex Corp. v. Catrett,
    477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)...................................21

Champ v. Baltimore County,
    884 F. Supp. 991 (D. Md. 1995), *aff'd* 1996 U.S. App. LEXIS 16417...................................23, 32

Cole v. Sisters of Charity,
    79 F. Supp. 2d 668 (E.D. Tx. 1999)................................... 35, 38-39

Collins v. NTN Bower Corp.,
    272 F.3d 1006 (7th Cir. 2001) ................................... 42-43

Comet Enters. Ltd. v. Air-A-Plane Corp.,
    128 F.3d 855 (4th Cir. 1997) ...................................21

Conley v. Gibson,
    355 U.S. 41, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957)...................................21

Cooper v. Olin Corp.,
    246 F.3d 1083 (8th Cir. 2001) ...................................28

Corder v. Lucent Technologies Inc.,
    162 F.3d 924 (7th Cir. 1998) ...................................24, 30

Dillon v. Great Atlantic & Pacific Tea Co.,
    43 Md. App. 161, 403 A.2d 406 (1979)...................................44

Duncan v. Washington Metropolitan Area Transit Authority,
    240 F.3d 1110 (D.C. Cir. 2001)...................................28

EEOC v. Sara Lee Corp.,
    237 F.3d 349 (4th Cir. 2001) ...................................27

Ennis v. National Association of Bus. & Educ. Radio, Inc.,
    53 F.3d 55 (4th Cir. 1995) ...................................22

Gazda v. Pioneer Chlor Alkali Co.,
    10 F. Supp. 2d 656 (S.D. Tx. 1997)...................................25, 30

Greer v. Emerson Electric Co.,
    185 F.3d 917 (8th Cir. 1999) ................................... 24, 31-32

Guice-Mills v. Derwinski,
    967 F.2d 794 (2nd Cir. 1992) ..................................................................................25

Gwinn v. Food Lion, L.L.C.,
    195 F. Supp.2d 728 (D. Md. 2002) .................................................................... 44-45

Hishon v. King & Spalding,
    467 U.S. 69, 104 S. Ct. 2229, 81 L.Ed.2d 59 (1984) ...............................................21

Hrehorovich v. Harbor Hospital Center, Inc.,
    93 Md. App. 772, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319 (1993)...............45

Ibarra v. United States,
    120 F.3d 472 (4th Cir.1997) .....................................................................................21

Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.,
    882 F. Supp. 1553 (D. Md. 1995)..............................................................................47

Lurie v. Meserve,
    214 F. Supp. 2d 546 (D. Md. 2002) ..........................................................................34

Maryland Commission on Human Relations v. Downey Communications, Inc.,
    110 Md. App. 493 (1996) .........................................................................................44

Mathews v. Giant Food, Inc.,
    187 F. Supp. 2d 486 (D. Md. 2002)...........................................................................32

McCullough v. Branch Banking & Trust Co.,
    35 F.3d 127 (4th Cir. 1994) .....................................................................................34

McDonnell Douglas Corp. v. Green,
    411 U.S. 792, 36 L.Ed. 2d 668, 93 S. Ct. 1817 (1973)..............................................22

Mid-America Tablewares v. Mogi Trading Co.,
    100 F.3d 1353 (7th Cir. 1996) ..................................................................................46

Mitchell v. Data General Corp.,
    12 F.3d 1310 (4th Cir. 1993) ....................................................................................34

Murray v. Red Kap Industries, Inc.,
    124 F.3d 695 (5th Cir. 1997) ....................................................................................38

Nweke v. Prudential Ins. Co.,
    25 F. Supp. 2d 203 (S.D.N.Y. 1998) ............................................................ 28-29

Ogborn v. United Food and Commercial Workers Union Local 881,
    305 F.3d 763 (7th Cir. 2002) ......................................................................27

Olsen v. Ohio Edison Co.,
    979 F. Supp. 1159 (N.D. Oh. 1997) ...........................................................35

Papasan v. Allain,
    478 U.S. 265, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986) ...............................22

Peeples v. Coastal Office Products,
    203 F. Supp. 2d 432 (D. Md. 2002) ...........................................................42

Petty v. Freightliner Corp.,
    122 F. Supp. 2d 666 (W.D.N.C. 2000) ..................................................26, 33

Polderman v. Northwest Airlines,
    40 F. Supp. 2d 456 (N.D. Oh. 1999) ..................................................... 29-30, 39

Revene v. Charles County Comm'rs,
    882 F.2d 870 (4th Cir.1989) ......................................................................22

Rocky v. Columbia Lawnwood Regional Medical Center,
    54 F. Supp. 2d 1159 (S.D. Fl. 1999) ....................................................25, 32, 43

Santiago v. Temple Univ.,
    739 F. Supp. 974 (E.D. Pa. 1990) ...........................................................25

Schneiker v. Fortis Ins. Co.,
    200 F.3d 1055 (7th Cir. 2000) ..................................................................29

Smith v. United Refrigeration, Inc.,
    47 Fed. Appx. 674 (4th Cir. 2002) ...........................................................35

Soileau v. Guilford of Maine,
    928 F. Supp. 37 (D. Me. 1996) .................................................................29

Stiefel v. Allied Domecq Spirits & Wine,
    184 F. Supp. 2d 886 (W.D. Ark. 2002).................................................25, 31, 38

Sutton v. United Air Lines, Inc.,

527 U.S. 471, 144 L. Ed. 450, 119 S. Ct. 2139 (1999) ...................................27

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506, 122 S. Ct. 992, 152 L.Ed.2d 1 (2002) ................................21

Toyota Motor Mfg. Ky. Inc. v. Williams,
    151 L.Ed.2d 615, 122 S. Ct. 681, 534 U.S. 184 (2002) ...........................27

Tyndall v. National Educ. Centers Inc. of California,
    31 F.3d 209 (4th Cir., 1994) .........................................................23-24

United Black Firefighters v. Hirst,
    604 F.2d 844 (4th Cir.1979) ...........................................................22

Walders v. Garrett,
    765 F. Supp. 303 (E.D. Va. 1991) ...................................................25

## Statutes

29 U.S.C.A. § 621(b) ..........................................................................33

29 U.S.C.A. § 623(a)(1) ..................................................................1, 33

29 U.S.C.A. § 626(d) ..........................................................................34

29 U.S.C.A. § 2612 ..............................................................................1

29 U.S.C.A. § 2612(a)(1) ....................................................................36

29 U.S.C.A. § 2612(b) ........................................................................37

29 U.S.C.A. § 2612(e)(2) .................................................................39-40

29 U.S.C.A. § 2612(2) ........................................................................39

29 U.S.C.A. § 2613(b)(1) ....................................................................40

29 U.S.C.A. § 2613(b)(5) .................................................................39-40

42 U.S.C. § 12102(2) ..........................................................................26

42 U.S.C. § 12111(8) ..........................................................................23

42 U.S.C. §12112(a) ................................................................................................ 1, 23-24

42 U.S.C. §12112(b) ....................................................................................................... 1

42 U.S.C. §12112(b)(5) .................................................................................................23

**Regulations**

29 C.F.R. § 825.114 ................................................................................................ 40-41

29 C.F.R. § 825.114(a) ..................................................................................................36

29 C.F.R. § 825.114(a)(2)(i) ..........................................................................................37

29 C.F.R. § 825.114(a)(2)(iii) ........................................................................................37

29 C.F.R. § 825.114(a)(2)(iv) ........................................................................................37

29 C.F.R. § 825.114(a)(2)(v) .........................................................................................37

29 C.F.R. § 825.114(c) ..................................................................................................37

29 C.F.R. § 825.115 .......................................................................................................36

29 C.F.R. § 825.117 ................................................................................................. 39-40

29 C.F.R. § 825.306 .......................................................................................................40

29 C.F.R. § 825.306(b)(1) .............................................................................................40

29 C.F.R. § 825.306(b)(2)(i) ................................................................................... 37-38, 40

29 C.F.R. § 825.306(b)(2)(ii) .........................................................................................40

29 C.F.R. § 825.306(b)(3) .............................................................................................41

29 C.F.R. § 1630.2(h)(2) ...............................................................................................27

29 C.F.R. § 1630.2(i) .....................................................................................................27

29 C.F.R. § 1630.2(j)(2) ................................................................................................27

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................................21

Fed. R. Civ. P. 26(a)......................................................................................................47

Fed. R. Civ. P. 26(a)(2)(A)............................................................................................46

Fed. R. Civ. P. 26(a)(2)(B)............................................................................................46

Fed. R. Civ. P. 26(e)(1).................................................................................................47

Fed. R. Civ. P. 26(e)(2).................................................................................................47

Fed. R. Civ. P. 37(c)(1).................................................................................................47

Fed. R. Civ. P. 56(c)......................................................................................................20

Local Rule 104(10).........................................................................................................46

**Maryland Codes**

MD. ANN. CODE § 49A (1957) ..................................................................................2, 43

MD. ANN. CODE § 49B (1957) .........................................................................43-44, 48

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PHYLLIS M. DETTMER          *

       Plaintiff            *

       v.                  *

CONSTELLATION POWER SOURCE     *        Civil Action No. MJG02-2595
GENERATION, INC.
                              *

       Defendant

\*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF
CONSTELLATION POWER SOURCE GENERATION, INC.'S
MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

### I.      STATEMENT OF THE CASE

Phyllis Dettmer filed a nine count Complaint against Constellation Power Source Generation, Inc. ("CPSG") alleging the following: Count One – violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12112(a), alleging Plaintiff is and was a qualified individual with a disability and CPSG terminated Plaintiff's employment due to her disability; Count Two – violation of the ADA, 42 U.S.C.A. § 12112(b) alleging CPSG terminated Plaintiff without providing her with a reasonable accommodation; Count Three – violation of the ADA, 42 U.S.C.A. § 12111(b), alleging CPSG participated in a contractual or other relationship that had the effect of subjecting Plaintiff to prohibited discrimination on the basis of disability; Count Four – alleging age discrimination in CPSG's decision to discharge Plaintiff in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.A. § 623(a)(1); Count Five – violation of 29 U.S.C.A. § 2612 alleging Plaintiff sought and was denied her rights under the Family and Medical Leave Act; Count Six – violation of Md. Ann. Code, Article 49A §

14 alleging CPSG terminated Plaintiff's employment due to a disability; Count Seven – violation of Md. Ann. Code, Article 49A, § 14 alleging CPSG terminated Plaintiff's employment due to her bisexuality; Count Eight – violation of Md. Ann. Code, Article 49A, § 14 alleging CPSG terminated Plaintiff's employment due to her age; and Count Nine – Breach of Contract.

Phyllis Dettmer previously filed a complaint against CPSG alleging ADA violations with the Equal Employment Opportunity Office ("EEOC") and Human Relations Office of Anne Arundel County on September 10, 2001. (Ex. 1, EEOC Complaint; Ex. 1-A, Anne Arundel County Complaint). A Right to Sue Letter was issued by the EEOC on May 9, 2002. (Ex. 2, Right to Sue Letter). Plaintiff filed suit on August 7, 2002. CPSG timely filed its Answer to Plaintiff's Complaint. On October 1, 2002, this Court entered a Scheduling Order and subsequently, the parties initiated and conducted discovery pursuant to that Order. The discovery deadline was February 13, 2003 and with the exception of certain expert issues, discovery has been concluded.

## II.   FACTS

On December 15, 1980, Phyllis Dettmer began her employment with CPSG's predecessor Baltimore Gas and Electric Company. (Ex. 3, Plaintiff's Depo., p. 9). She was terminated by CPSG on February 1, 2001. (Ex. 3, Plaintiff's Depo., p. 9). At the time of her termination, Plaintiff was employed as a Senior Administrative Assistant in Procurement Services at the company's Fort Smallwood Road Complex. (Ex. 3, Plaintiff's Depo., p. 16; Ex. 4, Lingner Depo., p. 6). Her department was responsible for procurement, materials management and warehousing for the power plants. (Ex., 4, Lingner Depo., p. 6). The Human Resources Department generally defined the essential functions of the job of Senior Administrative Assistant in an official job summary. (Ex. 5, Job Summary). With respect to the task of senior administrative assistant in the area of procurement services, Ms. Dettmer stated that her job

2

responsibilities included performing general office duties when requested by the assistant buyers.  (Ex. 3, Plaintiff's Depo., p. 17).  Her "main duty" involved supplying the power plants with what they needed to keep them up and running effectively by sending out requisitions and purchase orders to vendors for pricing and availability of stock materials.   (Ex. 3, Plaintiff's Depo., p. 18).   Plaintiff was also responsible for the preparation of a report every morning to be given to the purchasing assistant noting specific items that needed to be replaced in the warehouse.  (Ex. 3, Plaintiff's Depo., p. 44).  These items were required for the operation of the power plants.  (Ex. 3, Plaintiff's Depo., p. 44).  Plaintiff's supervisor required that Plaintiff run the report every morning.  (Ex. 3, Plaintiff's Depo., p. 45).

CPSG regarded prompt reporting as an essential function of Plaintiff's job.  (Ex. 4, Lingner Depo., p. 49).  The company provides essential services to the public 24 hours a day, 7 days a week, year round, and in order to do so, the company needs capable and dependable employees; therefore, it has performance standards which must be met by all employees.   (Ex. 6, Employee Handbook, B-23). Plaintiff and her department supported the operation of the power plants, whose field personnel work a shift from 6 a.m. to 6 p.m.  (Ex. 4, Lingner Depo., p. 50).  The field people in the plant are maintenance personnel who require parts and materials to make repairs to the power plants that generate electricity. (Ex. 4, Lingner Depo., p. 50).  The warehouse is open to those plant personnel from 6:30 a.m. to 3:30 p.m.  (Ex. 4, Lingner Depo., p. 50).  The majority of warehousemen reported for the job by 7:00 a.m. (Ex. 4, Lingner Depo., p. 50).  As senior administrative assistant, Plaintiff supported other employees in the unit.  (Ex. 4, Lingner Depo., p. 50).  If Plaintiff was late or absent, those employees had to obtain help from other means or do the job themselves.  (Ex. 4, Lingner Depo., p. 50).

Each department in the company establishes its own work schedule to provide the work force required for its efficient operation.  (Ex. 6, Employee Handbook, D-123).  Management sets the essential

3

functions of the job and establishes start and stop times and flexibility. (Ex. 7, Douglas Wernecke Depo., p. 26). Where operating conditions permit, a supervisor may establish a flexible work schedule ("flextime"). (Ex. 6, Employee Handbook, p. D-125). Some employees in Plaintiff's department had flextime but not all did. (Ex. 4, Lingner Depo., p. 23).

In mid-1999, Plaintiff had flexible hours. (Ex. 3, Plaintiff's Depo., p. 20). She testified that she had never been given specific report times prior to mid-1999. (Ex. 3, Plaintiff's Depo., p. 20). Before coming to Fort Smallwood, Plaintiff previously worked at the company's Rutherford Business Center. (Ex. 3, Plaintiff's Depo., p. 17). Plaintiff worked there in the purchasing and warehousing area since approximately 1982. (Ex. 3, Plaintiff's Depo., pp. 11-13). She had been arriving to work anytime from 6:00 a.m. to 9:30 a.m. and occasionally would arrive to work at 10:00 a.m. (Ex. 3, Plaintiff's Depo., p. 20). After her arrival, she would work a full eight-hour day. (Ex. 3, Plaintiff's Depo., p. 20). CPSG Director of Procurement Services JoAnn Lingner testified that at the Fort Smallwood facility there was flexibility in the starting time for work, but that, in contrast to the Rutherford Business Center, the hours for reporting were between 6:30 a.m. and 8:00 a.m. (Ex. 4, Lingner Depo., pp. 23-24). The 8:00 a.m. starting time was due to the operating conditions and the hours of operation of the warehouse and power plants. (Ex. 4, Lingner Depo., p. 50). There was also a safety concern about Plaintiff working late in the warehouse at the end of her shift. (Ex. 4, Lingner Depo., p. 51). Workplace safety is and always has been a top priority at the company. (Ex. 6, Employee Handbook, p. F-1). The warehouse was an unsecured building and was basically unattended after 3:30 or 4:00 p.m. (Ex. 4, Lingner Depo., p. 51). Management believed that from a safety standpoint, it was not safe to have an individual alone in the warehouse on a regular basis. (Ex. 4, Lingner Depo., p. 51). If nothing else, someone could fall or have a health problem and nobody would know. (Ex. 4, Lingner Depo., p. 51). Plaintiff was aware of

4

management's safety concerns and admitted she would come in late, make up her time at the end of the day and was alone at times. (Ex. 3, Plaintiff's Depo., p. 93).

The Procurement Services flextime policy had never been put in writing but had verbally been in place. (Ex. 4, Lingner Depo., p. 25). A written notice was sent to formalize the verbal policy so that everyone had a clear understanding of the requirements. (Ex. 4, Lingner Depo., p. 25). In January 2000, Plaintiff's work leader Michael Oneferu-Bey issued the following e-mail:

> To members of the warehouse team working flexible schedules, please be advised that because of operating conditions, it is my expectation that your work start times be no later than eight (8) am. This will provide the proper support needed to maintain the highest customer service level and back up for team members. Exceptions will be allowed on an as needed basis upon approval. Your cooperation will be greatly appreciated.

(Ex. 8, E-mail from Michael Oneferu-Bey, 1/6/00; Ex. 4, Lingner Depo., p. 25).

Plaintiff had also been verbally advised of the 8:00 a.m. start time by her work leader before the e-mail was issued. (Ex. 3, Plaintiff's Depo., p. 22).

After the issuance of the written notice on January 6, 2000, Plaintiff did not always report to work by 8:00 a.m. (Ex. 3, Plaintiff's Depo., p. 24; Ex. 4, Lingner Depo., p. 32). After the January 6, 2000 notice, Plaintiff was reprimanded for being late on the following dates: 1/11/00, 1/14/00, 1/18/00, 1/20/00, 1/21/00, 1/26/00, 2/2/00, 2/3/00, 2/7/00, 2/8/00, 2/9/00, 2/10/00, 2/15/00, 2/17/00, 2/23/00, 2/25/00, 2/29/00, 3/2/00, 3/6/00, 3/7/00, 3/10/00, 3/14/00, 3/16/00, 3/29/00, 6/7/00, 8/7/00, 9/11/00, 10/31/00, 11/6/00, 12/6/00, 1/10/01, 1/11/01, 1/30/01. (Ex. 11, CPSG Answer to Interrogatory No. 14). Plaintiff does not dispute that she was late on any of these dates with one exception. (Ex. 3, Plaintiff's Depo., p. 45). Additional latenesses that were not the subject of any reprimand are shown on Plaintiff's personal calendar. (Ex. 10, Plaintiff's Calendar excerpts, pp. 33-39).

5

Also recorded after January 6, 2000 are the following absences by Plaintiff (and reasons therefor): 1/10/00 (RX[1]); 1/12/00 (vacation - 2 hrs.); 1/13/00 (vacation); 1/25/00 (time off storm policy - 5 hrs.); 1/26/00 (time off storm policy - 1.25 hrs.); 1/27/00 (sick); 1/28/00 (sick); 2/1/00 (vacation); 2/4/00 (RX); 2/9/00 (vacation - 2 hrs.); 2/11/00 (vacation); 3/3/00 (vacation); 3/7/00 (RX - 4.75 hrs.); 3/17/00 (vacation - 2 hrs.); 4/3/00 (suspended); 4/4/00 (suspended); 4/5/00 (suspended); 4/6/00 (vacation); 4/7/00 (vacation); 4/10/00 (vacation); 4/21/00 (vacation - 2 hrs.); 4/27/00 (RX - 2 hrs.); 5/8/00 (sick); 5/9/00 (sick); 5/10/00 (sick); 5/11/00 (sick); 5/19/00 (sick base partial tour - 1 hr.); 5/19/00 (vacation - .5 hrs.); 5/22/00 (RX); 5/25/00 (vacation - 1 hr.); 5/26/00 (vacation); 5/29/00 (holiday); 6/2/00 (vacation - 1.5 hrs.); 6/9/00 (suspended); 6/12/00 (suspended); 6/13/00 (suspended); 6/19/00 (RX); 6/21/00 (sick); 6/22/00 (sick); 6/30/00 (vacation); 7/4/00 (holiday); 7/5/00 (RX); 7/6/00 (vacation); 7/10/00 (vacation); 7/11/00 (vacation); 7/12/00 (vacation); 7/13/00 (vacation); 7/14/00 (vacation); 7/26/00 (RX); 8/10/00 (sick); 8/11/00 (sick); 8/18/00 (vacation - 4.5 hrs.); 9/5/00 (sick); 9/15/00 (vacation - .5 hrs.); 9/18/00 (vacation); 9/19/00 (vacation); 9/20/00 (vacation); 9/21/00 (vacation); 9/22/00 (vacation); 9/29/00 (vacation - 2 hrs.); 10/6/00 (sick base partial tour - 4.5 hrs.); 10/23/00 (sick); 10/24/00 (sick); 10/27/00 (vacation - 2 hrs.); 11/23/00 (holiday); 11/24/00 (holiday); 11/29/00 (vacation - 1 hr.); 11/30/00 (sick); 12/1/00 (vacation - 1 hr.); 12/8/00 (vacation - 2 hrs.); 12/22/00 (holiday); 12/25/00 (holiday); 12/26/00 (sick); 1/1/01 (holiday); 1/2/01 (vacation - 1.5 hrs.); 1/3/01 (vacation - 2 hrs.); 1/5/01 (sick); 1/24/01 (vacation - 2 hrs.); 1/26/01 (vacation - 2.5 hrs.). (Ex. 11, CPSG Answer to Interrogatory No. 14). Plaintiff would take vacation time to make up for some latenesses. (Ex. 3, Plaintiff's Depo., p. 79).

---

[1] RX time is personal time off without pay. (Ex. 3, Plaintiff's Depo., p. 80).

Plaintiff's arrival times were documented in the company's TES system, an electronic time entry system where each employee records their stop/start times in a database. (Ex. 3, Plaintiff's Depo., pp. 25-26). Additionally, Plaintiff created a separate document that tracked her latenesses and absences. (Ex. 9, In-Out Record). Plaintiff also documented some of her latenesses in her personal calendar. (Ex. 3, Plaintiff's Depo., pp. 25, 30). While the reasons for the latenesses are not documented in the TES system, Plaintiff documented some of those reasons in her personal calendar. (Ex. 3, Plaintiff's Depo., pp. 25, 30). Some reasons shown in the calendar for Plaintiff's latenesses included traffic, accidents, weather, family illness, pet illness, plumbing problems and car trouble. (Ex. 3, Plaintiff's Depo., pp. 92-93, 105; Ex. 12, Corrective Action Report 11/3/00; Ex. 10, Plaintiff's Calendar excerpts, pp. 40-62). A frequent explanation for Plaintiff's attendance problems surrounded traffic problems on her commute to work. (Ex. 10, Plaintiff's Calendar excerpts, pp. 40-57). There are at least eleven incidents reported in the calendar relating to traffic problems. (Ex. 10, Plaintiff's Calendar excerpts, pp. 40-57). For example, Plaintiff wrote the following regarding a lateness on October 31, 2000:

> Was late arriving to work; due to "traffic" took 1½ hrs to get to work. Found there was large debris in the middle of highway along with glass by Interstate 95. Called Arthur at approx. 7:40 to let him know that I would be arriving late & that it was beyond my control.

(Ex. 10, Plaintiff's Calendar excerpt, p. 55).

Plaintiff reported to her psychologist that she had been late because of traffic and weather. (Ex. 19, Dr. Haller Depo., pp. 82-83). Plaintiff reported to her physician that she worked a fair distance from work and had to be on the beltway and that the direction she went was frequently backed up. (Ex. 20, Dr. Commerford Depo., p. 14). Her physician testified that this was "part of the problem." (Ex. 20, Dr. Commerford Depo., p. 14). Plaintiff's commute to work from her home in Reisterstown was down Interstate 795 to Interstate 695 to Exit One, Fort Smallwood Road and she said that it was not unusual to

7

see heavy traffic on that road.  (Ex. 3, Plaintiff's Depo., p. 92).  She had a 32-mile commute to work at

Fort Smallwood, but previously had a 12-mile commute to the Rutherford Business Center, where she

enjoyed her flexible hours of arrival until 9:30 a.m. or 10:00 a.m.  (Ex. 3, Plaintiff's Depo., p. 105).

CPSG's lateness/absence policy is documented in the company handbook.  (Ex. 4, Lingner

Depo., p. 52).  It states in part:

> Your job and performance at work are important to the successful operation of the
> company.  The company depends on your contribution to achieve its mission and goals.
> As a result, you must report to work each scheduled day, on time.  Your supervisor is
> responsible for monitoring your performance and for taking appropriate corrective action
> (as described in this section) when you fail to report as scheduled.

(Ex. 6, Employee Handbook, p. G-1).

Plaintiff acknowledged receipt of the handbook when she was first hired.  (Ex. 30, Plaintiff's

Answer to Interrogatory No. 20).  At that time, Plaintiff signed a notice advising her of the following:

- Additionally, as an employee of this Company you must clearly understand that there is
always a possibility that you may be required to work other than the stated days or hours
of your assigned job.  Work at different hours or on different days may be occasional or
over extended periods or there may even be a change to a different regular schedule.

- You have been employed by the Baltimore Gas and Electric Company to do a specific job
– a job you cannot perform if you are not present, for whatever reason.  It is therefore
essential that your absences and latenesses be kept to a minimum, and be closely
observed by your supervisors.

- A pattern of excessive absenteeism or lateness can interfere with the performance of your
duties, inconvenience your fellow employees, and make it more difficult for the Company
to perform its necessary activities.  If such a pattern should develop, appropriate action
(such as time off without pay or even termination of employment) may be taken against
any employee.

- The requirements of you as an employee as described above result from the nature of our
business.  We are a public utility company providing essential services to the public 24
hours a day, 7 days a week throughout the year.

(Ex. 21, Notice to be signed by all new company employees, 12/12/80).

After January 6, 2000, Plaintiff was repeatedly reprimanded for her failure to arrive at work by 8:00 a.m. (Ex. 3, Plaintiff's Depo., p. 26). The discipline is documented in Corrective Action Reports. (Exhibits 12 - 18, Corrective Action Reports). When each Corrective Action Report was issued, Plaintiff would meet and discuss it with her work leader and supervisor. (Ex. 3, Plaintiff's Depo., pp. 27, 30). With regard to her attendance, Plaintiff received seven Corrective Action Reports, and as a result was placed on probation three times, suspended without pay twice, received a reduction in pay and was ultimately terminated. (Ex. 3, Plaintiff's Depo., pp. 42-43).

Plaintiff was first reprimanded on March 20, 2000 for violating the lateness policy and being late on January 11, 14, 18, 20, 21, 26, February 2, 3, 7, 8, 9, 10, 15, 17, 23, 25, 29, and March 2, 6, 7, 10, 14 and 16. (Ex. 3, Plaintiff's Depo., pp. 28-29). At that time, a Corrective Action Report was administered. (Ex. 3, Plaintiff's Depo., p. 28; Ex. 13, 3/20/00 Corrective Action Report). Plaintiff does not dispute that she was late on those dates. (Ex. 3, Plaintiff's Depo., p. 30). She does not recall the precise reasons for those latenesses. (Ex. 3, Plaintiff's Depo., p. 30). At that time, Plaintiff was given a formal warning and put on probation effective March 27, 2000. (Ex. 3, Plaintiff's Depo., p. 31). Plaintiff knew that the company's expectation was that she should have no further latenesses and must arrive by 8:00 a.m. daily afterward. (Ex. 3, Plaintiff's Depo., p. 31).

Plaintiff was next reprimanded ten days later on March 30, 2000 for a lateness on March 29, 2000 and was administered a second Corrective Action Report. (Ex. 3, Plaintiff's Depo., p. 32; Ex. 14, Corrective Action Report, 3/30/00). She was given another formal warning, suspended without pay for three days and warned that disciplinary action may be taken if her latenesses did not improve, up to and including discharge. (Ex. 3, Plaintiff's Depo., pp. 32-33; Ex. 14, Corrective Action Report, 3/30/00).

9

Plaintiff was next reprimanded on June 7, 2000 when she received a third Corrective Action Report for a lateness on June 7, 2000. (Ex. 3, Plaintiff's Depo., pp. 33-35; Ex. 15, Corrective Action Report, 6/7/00). She was given another formal warning, her probation was extended for an additional three months and she received an additional three-day suspension. (Ex. 3, Plaintiff's Depo., pp. 33-35; Ex. 15, Corrective Action Report, 6/7/00). She was warned that if she did not improve her lateness record, the next corrective action would be a reduction in pay or discharge. (Ex. 15, Corrective Action Report, 6/7/00).

Plaintiff was next reprimanded on August 7, 2000 when she received a fourth Corrective Action Report for a lateness on August 7, 2000. (Ex. 3, Plaintiff's Depo., pp. 36-38; Ex. 16, Corrective Action Report, 8/7/00). She received a formal warning, was put on an additional six months of probation and her salary was reduced. (Ex. 3, Plaintiff's Depo., pp. 36-38; Ex. 16, Corrective Action Report, 8/7/00). She was warned that if the latenesses did not improve, the next Corrective Action Report would result in a further reduction in pay or discharge. (Ex. 3, Plaintiff's Depo., pp. 36-38; Ex. 16, Corrective Action Report, 8/7/00).

Plaintiff received a fifth Corrective Action Report on September 11, 2000. (Ex. 17, Corrective Action Report, 9/11/00). The report notes her attendance record for the period of 1/10/00 – 9/7/00 as including 32 days late, 11 sick days, 7 partial vacation days, 7 call-in vacation days, 2 partial RX days, 6 call-in RX days, 6 days of suspension and 8 scheduled vacation days. (Ex. 17, Corrective Action Report, 9/11/00). Plaintiff received a formal warning at that time.

Plaintiff was next reprimanded on November 3, 2000 when she received a sixth Corrective Action Report. (Ex. 3, Plaintiff's Depo., pp. 39-41; Ex. 12, Corrective Action Report, 11/3/00). The report indicates that:

Phyllis continues to demonstrate her unreliability. On 10/31/00 and 11/6/00 Phyllis again failed to report to her assigned work location (FS Warehouse) by 8:00 a.m. On 10/31/00 she arrived late for work at 8:23 a.m. and on 11/6/00 she arrived at 8:12 a.m. This is the latest in a series of thirty-four (34) separate occasions on which Phyllis has failed to arrive to work in a timely manner.

Phyllis indicated that the reason for her late arrival at work on 10/31/00 was that she had been stuck in traffic for more than an hour. Only fifteen (15) minutes before she was to report to work, at 7:45 am, Phyllis called into Arthur Johnson, acting work leader on 10/31/00. Her 11/6/00 lateness was also due to traffic.

(Ex. 12, Corrective Action Report ,11/3/00).

She was given a formal warning, put on an additional six months of probation and her salary was reduced. (Ex. 3, Plaintiff's Depo., pp. 39-41; Ex. 12, Corrective Action Report, 11/3/00). She was warned that if the latenesses did not improve, the next Corrective Action Report would result in a further reduction in pay or discharge. (Ex. 3, Plaintiff's Depo., pp. 39-41; Ex. 12, Corrective Action Report, 11/3/00). After this Corrective Action Report was administered, Plaintiff was late on 11/6/00, 12/6/00, 1/10/01, 1/11/01, and 1/30/01. (Ex. 11, CPSG Answer to Interrogatory No. 14). Her final lateness on 1/30/01 was due to the fact that she was twenty minutes late for work because the rain caused the commute take 1½ hours. (Ex. 19, Depo. of Dr. Haller, p. 98; Ex. 24, Dr. Haller notes, 1/31/01).

Plaintiff was terminated effective February 1, 2001. (Ex. 18, Corrective Action Report, 1/30/01). The official reason for her termination is documented as unreliable and unpredictable attendance despite being given multiple warnings and two grace periods. (Ex. 18, Corrective Action Report, 1/30/01). The report states:

Regular and reliable attendance is an essential job function. Phyllis continues to demonstrate unacceptable behavior in the areas of reliability and dependability. Phyllis' lack of regular and predicable attendance prevents her from meeting an essential job function.

(Ex. 18, Corrective Action Report, 1/30/01).

When she was first reprimanded in March 2000, Plaintiff informed her supervision that she had a problem with depression.  (Ex. 3, Plaintiff's Depo., p. 46).  Plaintiff had also spoken to company psychologist Dr. Ray Mosko.  Plaintiff's physician Dr. Christine Commerford, her psychologist Dr. Robin Haller, and an independent psychiatrist Dr. Philip Dvoskin also notified the company in writing of Plaintiff's depression.  (Ex. 3, Plaintiff's Depo., p. 49; Ex. 25, Commerford letter to Ms. Williams, 8/21/00; Ex. 32, Haller letter, 8/22/00; Ex. 33, Commerford letter to Dr. Rhodes, 12/18/00; Ex. 26, Haller letter to Dr. Rhodes, 12/8/00; Ex. 27, Dvoskin Psychiatric Evaluation, 12/6/00).

Plaintiff was first diagnosed with depression in May 1999.  (Ex. 20, Dr. Commerford Depo., p. 8).  Her treatment consisted of regular visits with Dr. Mosko, Dr. Commerford and Dr. Haller along with the use of various antidepressant medications.  (Ex. 3, Plaintiff's Depo., pp. 73-76).  She was never hospitalized on an inpatient basis for her depression.  (Ex. 20, Dr. Commerford Depo., p. 46).  While Plaintiff claims she took time off work due to her depression, she does not recall when.  (Ex. 3, Plaintiff's Depo., pp. 78-79).  She would on occasion take the whole day off.  (Ex. 3, Plaintiff's Depo., p. 79).  She does not recall if she took off more than one day in a row, but does not think she took off consecutive days because of depression.  (Ex. 3, Plaintiff's Depo., p. 79).

Her own physician testified that Plaintiff was not disabled in the sense that she was unable to function in any circumstance.  "She was not that bad."  (Ex. 20, Dr. Commerford Depo., p. 40).  "She was not unable to wash or do activities of daily living.  She was able to do those."  (Ex. 20, Dr. Commerford Depo., p. 40).  Her own psychologist believes Plaintiff had some degree of control over her tardiness.  (Ex. 19, Dr. Haller Depo., p. 92).  Plaintiff had good days and bad days and there were times she was able to get to work on time.  (Ex. 19, Dr. Haller Depo., pp. 79, 86, 95; Ex. 20, Dr. Commerford Depo., p. 45).  For example, in September 2000, Plaintiff reported she was doing "ok" and that she was

able to get up in the morning; at that time, Dr. Haller thought that Plaintiff was capable of being at work by 8:00 a.m. (Ex. 19, Dr. Haller Depo., pp. 71, 76, 80, 82).

Plaintiff asserts her depression caused her to be late or absent from work because "it took every bit of energy I had just to get out of bed every day." (Ex. 3, Plaintiff's Depo., p. 61). Her symptoms included irritability, forgetfulness, lack of concentration and focus, fatigue, overeating, not participating in activities and clenching her jaw. (Ex. 20, Dr. Commerford Depo., p. 9). The major life activities that Ms. Dettmer claims she could not perform are as follows:

> I became so depressed that I lost all desire to get out of bed for anyone or anything. As a result of this condition I virtually gave up all general outside contacts with anyone. I also gave up all outside activities and hobbies. I ceased any socialization with any other human, including my family. When I was at home from work I would go to bed and sleep, sometime skipping meals. I would spend all time when not at work in bed: weekends, evenings, and all other time. Sleep was the only time that I was relieved from my depression.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 11).

Objective evidence has been produced with respect to Plaintiff's activities of daily living. Plaintiff sang in the Sweet Adelines barbershop chorus for over 20 years. (Ex. 3, Plaintiff's Depo., p. 100; Ex. 19, Dr. Haller Depo., p. 27). The group met on a fairly regular basis and was a large group that practiced every week and performed. (Ex. 3, Plaintiff's Depo., p. 100; Ex. 19, Dr. Haller Depo., pp. 27-28; Ex. 10, Plaintiff's Calendar excerpts, pp. 63-93). Plaintiff traveled to Florida for ten days with the singing group for a competition in September 2000. (Ex. 19, Dr. Haller Depo., p. 80; Ex. 10, Plaintiff's Calendar excerpts, pp. 17-18). She also traveled with the group to Pennsylvania. (Ex. 3, Plaintiff's Depo., p. 105). She went on vacation to Ocean City and Deep Creek Lake. (Ex. 3, Plaintiff's Depo., p. 105; Ex. 10, Plaintiff's Calendar excerpts, pp. 17, 94-95, 126). She went out with friends for dinner and attended celebratory events. (Ex. 19, Dr. Haller Depo., p. 91; Ex. 10, Plaintiff's Calendar excerpts, pp.

96-111).  She went to a New Years party and was with her family at Christmas.  (Ex. 19, Dr. Haller Depo., p. 96; Ex. 10, Calendar excerpts).  She participated in company-sponsored events like mentoring in an elementary school.  (Ex. 3, Plaintiff's Depo., pp. 102-103).  Her personal calendar documents that Plaintiff regularly had hair appointments, nail appointments, dental and doctor visits, as well as shopping trips, attending family events, even appearing as a witness at a trial.  (Ex. 10, Plaintiff's Calendar excerpts, pp. 27-32, 96-97, 112-125, 127-128).  It has not been alleged that she could not perform the life activities of caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  (Ex. 30, Plaintiff's Answer to Interrogatory No. 11).

Plaintiff's depression was not precipitated by any deaths or major life events.  (Ex. 20, Dr. Commerford Depo., p. 44).  Plaintiff was involved in a troubling lesbian relationship and had financial problems.  (Ex. 3, Plaintiff's Depo., p. 94).  Plaintiff lived at home with her parents where her family life was getting more difficult as her parents aged due to their increasing physical disabilities and a greater need to care for them.  (Ex. 19, Dr. Haller Depo., pp. 40-41).  Plaintiff reported to her psychologist that she was bored with her work.  (Ex. 3, Plaintiff's Depo., p. 95; Ex. 19, Dr. Haller Depo., p. 86).  She did not want to be an administrative assistant anymore and deal with paperwork or supervision.  (Ex. 19, Dr. Haller Depo., p. 101).

Once she arrived at work, Plaintiff was able to perform her job adequately.  She was described by her director as "a pleasant individual who came to work to do her job.  She had a good work product although there were issues regarding the timeliness of her delivery.  The quality of the end product, the way she handled herself on the phone and with people, her general demeanor were all good."  (Ex. 4, Lingner Depo., p. 36).  Plaintiff reported to her  psychologist that her work performance was considered adequate and testified that the depression did not prevent her from performing the general functions of

her job.  (Ex. 19, Dr. Haller Depo., p. 107; Ex. 3, Plaintiff's Depo., p. 61).  Her job was clerical;  she can type, use the computer and is versed in office software.  (Ex. 3, Plaintiff's Depo., pp. 61-62).  Her psychologist believed that Plaintiff was capable of performing most jobs and Plaintiff thought herself capable of working outside CPSG.  (Ex. 19, Dr. Haller Depo., p. 74).  Toward the end of her tenure at CPSG, Plaintiff worked two jobs.  She took a part time job at PetSmart working evenings and weekends 12-15 hours per week and did not think that was too taxing.  (Ex. 19, Dr. Haller Depo., p. 90; Ex. 3, Plaintiff's Depo., p. 85).  Plaintiff has held a number of jobs since her termination, including a water treatment salesperson, a temp for AICPA, a cashier at Giant, as well as the PetSmart job.  (Ex. 3, Plaintiff's Depo., pp. 80-85).  Since August 2002, she has been working full-time as a support staff specialist at Holy Cross Hospital, where she performs clerical tasks for nurses.  (Ex. 3, Plaintiff's Depo., pp. 63-64).

Plaintiff requested an accommodation from CPSG for her depression but does not recall when. (Ex. 3, Plaintiff's Depo., p. 53).  She asked her supervision for time while she was trying to get some control over her depression and requested an accommodation to allow her up to 9:30 a.m. or even an extra ½ hour to report.  (Ex. 3, Plaintiff's Depo., p. 55).  She requested intermittent FMLA leave on December 7, 2002 in an e-mail, stating that "I am formally requesting intermittent FMLA while I continue treatment for major depression.  Although there has been improvement due to medication changes and continued therapy, I have a very long way to go [...] Again, I am requesting intermittent FMLA while diligently working to improve my health."  (Ex. 3, Plaintiff's Depo., pp. 54, 64-65; Ex. 28, E-mail from Plaintiff, 12/7/00).  Plaintiff defines her request as essentially an accommodation for a late arrival in the morning. (Ex. 3, Plaintiff's Depo., p. 56).  She was not asking for days off or months off or anything of that nature.  (Ex. 3, Plaintiff's Depo., p. 56).  When making her FMLA request, she did not

state specifically how late she wanted to come in or give a specific time frame to get control over her depression. (Ex. 3, Plaintiff's Depo., p. 57). Her physician sought flexibility in her hours so that instead of having to be at work real early if she could get in at an hour more likely for her to reach, but did not recall what hour that would be. (Ex. 20, Dr. Commerford Depo., p. 31).

The supporting documentation provided by her doctors consists of several letters verifying Plaintiff's depression. The first was sent on August 21, 2000 by Dr. Commerford and with respect to a timeline for accommodation, Dr. Commerford stated, "[w]e may not be able to reach full therapeutic benefit for 2 to 3 months." (Ex. 20, Dr. Commerford Depo., p. 29; Ex. 25, Commerford letter to Ms. Williams, 8/21/00). On August 22, 2000, Dr. Haller sent a notice which attributes Ms. Dettmer's tardiness to her psychological condition rather than to voluntary behavior. (Ex. 32, Dr. Haller letter, 8/22/00). Dr. Haller's letter of December 8, 2000 asked that Ms. Dettmer not be penalized for her lateness. (Ex. 26, Dr. Haller letter to Dr. Rhodes, 12/8/00). Dr. Commerford's letter of December 18, 2000 asked CPSG's help in "seeking accommodations" for Ms. Dettmer. (Ex. 23, Dr. Commerford letter to Dr. Rhodes, 12/18/00).

During the period August 7, 2000 through October 9, 2000, Plaintiff was given an accommodation where her latenesses were recorded but no disciplinary action would be taken. (Ex. 17, Corrective Action Report, 9/11/00; Ex. 4, Lingner Depo., p. 48; Ex. 22, Letter of Dr. Mosko; Ex. 3, Plaintiff's Depo., p. 86). On August 31, 2000, Dr. Ray Mosko sent a letter to Dr. Christine Commerford informing her that:

> Based partially on the information presented in your recent note, we will continue to accommodate Ms. Dettmer's illness through the month of September. As you may or may not know we have made numerous accommodations and continue to do so as I write this note. Although it is clearly a business necessity for her to be at her job by 6:30-7 a.m. [of which she has been informed both informally and formally on many occasions]

16

her department on an interim basis has allowed her to come in at 8 a.m.  Despite the latter, she has been chronically late.  They do not feel that they can continue to allow her to come in to work after 8 o'clock, e.g., there have been approximately 80 plus incidents where she has not come to work as required since the beginning of this year.

(Ex. 22, 8/31/00 letter from Dr. Mosko).

A second grace period was later approved to include the period December 6, 2000 through January 2, 2001 to allow Plaintiff a final opportunity to improve her attendance.  (Ex. 17, Corrective Action Report, 9/11/00; Ex. 18, Corrective Action Report 1/30/01).  Plaintiff was also given some leeway in her arrival time when changing medications.  (Ex. 3, Plaintiff's Depo., p. 86).

CPSG's Medical Department, headed by Dr. Sheila Rhodes, questioned but did not disagree with the diagnosis of depression.  (Ex. 29, Dr. Rhodes Depo., pp. 25, 31).  She denied Plaintiff's FMLA request on the ground that FMLA pertains to persons with serious medical conditions who are incapacitated or unable to work.  (Ex. 29, Dr. Rhodes Depo., p. 34).  Although Dr. Rhodes was not totally convinced Plaintiff's lateness was due to depression she continued to give her the benefit of the doubt.  (Ex. 29, Dr. Rhodes Depo., p. 31).  She questioned whether the latenesses were related to the depression because Plaintiff was late for a variety of reasons, had proven she could get to work on time, and was late regardless of her medication.  (Ex. 29, Dr. Rhodes Depo., p. 38).  Plaintiff had been given a long time to work on her condition, well over one year before she was terminated. (Ex. 29, Dr. Rhodes Depo., p. 39).  Even Plaintiff's doctors admitted that with appropriate treatment and time, most people with depression can be helped.  (Ex. 19, Dr. Haller Depo., p. 103; Ex. 20, Dr. Commerford Depo., p. 44).  Depression is an illness that can be nondebilitating and some depression is less severe than others. (Ex. 20, Dr. Commerford Depo., pp. 42-43).  Ordinarily when Plaintiff's physician gives a patient a course of medicines for depression, she hopes for a total resolution of the disease.  (Ex. 20, Dr. Commerford Depo., p. 25).  This can take a week, sometimes months because of adjusting medications.

(Ex. 20, Dr. Commerford Depo., p. 25).  Plaintiff's physician predicts changes in depressive symptoms

with medication in three to six weeks.  (Ex. 20, Dr. Commerford Depo., p. 25).

When asked to state the factual basis for her claim that CPSG violated the Age Discrimination in

Employment Act, Plaintiff responded:

> The company had been downsizing for years and I was unable to avail myself of any early
> out program.  However, I was an employee of 20 years duration, a female and over 40
> years of age.  It is my belief that my dismissal was in part motivated by the company's
> desire to get rid of persons with my seniority and age.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 9).

No CPSG representative told her she was fired due to her age and she has no written evidence

that she was terminated because of her age.  (Ex. 3, Plaintiff's Depo., p. 98).  Ms. Dettmer was 43 years

old at the time of her termination.  (Ex. 3, Plaintiff's Depo., p. 9).

When asked to what extent CPSG was aware of her bisexuality, Plaintiff responded:

> I started seeing Ray Masko (sic) of the company medical office in January 2000.  As
> part of my sessions with him I advised him of my sexual orientation and how that
> played a part in my depression.  I later learned that he was telling my immediate
> supervisor about the matters we discussed.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 19).

Plaintiff thinks Dr. Mosko divulged information to JoAnn Lingner because he had several

conversations with Mrs. Lingner without her permission.  (Ex. 3, Plaintiff's Depo., p. 96).  However, Dr.

Mosko never told Plaintiff he broke this confidence.  (Ex. 3, Plaintiff's Depo., p. 97).  Neither Mrs.

Lingner nor Mr. Snyder told Plaintiff Dr. Mosko divulged this information.  (Ex. 3, Plaintiff's Depo., p.

97).  Plaintiff has no written evidence indicating that anyone except Dr. Mosko was aware of her

sexuality and nobody told her that information was disclosed.  (Ex. 3, Plaintiff's Depo., p. 97).  JoAnn

Lingner did not learn Plaintiff was bisexual until after Plaintiff's Complaint was filed in this Court.  (Ex.

4, Lingner Depo., pp. 46-47, 53).  The only discussion Mrs. Lingner recalls with Dr. Mosko was one

occasion when she was discussing Plaintiff's situation with Human Relations' representatives and Dr.

Mosko showed up. (Ex. 4, Lingner Depo., pp. 46-47). Mrs. Lingner asked him if there was any reason

why the Corrective Action Report should not be issued and he said "no." That was the extent of the

discussion. (Ex. 4, Lingner Depo., pp. 46-47).

> As the basis for her breach of contract claim, Plaintiff stated:
>
> When I was hired I was given an Employee Handbook which detailed the conditions associated with working for BG&E. I am advised that this forms a term of employment which has been recognized by law as requiring certain steps when dealing with an employee.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 20).

> Plaintiff was an at-will employee. The Employee Handbook provides:
>
> This handbook is not an employment contract. It is not intended to be, and may not in any way be, considered as an employment contract. The terms of this handbook may be changed at any time by the company without notice. The employment relationship may be ended at any time, by you or the company.

(Ex. 6, Employee Handbook, p. B-32).

## III.    A.  SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Thus a grant of summary judgment is appropriate where a two-fold test is met. The movant for summary

judgment must (1) clearly demonstrate the absence of any genuine issue of material fact, and, (2)

demonstrate that it is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 106 S. Ct. 2505, 91 L.Ed.2d. 202 (1986).

A material fact, as identified by the substantive law, is one "that might affect the outcome of the

suit ...." *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*. The non-

moving party "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Likewise, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

To survive a motion for summary judgment, the non-moving party cannot solely rely upon his pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* Accordingly, where "a party ... fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial," summary judgment is mandated. *Id.,* 477 U.S. at 322.

## B.  FAILURE TO STATE A CAUSE OF ACTION

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47; Comet Enters. Ltd. v. Air-A-Plane Corp., 128 F.3d 855, 860 (4th Cir.1997). "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 998, 152 L.Ed.2d 1 (2002), *quoting* Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L.Ed.2d 59 (1984).

In reviewing the complaint, the court accepts all well-pled allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. Ibarra v. United States, 120 F.3d 472, 473 (4th Cir.1997). The court must disregard the contrary allegations of the opposing party. A.S. Abell Co. v. Chell, 412 F.2d 712, 715 (4th Cir.1969). The court need not, however, accept unsupported legal conclusions, Revene v. Charles County Comm'rs, 882 F.2d 870, 873 (4th Cir.1989), legal conclusions couched as factual allegations, Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986), or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir.1979).

## IV.    ARGUMENT

**A.    PLAINTIFF IS NOT ENTITLED TO ADA PROTECTION BECAUSE SHE IS NOT A "QUALIFIED INDIVIDUAL" WITH A "DISABILITY," HAS FAILED TO PROVE HER LATENESSES AND ABSENCES WERE CAUSED BY A QUALIFYING DISABILITY, AND HAS NOT SHOWN THAT CPSG'S REASON FOR TERMINATING HER WAS PRETEXTUAL.**

To establish a claim for discriminatory discharge under the ADA, Plaintiff must show that she was disabled under the ADA, that she was fired, that when she was fired she was performing her job at a level that met her employer's reasonable expectations, and that the circumstances of her firing permit a reasonable inference of unlawful discrimination. Ennis v. National Association of Bus. & Educ. Radio, Inc., 53 F. 3d 55, 58 (4th Cir. 1995). Claims of discrimination under the ADA are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L.Ed. 2d 668, 93 S. Ct. 1817 (1973). Under this framework, a plaintiff is required to establish a prima facie case, which creates a rebuttable presumption of discrimination. To refute this presumption, the employer must come forward with a legitimate, nondiscriminatory reason for the discharge. Then the

21

burden shifts back to the employee to prove that the employer's proffered reason is pretextual.  Bailey v. Amsted Inds. Inc., 172 F.3d 1041 (8th Cir. 1999).

Discrimination under the ADA can occur when there is a failure to make a reasonable accommodation to an otherwise qualified individual with a disability.  42 U.S.C. § 12112(b)(5).  Only individuals who are "qualified" may state a discrimination claim.  42 U.S.C. § 12112(a).  The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  The employee bears the burden of establishing his ability to perform the essential functions of his position with reasonable accommodation.  Champ v. Baltimore County, 884 F. Supp. 991, 995 (D. Md. 1995).  Attendance is considered an essential function of the job.  Tyndall v. National Educ. Centers Inc. of California, 31 F.3d 209 (4th Cir., 1994). Discrimination under the ADA is not established if the disability caused unacceptable job performance and if the consequences of the handicap are such that the employee is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing is solely by reason of the handicap.  Adams v. Rochester General Hospital, 977 F. Supp. 226 (W.D.N.Y. 1997).

i.    **MS. DETTMER IS NOT A "QUALIFIED INDIVIDUAL" UNDER THE ADA BECAUSE SHE DID NOT SATISFY THE REQUISITES FOR THE JOB OR PERFORM THE ESSENTIAL FUNCTIONS OF THE JOB DUE TO HER CONSISTENT TARDINESS AND ABSENCES.**

It is undisputed that Ms. Dettmer was late for work and absent on many occasions.  One of the job requirements of the Plaintiff's position was reliable consistent attendance.  The existence and importance of this requirement were made clear to Plaintiff on many occasions.  Plaintiff came to work

late numerous times, and therefore failed to satisfy an essential requirement of her position.  Ms. Dettmer's repeated latenesses and absences disqualify her from ADA protection.

In Tyndall, *supra*, 31 F.3d 209, the court held that an employee who cannot meet the attendance requirements of the job at issue is not a "qualified" individual protected by the ADA.  Tyndall suffered from lupus and her continued and frequent absences from work began to disrupt the operations of her employer.  When Tyndall requested time off, NEC refused and encouraged her to resign her position.  The court reviewed Tyndall's work record in reference to her ability to perform the essential functions of her employment position:

> Tyndall contends that she was qualified for her job because she could perform all of her teaching duties and received "excellent" and "good" performance evaluations at Kee.  We agree, and NEC does not dispute, that the quality of Tyndall's performance when she was working was more than adequate.  However, an evaluation of the quality of Tyndall's performance does not end our inquiry.  In addition to possessing the skills necessary to perform the job in question, **an employee must be willing and able to demonstrate these skills by coming to work on a regular basis.**  Except in the unusual case where an employee can effectively perform all work-related duties at home, **an employee "who does not come to work cannot perform *any* of his job functions, essential or otherwise."** (Citations omitted.)  Therefore, a regular and reliable level of attendance is a necessary element of most jobs.

Tyndall, 31 F.3d at 213 (emphasis added).

The Fourth Circuit concluded that because Tyndall's attendance problems rendered her unable to fulfill the essential functions of her job, she was not a "qualified individual with a disability" as required by §12112(a) of the ADA.  Tyndall, 31 F.3d at 214.

The underlying rationale of the Tyndall case has been applied in other ADA cases where depression has been the employee's explanation for attendance problems.  Where a policy of regular attendance is necessary to the efficient operation of a business, excessive absenteeism caused by depression will not be protected by the ADA.  Bailey v. Amsted Inds. Inc., 172 F.3d 1041 (8th Cir.

1999). An employee with depression who does not come to work cannot perform the essential functions of his job. Corder v. Lucent Technologies Inc., 162 F.3d 924 (7th Cir. 1998). Reliable and regular attendance is a necessary element of most jobs and an employee who is unable to come to work on a regular basis due to depression is unable to satisfy any of the functions of the job in question, much less the essential ones. Greer v. Emerson Electric Co., 185 F.3d 917 (8th Cir. 1999). The ADA does not protect persons who have erratic, unexplained absences even when those absences are the result of depression. Brookins v. Indianapolis Power & Light Co., 90 F. Supp. 2d 993 (S.D. In. 2000). An employer has no obligation to tolerate and accommodate frequent and unpredictable absences from work due to depression. Santiago v. Temple Univ., 739 F. Supp. 974 (E.D. Pa. 1990). This is true even in a case where the employee, when present, is an effective worker who otherwise satisfies the job requirements. Walders v. Garrett, 765 F. Supp. 303 (E.D. Va. 1991). Even latenesses of less than one-half hour are not excusable. Alderdice v. American Healthholding Inc., 118 F. Supp. 2d 856 (S.D. Oh. 2000). An essential element of any job is an ability to appear for work and complete assigned tasks. Gazda v. Pioneer Chlor Alkali Co., 10 F. Supp. 2d 656 (S.D. Tx. 1997). Tardiness and poor work history are legitimate non-discriminatory reasons for termination. Alderdice, *supra,* 118 F. Supp. 2d 856. *See also*, Rocky v. Columbia Lawnwood Regional Medical Center, 54 F. Supp. 2d 1159 (S.D. Fl. 1999); Stiefel v. Allied Domecq Spirits & Wine, 184 F. Supp. 2d 886 (W.D. Ark. 2002).

At least one court has addressed the issue squarely before this court and held that the inability to get to work on time disqualifies an employee from ADA relief and an employer is not required to have a flexible schedule as an accommodation. In Guice-Mills v. Derwinski, 967 F.2d 794 (2nd Cir. 1992), plaintiff held the position of head nurse at a hospital. For various reasons the head nurses needed to work a shift beginning at 7:30 a.m. or 8:00 a.m. and this was an essential requirement of the position.

Plaintiff suffered from a variety of maladies including depression. She took extended leaves of absence and was under the care of physicians prescribing medication. She found it nearly impossible to get out of bed in the morning and usually arrived for her 8:00 a.m. shift after 10:00 a.m. Her supervisors repeatedly instructed her to arrive by 8:00 a.m. but she regularly failed to do so. She requested that she be allowed to start at 10:00 a.m. and submitted a letter from her doctor supporting the request. She was denied the request and eventually took a disability retirement. The court held that the plaintiff's inability to begin her shift at 8:00 a.m. made her "not otherwise qualified" for the position.

Similarly, Ms. Dettmer was unable to consistently arrive to work by 8:00 a.m. She was late on the days documented, regularly took time off from work and was not considered a reliable employee. It was essential for her to be present at the workplace on a regular basis by 8:00 a.m. due to the operating conditions of the workplace. The lateness and absence policy was well-documented and well-known to Plaintiff, and the necessity for prompt attendance was conveyed to her again and again through extensive disciplinary procedures. She failed to meet her employer's job requirements. Her good work performance while present on the job does not mitigate her lateness, nor does her ability to perform her job on a schedule unacceptable to her employer. Plaintiff was terminated for failure to abide by the company's attendance policy, and failure to attend work on a reliable basis is a legitimate, non-discriminatory reason for termination. Therefore, because of her tardiness and absenteeism and her inability to perform one of the essential functions of her job as senior administrative assistant, Ms. Dettmer is not qualified for relief under the ADA.

**ii.    MS. DETTMER IS NOT A QUALIFIED INDIVIDUAL WITH A "DISABILITY" WITHIN THE MEANING OF THE ADA BECAUSE SHE DOES NOT HAVE A MENTAL IMPAIRMENT THAT SUBSTANTIALLY LIMITS A MAJOR LIFE ACTIVITY.**

Even if Plaintiff was a qualified individual, having physical limitations is by no means dispositive of the issue of whether she would be regarded as disabled for purposes of the ADA.  The ADA does not cover all impaired individuals, only those whose impairments are substantially limiting their lives.  Petty v. Freightliner Corp., 122 F. Supp. 2d 666 (W.D.N.C. 2000); 42 U.S.C. § 12102(2).

The phrase "substantially limits" sets a threshold that excludes minor impairments from coverage under the ADA, EEOC v. Sara Lee Corp., 237 F.3d, 349, 352, and suggests impairments that are considerable or specified to a large degree.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 144 L. Ed. 450, 119 S. Ct. 2139 (1999).  To be substantially limited, an individual must have an impairment that prevents or severely restricts an individual from doing activities that are of central importance to most people's daily lives.  Toyota Motor Mfg. Ky. Inc. v. Williams, 151 L.Ed.2d 615, 122 S. Ct. 681, 534 U.S. 184 (2002).  Life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(i).  A plaintiff's significant restriction in a major life activity must be "compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(2).  Factors considered in determining whether an individual is substantially limited in a major life activity include:  (i) the nature and severity of the impairment; (ii) the duration of the impairment; and (iii)  the permanent or long term impact resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).  A "mental impairment" is defined as any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities.  29 C.F.R. § 1630.2(h)(2).  Depression may qualify as a mental impairment.  Alderdice, supra, 118 F. Supp. 2d 856.  However, intermittent episodic impairments such as isolated bouts of depression are not considered

disabilities. Ogborn v. United Food and Commercial Workers Union Local 881, 305 F.3d 763 (7th Cir. 2002).

If working is the major life activity substantially impaired, the Plaintiff must allege she is unable to work in a broad class of jobs. Sutton, *supra*, 527 U.S. at 491. One must be precluded from more than one type of job, a specialized job, or a particular job of choice. *Id.*, 527 U.S. at 491-492. The ADA requires that a plaintiff produce evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs. Duncan v. Washington Metropolitan Area Transit Authority, 240 F.3d, 1110, 1115-1116 (D.C. Cir. 2001).

It is undisputed that Plaintiff is unimpaired in her ability to work in a broad class of jobs. The record shows that she is capable of performing and continues to perform clerical jobs. She held jobs since her termination and is currently employed on a full-time basis. Her physicians thought her capable of gainful employment, and when Plaintiff did show up for work, she was able to perform her job adequately. There was a period where she simultaneously held down two jobs. When compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity, Plaintiff is not substantially limited in the life activity of working.

A number of cases have examined the relationship between depression and the limitations it placed on an individual's life activities other than working, and found no ADA protection where there was no evidence of substantial limitation. Courts have been careful to distinguish impairments which merely affect major life activities from those that substantially limit them and have held that an impairment which merely causes a negative impact is not sufficient to allow an inference of substantial limitation. Cooper v. Olin Corp., 246 F.3d 1083 (8th Cir. 2001). *See also,* Nweke v. Prudential Ins. Co., 25 F. Supp. 2d 203 (S.D.N.Y. 1998). For example, in Cash v. Smith, 231 F. 3d 1301 (11th Cir. 2000), a

plaintiff suffering from depression walked, swam, fished and held a 40-hour a week job for eight years. Much like Ms. Dettmer, the Plaintiff in <u>Cooper</u>, *supra*, 246 F.3d 1083, claimed that during an episode of depression she did the minimum necessary for survival and that her depression resulted in a general lack of energy and profound fatigue. She contended she was substantially limited in the life activity of social interaction and generally avoided speaking to anyone on the phone or socially. Evidence was presented that she was married twice, had regular contact with family members, visited and chatted with friends, and lived alone on a 20-acre plot in a rural area where she had up to nine horses and ten dogs at one time which she tended by herself. In <u>Brookins</u>, *supra*, 90 F. Supp. 2d 993, the plaintiff claimed he was unable to work, to sleep, to pay bills or to otherwise care for himself. However, a physician testified that plaintiff's depression was not such that it was limiting his major life activities, at least in terms of getting back to work. In <u>Nweke</u>, *supra*, 25 F. Supp. 2d 203, Plaintiff's depression that caused periodic limitation on the ability to care for herself was not a substantial limitation when she was still able to get dressed, groomed and get to work. In <u>Soileau v. Guilford of Maine</u>, 928 F. Supp. 37 (D. Me. 1996), plaintiff claimed his depression limited his ability to interact with other people and his ability to work. He claimed he could not visit his favorite pub, shopping centers, or perform his employment-related duties in crowds. The court found that while his contentions may be true, the fact that his disorder caused him to alter his lifestyle did not bring him under the umbrella of the ADA's major life activity requirement. Neither his inability to visit his favorite pub, shop for food at crowded times, nor his inability to get along with his girlfriend implicated a major life activity. *See also*, <u>Schneiker v. Fortis Ins. Co.</u>, 200 F.3d 1055 (7th Cir. 2000); <u>Polderman v. Northwest Airlines</u>, 40 F. Supp. 2d 456 (N.D. Oh. 1999).

Against this backdrop of federal law, the Court must examine Ms. Dettmer's complaints.  It has not been alleged that she could not perform the life activities of caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  The major life activities that Ms. Dettmer claims she cannot perform are as follows:

> I became so depressed that I lost all desire to get out of bed for anyone or anything.  As a result of this condition I virtually gave up all general outside contacts with anyone.  I also gave up all outside activities and hobbies.  I ceased any socialization with any other human, including my family.  When I was at home from work I would go to bed and sleep, sometime skipping meals.  I would spend all time when not at work in bed: weekends, evenings, and all other time.  Sleep was the only time that I was relieved from my depression.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 11).

Other than this bare allegation, the record is overflowing with evidence that Plaintiff was able to perform all her major life activities.  A plaintiff may not rely on merely conclusory assertions or personal opinion to defeat a motion for summary judgment.  Corder v. Lucent Technologies Inc., 162 F.3d 924 (7th Cir. 1998); Gazda v. Pioneer Chlor Alkali Co., 10 F. Supp. 2d 656 (S.D. Tx. 1997).  The evidence shows that Plaintiff held a full time job for over twenty years.  At one point, she held down two jobs.  While her attendance and reliability did not meet CPSG standards, she still came to work.  Plaintiff sang in the Sweet Adelines singing group for over 20 years, meeting with them on a fairly regular basis.  Plaintiff traveled to Florida for ten days and to Pennsylvania with the singing group.  She vacationed in Ocean City and Deep Creek Lake.  She went out with friends for dinner and attended celebratory events.  She went to a New Years party and was with her family at Christmas.  She participated in company-sponsored events like mentoring in an elementary school.  Plaintiff regularly had hair appointments, nail appointments, dental and doctor visits, as well as shopping trips, family events, and appeared as a witness at a trial.  Like the flight attendant in Polderman, supra, 40 F. Supp. 2d 456, 462, who claimed

disability because "it was real difficult to be able to go into an airline and put on lipstick and a happy face and be cute to the passengers," Ms. Dettmer has no objective evidence other than her own personal opinion that her major life activities were substantially affected. Even her physician says she could perform the activities of daily living and was not that bad.

Furthermore, Plaintiff cannot claim that her depression was the cause of all of her absences and latenesses. Absences that are not attributable to a serious health condition are not entitled to protection, and an employee is not protected against disciplinary action based upon such absences. Stiefel, *supra*, 184 F. Supp. 2d 886; Bailey, *supra*, 172 F.3d 1041; Greer, *supra*, 185 F.3d 917. There is substantial evidence to indicate that at least some of the latenesses and absences were caused by other problems.

She has a 32-mile commute along the west side outer loop of the beltway in rush hour traffic which was frequently backed up. Her physician testified that this was "part of the problem." (Ex. 20, Dr. Commerford Depo., p. 14). Other non-medical reasons are revealed in Plaintiff's calendar. Her lateness on January 18, 2000 is described as "plumbing problems @ home (bathroom), working on it from about 6:15 a.m." (Ex. 10, Plaintiff's Calendar excerpts, p. 58). On February 4, 2000, she used RX time to care for her sick mother. (Ex. 10, Plaintiff's Calendar excerpts, p. 61). On May 19, 2000, she stopped at the doctor's office on the way to work to make an appointment. (Ex. 10, Plaintiff's Calendar excerpts, p. 30). On January 14, 2000, "there were 2 separate 3 car accidents on 695 in a.m., involving police and other emergency vehicles. Blinding sun for entire drive impeding traffic." (Ex. 10, Plaintiff's Calendar excerpts, p. 40). On August 29, 2000 the problem was "rain ... rain ... rain..." (Ex. 10, Plaintiff's Calendar excerpts, p. 51). On July 5, 2000, she had a flat tire. (Ex. 10, Plaintiff's Calendar excerpts, p. 48). On July 26, 2000, her truck overheated. (Ex. 10, Plaintiff's Calendar excerpts, p. 49).

She left work early on March 7, 2000 because her dog was sick.  (Ex. 10, Plaintiff's Calendar excerpts, p. 59).  Plaintiff cannot argue that these excuses are protected by any federal law.

Plaintiff cannot establish a prima facie case under the McDonnell Douglas burden-shifting framework as her depression is not a qualifying disability because it fails to substantially limit a major life activity.  Greer, *supra*, 85 F.3d 917.  Additionally, Plaintiff has no proof that the reason for her discharge was pretext.  A legitimate nondiscriminatory reason for discharge is violation of a policy against excessive absenteeism, a policy necessary to the employer's efficient operation.  Bailey, *supra*, 172 F.3d 1041; Alderdice, *supra*, 118 F. Supp. 2d 856; Mathews v. Giant Food, Inc., 187 F. Supp. 2d 486 (D. Md. 2002); Rocky, *supra*,  54 F. Supp. 2d 1159.  Conclusory allegations of discrimination without more are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of a legitimate, nondiscriminatory reason for its action.  *Id.* When viewed as a whole, in conjunction with the case law, the evidence is insufficient to establish that Ms. Dettmer has met her burden under the ADA.  Her latenesses prevent her from being a qualified individual.  She did not have a disability that was a substantial limitation on a major life activity.  She cannot prove that a qualifying disability was the cause of many of her latenesses and absences, nor has she proven that CPSG's reason for terminating her employment is pretext.  CPSG's Motion for Summary Judgment should be granted.

**B.    CPSG REASONABLY ACCOMMODATED MS. DETTMER BY ALLOWING FLEXIBILITY, GIVING HER TWO GRACE PERIODS, AND WAITING OVER ONE YEAR BEFORE TERMINATING HER.**

Because Ms. Dettmer has failed to prove she is a qualified individual with a disability within the ADA, the Court need not examine whether the Plaintiff was denied reasonable accommodation.  Champ, *supra*, 884 F. Supp. 991, 1000; Basith v. Cook County, 241 F.3d 919, 931 (7th Cir. 2001).  Nonetheless,

there is evidence that CPSG tried to reasonably accommodate Ms. Dettmer.  Plaintiff did have some

flexibility in her schedule.  While CPSG would have preferred that Ms. Dettmer arrive around 7:00 a.m.,

she was allowed to come in anytime between 6:30 a.m. and 8:00 a.m.  (Ex. 22, Mosko letter to Dr.

Commerford, 8/31/00).  Additionally, she was given two grace periods to improve her attendance and

not terminated until over one year after the issuance of the written notice of the arrival time policy.  An

employer does not have to provide the exact accommodation requested by the employee if it provides

some reasonable accommodation.  Petty, *supra*, 122 F. Supp. 2d 666.  CPSG was more than reasonable

in light of Plaintiff's repeated violations of express company policy.

**C.   PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION FOR AGE DISCRIMINATION UNDER 29 U.S.C. § 623 BECAUSE SHE DID NOT EXHAUST HER ADMINISTRATIVE REMEDIES AND HAS PRODUCED NO EVIDENCE TO SUPPORT HER CLAIM.**

Plaintiff alleges that CPSG was unlawfully motivated to discharge her from her position because

of her age in violation of 29 U.S.C.A. § 623(a)(1).  However, this claim must be dismissed as a matter of

law because Plaintiff did not exhaust her administrative remedies prior to bringing this civil action.

Even if she had, the claim would fail because Plaintiff has failed to produce any facts that support her

allegations.

The Age Discrimination in Employment Act, 29 U.S.C.A. § 623(a)(1), prohibits employers from

terminating an employee on the basis of the employee's age.  Congress enacted this statute in order to

"promote employment of older persons based on their ability rather than age; to prohibit arbitrary age

discrimination in employment; to help employers and workers find ways of meeting problems arising

from the impact of age on employment."  29 U.S.C.A. § 621(b).  While this statute provides aggrieved

employees with the right to file a civil action in order to seek relief, the statute expressly prohibits an

employee from doing so until 60 days after the employee has filed a charge of age discrimination with the Secretary of Labor.  29 U.S.C.A. § 626(d).  This section also provides that such charges to the Secretary of Labor must be filed within 180 days of the alleged discriminatory event.  *Id.*  In McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 131 (4th Cir. 1994), the Fourth Circuit Court of Appeals, considering a similar 180-day time requirement under the ADA, held that a claim is time-barred if the plaintiff fails to file a timely claim with the EEOC.  In Lurie v. Meserve, 214 F. Supp. 2d 546, 550 (D. Md. 2002), the court granted defendant employer summary judgment because the plaintiff employee failed to file an age discrimination notice with the EEOC within 180 days after the alleged discrimination occurred.  In this case, Plaintiff did not file any such claim with the EEOC alleging that CPSG discriminated against her on the basis of her age.  (Ex. 1, EEOC Complaint).  Therefore, because she failed to exhaust her administrative remedies prior to bringing this present civil action, this claim must be dismissed as a matter of law.

Furthermore, Plaintiff failed to produce facts that support her age discrimination claim.  In order to succeed on an ADEA claim, a plaintiff "must prove, with reasonable probability, that but for the age of the plaintiff, the adverse employment decision would not have been made."  Mitchell v. Data General Corp., 12 F.3d 1310, 1314 (4th Cir. 1993).  Plaintiff has entirely failed to present any evidence that even suggests that the reason for her termination from CPSG was her age.  When asked to state the factual basis for her claim that CPSG violated the Age Discrimination in Employment Act, Plaintiff responded:

> The company had been downsizing for years and I was unable to avail myself of any early out program.  However, I was an employee of 20 years duration, a female and over 40 years of age.  It is my belief that my dismissal was in part motivated by the company's desire to get rid of persons with my seniority and age.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 9).

No CPSG representative told her she was fired due to her age and she has no written evidence that she was terminated because of her age. (Ex. 3, Plaintiff's Depo., p. 98). Ms. Dettmer was 43 years old at the time of her termination. (Ex. 3, Plaintiff's Depo., p. 9). Furthermore, CPSG informed Plaintiff at the time of her termination that the reason for her termination was her excessive lateness and absence. (Ex. 18, Corrective Action Report, 1/30/01). In order to establish the prima facie case for age discrimination, Plaintiff must show that she "was performing at a level that met her employer's legitimate expectations." Smith v. United Refrigeration, Inc., 47 Fed. Appx. 674, 675 (4th Cir. 2002). However, Plaintiff has admitted to repeatedly violating CPSG's policy regarding late-arrival. (Ex. 3, Plaintiff's Depo., p. 24) Therefore, because of these repeated violations of legitimate CPSG policy, Plaintiff is unable to show that she was performing her duties in a satisfactory manner.

**D.    PLAINTIFF IS NOT ELIGIBLE FOR FMLA LEAVE AS HER CONDITION IS NOT WITHIN THE DEFINITIONS OF "SERIOUS HEALTH CONDITION" OR "INCAPACITY." HER REQUEST FAILS TO MEET THE FMLA NOTICE AND CERTIFICATION REQUIREMENTS, WOULD UNDULY DISRUPT THE OPERATIONS OF CPSG, AND WAS NOT DIRECTED TO FORESEEABLE LEAVE OR PLANNED MEDICAL TREATMENT.**

FMLA was designed to address the issue of inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods. Cole v. Sisters of Charity, 79 F.Supp. 2d 668 (E.D. Tx. 1999). "The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it." Olsen v. Ohio Edison Co., 979 F. Supp. 1159, 1163 (N.D. Ohio 1997). It is clear that Congressional intent was to protect workers who could not work due to a serious illness and the legislative history of the act specifically refers to conditions such as heart attacks, cancers, strokes, spinal injuries and appendicitis as falling within the

purview of a serious health condition.  <u>Bond v. Abbott Laboratories</u>, 417 F. Supp. 2d 967 (N.D. Oh. 1998).

In order to implement this Congressional intent, FMLA and supporting regulations set forth a substantial number of conditions that must be met in order to have statutory protection.  Plaintiff's depression does not meet those requirements for a myriad of reasons.  Ms. Dettmer does not have a "serious health condition" because she does not suffer from any "incapacity" as those terms are defined by the code and regulations.  Her request for intermittent FMLA was not for foreseeable leave or planned medical treatment, and her vague request to come to work at a time convenient to her would unduly disrupt the operations of CPSG.  Plaintiff wished to take her intermittent FMLA leave without providing the required notice to CPSG and the information provided by her doctors fails to meet the FMLA certification requirements as it never indicated, nor could indicate according to Plaintiff, the duration or dates of such leave.  (Ex. 3, Plaintiff's Depo., p. 57).

Under the Family and Medical Leave Act, 29 U.S.C. § 2612(a)(1), an eligible employee is entitled to twelve weeks of leave annually for certain reasons including a serious health condition that makes the employee unable to perform the functions of his position.  An employee is considered unable to perform the functions of his position if a health care provider finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the position.  29 C.F.R. § 825.115.  When certain statutory and regulatory conditions are met, leave may be taken intermittently or on a reduced leave schedule when medically necessary.  29 U.S.C § 2612(b).  The regulations define "serious health condition" as a condition that involves inpatient care or continuing treatment by a health care provider.  29 C.F.R. § 825.114(a).  The regulations set forth alternative definitions for such treatment.  Under 29 C.F.R. § 825.114(a)(2)(i), treatment includes a period of incapacity of more than

three consecutive calendar days.  Under 29 C.F.R. § 825.114(a)(2)(iii), treatment may also include any period of incapacity due to a chronic serious health condition.  Under 29 C.F.R. § 825.114(a)(2)(iv), treatment can mean a period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective.  Under 29 C.F.R. § 825.114(a)(2)(v), treatment can mean any period of absence to receive multiple treatments by a health care provider either for restorative surgery or for a condition that would result in incapacity of more than three consecutive calendar days in absence of medical intervention.

It is undisputed that Ms. Dettmer was never treated on an inpatient basis.  Thus, in order to be entitled to leave she must have continuing treatment by a health care provider that results in an incapacity.  "Incapacity" is defined as the inability to work, attend school, or perform any other regular daily activity due to the serious health condition, its treatment or recovery.  29 C.F.R. § 825.306(b)(2)(i).  Mental illness resulting from stress or allergies may be a serious health condition but only if all the conditions of the regulation are met.  29 C.F.R. § 825.114(c).  In order to succeed on her FMLA claim, Plaintiff must first demonstrate that she suffered from a period of incapacity within the meaning of the regulation because this is the threshold consideration.  Bond, *supra*, 417 F. Supp. 2d 967.  It is only where an incapacity is shown that the Court need proceed to a consideration of whether the employee received continuing treatment within the meaning of the act.  *Id.*, 417 F. Supp. 2d at 972.

The record does not demonstrate that Ms. Dettmer suffered from an incapacity as defined by the regulation.  She was able to work, just not able to arrive to work on a timely and consistent basis.  "Incapacity" is defined by the regulation as the "inability to work", not the inability to get to work on time.  29 C.F.R. § 825.306(b)(2)(i).  "The possibility that a person can work removes FMLA protection."  Cole, *supra*, 79 F.Supp. 2d 668, 672.  Nor was Ms. Dettmer absent from work for more than three

36

consecutive days as required by the code.  In fact, she should not recall being out due to depression for any consecutive string of days.

The case of <u>Bond v. Abbott Laboratories</u>, 417 F. Supp. 2d 967 (N.D. Oh. 1998) is analogous to the case at bar.  In <u>Bond</u>, plaintiff was discharged for absenteeism for which he was disciplined on many occasions.  Plaintiff received no medical authorization that he should be off work for at least four consecutive days.  The Court noted that a plaintiff who has not been an inpatient but who claims to have suffered a serious health condition under FMLA must make a two-pronged showing of both an incapacity requiring absence from work and continuing treatment.  "If a plaintiff cannot show that he or she had a condition that incapacitated him or her, the court's inquiry is over and summary judgment is appropriate."  <u>Bond</u>, 417 F. Supp. 2d at 973, *citing* <u>Murray v. Red Kap Industries, Inc.</u>, 124 F.3d 695 (5th Cir. 1997).  The Court noted that determining whether an illness qualifies as a serious health condition for purposes of the FMLA is a legal question that a plaintiff may not avoid simply by alleging it to be so.  A health care provider must authorize an employee not to work for at least four consecutive days for that employee to be considered incapacitated for the required period of time under the FMLA.

Other courts are in accord.  <u>Carter v. Rental Uniform Svc. of Culpeper Inc.</u>, 977 F.Supp. 753 (W.D. Va. 1997)(As a matter of law, an illness that incapacitates an individual for only two hours or even [two days] is not covered by the FMLA); <u>Stiefel</u>, *supra*, 184 F. Supp. 2d 886)(Plaintiff's excessive absenteeism that is not attributable to a serious health condition is not entitled to protection under the FMLA, and an employee is not protected against disciplinary action based upon such absences.  The Plaintiff's poor attendance record over the years is sufficient to justify the Defendant's decision to terminate her for employment for chronic absenteeism."); <u>Polderman</u>, *supra*, 40 F. Supp. 2d 456)(In order to show a causal relationship between the protected activity and the adverse action, Plaintiff must

demonstrate that the basis for her termination was not her excessive absences but requests for leave under FMLA).

Nor can Plaintiff's condition be considered a chronic serious health condition within the definition of the regulation.  In order to qualify for FMLA leave due to a chronic serious health condition, FMLA requires incapacity, "that is, the inability to work or perform regular daily activities" and courts have focused on the ability to work in determining whether a person is incapacitated for purposes of the FMLA.  Cole, supra, 79 F.Supp. 2d 668.  In Cole, the Court found no indication that plaintiff's stress caused her any period of incapacity and therefore she did not meet the requirements of having a chronic serious health condition and was not eligible for FMLA leave.  The Court found that evidence of stress and a day of illness did not amount to evidence that she was unable to perform the functions of her job nor prevented her from working.  Like Ms. Dettmer, Cole, by her own admissions, was able to perform her job and there was no indication that her stress caused her any period of incapacity.

Additionally, Plaintiff has not met the FMLA notice and certification requirements.  Intermittent leave or a reduced leave schedule is allowable if the conditions of 29 U.S.C. § 2612(2), 29 U.S.C. § 2612(e)(2), 29 U.S.C. § 2613(b)(5) are met and the leave is medically necessary.  29 C.F.R. § 825.117. Leave is medically necessary when there is a medical need for the leave (as distinguished from voluntary treatment) and it must be that the medical need is best accommodated through intermittent leave.  29 C.F.R. § 825.117.  Leaving aside the issue of whether Ms. Dettmer's treatment was voluntary, in order for leave to be medically necessary, the certification requirements of 29 C.F.R. § 825.306 must be met. The employee must attempt to schedule leave so as not to disrupt the employer's operations.  29 C.F.R. § 825.117.

When leave is foreseeable based on planned medical treatment, the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the operations of the employer. 29 U.S.C. § 2612(e)(2). The dates on which treatment is expected to be given and the duration of treatment must be certified. 29 U.S.C. § 2613(b)(5). The certification must state when the serious health condition commenced, its probable duration and be accompanied by appropriate supporting medical facts. 29 C.F.R. § 2613(b)(1).

The certification requirements of 29 C.F.R. § 825.306 may be met by completing Department of Labor Form WH-380[2] (Ex. 31, Form WH-380) or some statement with the information required by the form. The information includes identification of the serious health condition alleged (as defined by 29 C.F.R. § 825.114) and the medical facts including a statement of how the facts meet the regulatory criteria. 29 C.F.R. § 825.306(b)(1). Certification must include the approximate date the serious health condition commenced, the probable duration of the serious health condition including the probable duration of the present incapacity. 29 C.F.R. § 825.306(b)(2)(i). The certification must designate whether the employee seeks intermittent leave or a reduced leave schedule and the probable duration of such a schedule. 29 C.F.R. § 825.306(b)(2)(ii). The certification must include the estimated number of treatments, the interval between the treatments, the actual or estimated dates of treatment if known, the period required for recovery if any, and a general description of the regimen of continued treatment. 29 C.F.R. § 825.306(b)(3).

A review of the documentation provided in support of Ms. Dettmer's request and comparison to Labor Form WH-380 demonstrates that the notice and certification requirements of the statute have not been met in this case. (See Ex. 25, Commerford letter to Ms. Williams, 8/21/00; Ex. 32, Haller letter,

8/22/00; Ex. 33, Commerford letter to Dr. Rhodes, 12/18/00; Ex. 26, Haller letter to Dr. Rhodes, 12/8/00; Ex. 27, Dvoskin Psychiatric Evaluation, 12/6/00).  At no time do Dr. Haller or Dr. Commerford set out which 29 C.F.R. § 825.114 serious health condition is claimed by Plaintiff, nor have they set forth medical facts showing how the facts meet the regulatory criteria.  The letters do not show the probable duration of the depression, with the exception that on August 21, 2000, Dr. Commerford stated "[w]e may not be able to reach full therapeutic benefit for 2-3 months."  (Ex. 25, Commerford letter to Ms. Williams, 8/21/00).  That schedule obviously was not met since Plaintiff was still coming to work late as of her termination five months later in January 2001; furthermore, Plaintiff was given a grace period based on this recommendation.  (Ex. 22, Mosko letter to Dr. Commerford, 8/31/00).  There is no disclosure of the probable duration of any intermittent or reduced leave schedule, or estimate of the number of additional treatments, the interval between treatments, the actual or estimated dates of treatment or the period required for recovery.  Plaintiff was asking to be able to come in late, not for time off for planned medical treatment or foreseeable leave.  She was not asking for days off or months off or anything of that nature.  When making her FMLA request, she did not state specifically how late she wanted to come in or give a specific time frame to get control over her depression.  She believed she could not even give it a time frame.  (Ex. 3, Plaintiff's Depo., p. 57).  It is beyond dispute that Plaintiff's request was too vague and amorphous to qualify for FMLA protection.

The case of <u>Collins v. NTN Bower Corp.</u>, 272 F.3d 1006 (7th Cir. 2001) is instructive on this point.  The court found that NTN did not violate the FMLA by discharging Collins, who claimed depression and had a spotty attendance record.  Collins received twelve informal and four formal warnings for deficient attendance and was fired when she called in sick for two days.  Medical evidence

---

[2]        Defendant would ask the Court to take judicial notice of the form and its requirements.

was presented to indicate that Collins was incapacitated by depression between 10% - 20% of the time and that episodes may occur without warning.  The Court held that:

> ....if this is so then it is doubtful that the Act has much to offer Collins.  Courts have been reluctant to read the FMLA as allowing unscheduled and unpredictable, but cumulatively substantial, absences, when the Americans with Disabilities Act protects only person who over the long run are capable of working full time. [citations omitted.]  Collins is not suffering from an acute condition that will improve with time off; instead she asserts a right to take unscheduled leave at a moment's notice for the rest of her life.  This implies that she is not qualified for a position where reliable attendance is a *bona fide* requirement, and a person not protected by the ADA may be discharged.

*Id.* at p. 1007.

An employer's obligations and duties under FMLA will not be triggered where the employee does not provide adequate and timely notice to his employer of his need for, and the likely duration of sick leave.  Peeples v. Coastal Office Products, 203 F. Supp. 2d 432 (D. Md. 2002).  Peeples was a service technician who repaired computers.  He was promoted to a demanding stressful job that required longer hours.  He was diagnosed with depression and took medication.  Peeples had extended absences from work and failed to disclose the true nature of his illness to his employer.  The court found that employers are entitled to the sort of notice that will inform them not only that the FMLA may apply but also when a given employee will return to work, and that a claimant cannot win a FMLA claim without adequate and timely notice to his employer.  Other jurisdictions are in accord.  *See,* Bailey, *supra*, 172 F.3d 104)(An attempt to satisfy the notice requirements by an indication that an employee might be absent at some unforeseen time in the future satisfies neither the requirement of notice of the anticipated timing and duration of the leave nor the requirement of notice as soon as practicable if dates were initially unknown); Carter, *supra*, 977 F.Supp. 753.  (The regulations require an employee to give notice to the employer of the need for FMLA leave as soon as practicable); Rocky, *supra*, 54 F. Supp. 2d 1159.

(Plaintiff's belief that she should be absent or tardy whenever and as often as she desired fails to satisfy FMLA notice requirements).

The Court cannot countenance Plaintiff's request for "unscheduled and unpredictable, but cumulatively substantial, absences" or "unscheduled leave at a moment's notice." Collins, *supra,* 272 F.3d at 1007. Her nebulous request to come to work at a time fitting to her would unduly disrupt the operations of any employer, and CPSG has legitimate non-discriminatory reasons for mandating an 8:00 a.m. start time. Ms. Dettmer's depression does not meet the code and regulations requirements and CPSG would request that the court enter summary judgment in its favor.

**E.    THERE IS NO PRIVATE CAUSE OF ACTION UNDER MD. ANN. CODE, ART. 49B § 14.**

In Counts Six, Seven and Eight, Plaintiff alleges that CPSG terminated her because of her "disability", "sexual orientation", and "age" in violation of Article 49A of the Maryland Code. These counts must fail for several reasons.

First, Article 49A does not exist in the current Maryland Code. Plaintiff is most likely referring to Article 49B, which does exist, and does indeed concern employment discrimination. However, even if Plaintiff had brought these three counts under the appropriate article, they would still fail.

Section 14 of Article 49B of the Maryland Code, known as the Fair Employment Practices Act (FEPA), is a policy declaration by the state legislature that prohibits discrimination in employment based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, or disability." However, Plaintiff's claims under this statute must be dismissed because Article 49B § 14 does not provide a private cause of action. Carson v. Giant Food, Inc., 187 F. Supp.2d 462, 481 (D. Md. 2002). Instead, Article 49B "is a state administrative remedy that only provides for injunctive relief."

*Id.*  In order to allege a violation under this article, plaintiffs are required to file a FEPA claim with the

Maryland Commission on Human Relations and pursue the administrative remedies provided by that

commission.  Maryland Commission on Human Relations v. Downey Communications, Inc., 110 Md.

App. 493, 541 (1996).  No provision of FEPA authorizes civil lawsuits by aggrieved individuals for

claims of employment discrimination.  *Id.*  The "sole means of redress" to a plaintiff alleging a violation

of FEPA is to file a complaint with the Commission on Human Relations.  Dillon v. Great Atlantic &

Pacific Tea Co., 43 Md. App. 161, 167, 403 A.2d 406 (1979).  For these reasons, Counts Six, Seven and

Eight of Plaintiff's Complaint must be dismissed as a matter of law.  Furthermore, Plaintiff has failed to

produce sufficient evidence that her disability, age or sexual orientation were the reasons for her

discharge.

### F.    SINCE PLAINTIFF WAS AN AT-WILL EMPLOYEE, THERE CAN BE NO BREACH OF CONTRACT.

Plaintiff alleges that her termination by CPSG constituted a breach of an employment contract

between the parties.  However, Plaintiff does not assert any facts that indicate that she was employed by

CPSG under a contract for employment.  Under Maryland law, when there is no contract for employment

of a definite term, an employee is considered to be an at-will employee.  Gwinn v. Food Lion, L.L.C.,

195 F. Supp.2d 728, 703 (D. Md. 2002).  "In Maryland, at-will employment is a contract of indefinite

duration that can be terminated at the pleasure of either party at any time."  Hrehorovich v. Harbor

Hospital Center, Inc., 93 Md. App. 772, 790, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319 (1993).

An at-will employee "may maintain an action for breach of an implied employment contract if existing

general personnel policies or procedures limit the employer's discretion to terminate an employee."  *Id.*

at 793.  However, to be successful in this claim, the at-will employee must allege facts "that would

suggest the existence of either an implicit or explicit employment contract" that limit the employer's right to terminate the employment.  Gwinn, 195 F. Supp.2d at 730.  Plaintiff has not identified any personnel policies or procedures that limited the discretion of CPSG to terminate Plaintiff.  Plaintiff therefore fails to allege any facts that indicate that either an implicit or explicit employment contract exists.  Finally, Maryland courts have held that an at-will employee's "reliance on expressed personnel policies and procedures is precluded where those same policies clearly and effectively disclaimed any contractual intent."  Hrehorovich, 93 Md. App. at 794, 614 A.2d 1021, *citing* Castiglione v. Johns Hopkins Hospital, 69 Md. App. 325, 339-341, 517 A. 2d 786 (1986), *cert. denied,* 309 Md. 325 (1987).  The Employee Handbook directly addresses this issue.  "Your Employee Handbook is not an employment contract.  It is not intended to be, and may not be, considered as an employment contract.  The terms of this handbook may be changed at any time by the company without notice.  The employment relationship may be ended at any time, by you or by the company."  (Ex. 6, Employee Handbook, Introductory page).  Therefore, even if Plaintiff had alleged reliance on expressed personnel policies and procedures, that reliance would be precluded by the express language of the Employee Handbook which disavows any contractual relationship.

## G.    PLAINTIFF FAILED TO IDENTIFY EXPERTS AND HAS FAILED TO PROVE DAMAGES.

Aside from the serious substantive flaws in Plaintiff's case, two equally serious procedural flaws in Plaintiff's case would prevent the entry of judgment in Plaintiff's favor should CPSG's motion be denied.  Plaintiff has failed to identify experts and has failed to produce evidence of the value of her damages.

Plaintiff was asked in interrogatories, "For each witness identified by you in connection with the disclosures required by Fed. R. Civ. P. 26(a)(2)(A), provide a complete statement of the opinions to be expressed and the basis and reasons therefore." Plaintiff responded, "[o]n the advice of counsel I am advised that the requirements of Rule 26(a)(2)(A) were waived in this case. If this question seeks the opinion of my experts, they will be provided as required by the Order of the Court." The Court entered a Scheduling Order which provided that Plaintiff designate experts by December 2, 2002. No designation was ever filed.

Fed. R. Civ. P. 26(a)(2)(A) states that "a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Local Rule 104(10) provides that Rule 26(a)(2)(B) disclosures (the expert's written report) are not required to be provided for hybrid fact/expert witnesses such as treating physicians. Local Rule 104(10) goes on to state that a party must disclose the existence of such hybrid witnesses pursuant to Fed. R. Civ. P. 26 (a)(2)(A). Discretion is given to the trial court to determine when violations of these requirements occur and what sanctions should be applied. Mid-America Tablewares v. Mogi Trading Co., 100 F.3d 1353, 1363 (7th Cir. 1996). Fed. R. Civ. P. 37(c)(1) states: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions." The rule leaves the door open for courts to decline excluding the evidence if there was a "substantial justification" for not making the required disclosure of if the failure was "harmless."

45

Since Plaintiff has not identified any experts, the Court has the discretion to exclude any expert testimony.  Without expert testimony, Plaintiff will certainly be unable to prove that she has a medical condition that can be the subject matter of this litigation.

Plaintiff was asked in interrogatories, "[i]temize and show how you calculate any damages claimed by you in this action, whether economic, non-economic, punitive or other."  Plaintiff responded:

> The damaged (sic) claimed are not always able to be calculated to mathematical certainty. Once discharged, I had to take a lower paying job in an effort to make ends meet.  Finally, unable to meet my bills I was forced to file for personal bankruptcy which I attribute to the loss of my job.  My depression deepened and was made worst (sic) as a result of the discharge.  The problem was heightened by my inability to treat with anyone since I had no insurance coverage and no additional funds to pay for the assistance.  There is also the emotional damages done as a result of the discharge:  stress, fear of the future, embarrassment, and some harassment, all of which added to my emotional state.  When I was discharged my personal loan from my pension plan became ordinary income, adding to my tax problem.  While I was returned the pension contributions, I have lost the ability to plan on a pension from the company after 20 years of working for BG&E.

(Ex. 30, Plaintiff's Answer to Interrogatory No. 6).

Plaintiff must prove her damages with reasonable certainty and a court is not required to guess the value of damages in an employment case.  <u>Long v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.</u>, 882 F. Supp. 1553 (D. Md. 1995).  By her own admission Plaintiff cannot calculate the damages claimed by her in this action, whether economic, non-economic, punitive or other, with certainty.  Her failure to do so would preclude any recovery by her in this case should the Court allow the matter to go to a jury.

## <u>CONCLUSION</u>

The above-cited undisputed facts and case law confirm that CPSG is entitled to judgment as a matter of law as to Plaintiff's claims.  Ms. Dettmer cannot be afforded relief under the ADA because she is not a "qualified individual" due to her inability to meet the essential functions of her job.  Further, Ms.

Dettmer is not a qualified individual with a "disability" and CPSG reasonably accommodated Ms.

Dettmer.  Plaintiff cannot prove her condition caused her attendance problems or that CPSG's reason for

terminating her was pretextual.  Plaintiff's unsupported Age Discrimination claim is barred by her

failure to exhaust administrative remedies.  Plaintiff is not qualified for relief under the FMLA because

she has not proven she has a serious health condition.  She has no private cause of action under Md.

Ann. Code, Art. 49B § 14 and has failed to state a cause of action for Breach of Contract.  For these

reasons, CPSG respectfully asks that this Court grant its Motion to Dismiss and/or for Summary

Judgment.

***/s/ Barbara A. Gaughan***

Barbara A. Gaughan
Trial Bar No. 05050
17th Floor, Gas and Electric Building
P. O. Box 1475
Baltimore, Maryland  21203
410-234-6869
410-234-5840 (fax)

Attorney for Defendant,
Constellation Power Source Generation, Inc.

47

**Phyllis Dettmer v. CPSG**
**Civil Action No. MJG02-2595**
**<u>Appendix of Exhibits</u>**

Exhibit 1        EEOC Complaint

Exhibit 1A       Anne Arundel County Complaint

Exhibit 2        EEOC Right to Sue Letter

Exhibit 3        Deposition transcript of Plaintiff

Exhibit 4        Deposition excerpts of JoAnn Lingner

Exhibit 5        Job Summary

Exhibit 6        Employee Handbook excerpts

Exhibit 7        Deposition excerpts of Douglas Wernecke

Exhibit 8        E-mail from Michael Oneferu-Bey, 1/6/00

Exhibit 9        In-Out Record

Exhibit 10       Plaintiff's Calendar excerpts

Exhibit 11       CPSG Answers to Interrogatories

Exhibit 12       Corrective Action Report dated 11/3/00

Exhibit 13       Corrective Action Report dated 3/20/00

Exhibit 14       Corrective Action Report dated 3/30/00

Exhibit 15       Corrective Action Report dated 6/7/00

Exhibit 16       Corrective Action Report dated 8/7/00

Exhibit 17       Corrective Action Report dated 9/11/00

Exhibit 18       Corrective Action Report dated 1/30/01

Exhibit 19       Deposition excerpts of Dr. Robin Haller

Exhibit 20      Deposition excerpts of Dr. Christine Commerford

Exhibit 21      Notice to be signed by all employees, 12/12/80

Exhibit 22      Dr. Ray Mosko letter to Dr. Commerford dated 8/31/00

Exhibit 23      Dr. Commerford letter to Dr. Rhodes dated 12/18/00

Exhibit 24      Dr. Robin Haller's Notes

Exhibit 25      Dr. Commerford letter to Ms. Williams dated 8/21/00

Exhibit 26      Dr. Robin Haller letter to Dr. Rhodes dated 12/8/00

Exhibit 27      Dr. Philip Dvoskin Psychiatric Evaluation

Exhibit 28      E-mail from Phyllis Dettmer dated 12/7/00

Exhibit 29      Deposition excerpts of Dr. Sheila Rhodes

Exhibit 30      Plaintiff's Answers to Interrogatories

Exhibit 31      Form WH-380

Exhibit 32      Dr. Haller letter dated 8/22/0