1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3    PHYLLIS M. DETTMER,          *

4              Plaintiff,         *

5    v.                           *   Civil Action No.

     CONSTELLATION POWER              MJG02-2595

6    SOURCE GENERATION, INC.      *

7              Defendant.         *

8    *    *    *    *    *    *    *    *    *    *

9

10              DEPOSITION OF PHYLLIS M. DETTMER

11

12         The Deposition of Phyllis M. Dettmer was

13    taken on Monday, February 3, 2003, commencing at

14    10:00 a.m. at the Offices of Baltimore Gas and

15    Electric, 39 West Lexington Street, Baltimore,

16    Maryland, and was reported by Cari M. Inkenbrandt,

17    RPR, Notary Public.

18

19

20              EVANS REPORTING SERVICE

                2 North Charles Street

21              Baltimore, Maryland  21201

EXHIBIT
3

2

1  APPEARANCES:

2  BARBARA A. GAUGHAN, ESQUIRE

      Baltimore Gas and Electric Company

3      39 West Lexington Street

      17th Floor

4      Baltimore, Maryland  21201

      (410)234-6869

5          On Behalf of the Defendant

6  RALPH E. HALL, JR., ESQUIRE

      224 North Adams Street

7      Rockville, Maryland  20850

      (301)294-9340

8          On Behalf of the Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

3

1                    P R O C E E D I N G S

2                    PHYLLIS M. DETTMER

3   a witness herein, called for oral examination in

4   the matter pending, being first duly sworn to tell

5   the truth, the whole truth and nothing but the

6   truth testified as follows:

7                    EXAMINATION

8          BY MS. GAUGHAN:

9      Q    Can you state your name and address for

10  the record, please.

11     A    It's Phyllis Marie Dettmer.  My address

12  is 108 Cherry Valley Road, Reisterstown, Maryland

13  21136.

14     Q    Ms. Dettmer, my name is Barbara Gaughan.

15  I'm the attorney for Constellation Power Source

16  Generation in the case that you brought against

17  them for discrimination.  I'm here today to take

18  your deposition.

19              Have you ever had your deposition taken

20  before?

21     A    No.

4

1      Q    Let me explain to you the process we're

2   going to go through today.  I'll be asking you

3   some questions about yourself, about your

4   background, about your employment history, about

5   the dispute.  I am doing so because of the

6   litigation, not out of any personal curiosity that

7   I have, so if I offend you in any way, it is not

8   my intent to do so.  So please bear that in mind.

9           Everything we say is being taken down.

10  And you've just taken an oath to tell the truth,

11  so we're going to assume because you've done that

12  that your answers are complete and honest and

13  accurate.

14           Sometimes, though, later on you find out

15  that perhaps you misspoke or you left something

16  out or your answer was not complete in some way.

17  You cannot go back and change the record; however

18  you will be allowed to review the transcript after

19  the deposition is over, and you can correct

20  typographical errors only.  So I want to warn you

21  up front that you're going to be held to what you

5

1  say today, so you want to try as best you can to

2  be as complete and as honest as you can with your

3  answers.

4          It is not my intention to mislead you or

5  confuse you, so if you find that my questions are

6  confusing, please tell me.  I will be happy to

7  rephrase them or explain what it is I'm looking

8  for.

9      A    Okay.

10     Q    There are a couple rules that you want

11  to keep in mind because everything we say is being

12  taken down today.  I have a tendency to talk too

13  fast, and she's going to interrupt and say, "Slow

14  down," when I do that.

15          You have a voice that seems a little bit

16  on the quiet side, and she may tell you at times

17  to keep your voice up.

18          We cannot both talk at the same time

19  because she can't take that down.

20          We can't use our hands or head nods to

21  indicate an answer because she can only take down

6

1    vocalizations, words.  So if during the deposition

2    you start to nod your head or you start to use

3    your hands, I'm going to scold you and tell you

4    not to do that.  But I only do that so that our

5    record is complete.

6            As you'll see later on, it's written out

7    like a little book.  I explain to people it's a

8    lot like reading a book and then seeing the movie;

9    it doesn't exactly seem the same later on.  But we

10   want to be as complete and as clear as we can

11   today.

12           We may be here for an extended period of

13   time because there is a lot of ground to cover,

14   and it's not my intention to sit here and torture

15   you today or make this a marathon, so if at any

16   time you want to take a break, use the restroom or

17   get a refreshment or have lunch or anything like

18   that, stop me and we'll accommodate you any way we

19   can.

20       A    Okay.

21       Q    It is also not my style to take long

7

1   depositions, because I just don't enjoy doing this

2   all that much, so I will try to be as brief and to

3   the point as I can today.

4           Do you have any questions of me before

5   we start?

6       A    Not one.

7       Q    Okay.  I'm going to start off by asking

8   you just some background questions because we've

9   never met before.  I will say, I have a lot of

10  information about you, so some of the stuff I have

11  or I am asking you now may already be in the

12  records, and I'm not doing that to be redundant.

13  It's just that later on when we read the

14  deposition, it's nice to have it all in one place.

15          Let me start by asking you:  What is

16  your age today?

17      A    Forty-five.

18      Q    And your date of birth?

19      A    /18/

20      Q    And this dispute occurred, it appears,

21  over the period of time from 1999 through 2001.

8

```
1    In 1999, your age would have been?

2         A    Let's see, '99, 41 I think.

3         Q    And when you were terminated, what was

4    your age?

5         A    42 -- 43, excuse me.

6         Q    Were you born here in the Baltimore

7    area?

8         A    Yes.

9         Q    Have you lived here all your life?

10        A    Yes.

11        Q    Did you attend high school?

12        A    Yes.

13        Q    Where did you go to school?

14        A    Woodlawn Senior High.

15        Q    And did you graduate?

16        A    Yes.

17        Q    When was that?

18        A    1975.

19        Q    Did you have any education after 1975?

20        A    No.

21        Q    I was explaining to the reporter, we're
```

9

1   going to get confused today about who you worked

2   for and when you worked for the company because of

3   the changes here.   But I'm assuming you started

4   working for Baltimore Gas and Electric?

5        A     Yes, I did.

6        Q     And that was when?

7        A     December 15th of '80.

8        Q     Between 1975 and 1980, were you

9   employed?

10       A     Yes.

11       Q     What did you do?

12       A     Oh, let's see.   First I worked for

13  Morrows Nuthouse.   Then I worked for Webster's

14  Menswear in their accounting and executive

15  offices.   And from Webster's Menswear, I came to

16  Baltimore Gas and Electric Company.

17       Q     And from the period December 15, 1980,

18  through February the 1st of 2001, were you

19  employed by BGE or its --

20       A     Constellation Power Source Generation,

21  yes.

10

1      Q      Continuously throughout that period of

2  time?

3      A      Yes.

4      Q      And when you were terminated, you worked

5  for Constellation Power Source Generation,

6  correct?

7      A      Yes.

8      Q      So I don't have to keep saying that over

9  and over, can we just call that CPSG?

10     A      That's perfectly fine.

11     Q      Did you work for BGE first and then

12  CPSG?

13     A      Yes.

14     Q      When did that change occur?

15     A      You know, I honestly can't give you the

16  date.  I don't know.  Whenever the company did

17  the, actually did the changeover, which I don't

18  know if that occurred prior to -- I don't remember

19  if that occurred prior to when they tried to do

20  the merger with Pepco or not.  It was somewhere

21  around that time, I believe.

11

1        Q     If I have my dates straight, I think

2    there was a separation date when the generation

3    assets were transferred to a separate company?

4        A     Yeah, and I don't remember when that

5    was.

6        Q     I think that was July 1st of 2000, but

7    that's sound a little bit late, doesn't it?

8        A     I'm not sure.  Yeah, little bit late.

9        Q     Okay.  When you came to BGE, what was

10   your job?

11       A     I was a utility chauffeur.

12       Q     What is that?

13       A     What I did is I ran -- I was in charge

14   of the mailroom for the department that I worked

15   for, production maintenance department, and I

16   drove around to all the power plants and picked up

17   and delivered mail, ran specific requested

18   errands, delivered paychecks, would come to the

19   BGE building, have special checks run, would come

20   down to BGE building and pick up potential

21   employees for interviews, and things of that

12

1   nature.

2       Q    Before the time you came to work at BGE

3   in 1980, did you suffer any major illness or

4   injury?

5       A    No, not that I'm aware of.

6       Q    How long were you a utility chauffeur?

7       A    Offhand, I don't recall.  Maybe two

8   years.  That's a guess.

9       Q    Well, here is another rule.  Guessing is

10  fine as long as you qualify your answer.  If you

11  don't know the answer to a question, feel free to

12  say so.  We don't expect you to have a clear

13  memory of everything.

14      A    Okay.  I don't have a clear memory of

15  that.

16      Q    That's fine.  But if you can estimate,

17  you can do that as long as you tell me that you're

18  making an estimate.

19      A    Okay.

20      Q    After your job as utility chauffeur,

21  what did you do next?

13

```
 1      A      Then I took a job at Woodlawn RBC as

 2  a -- I don't know if it was called -- I don't

 3  remember the job title.  Warehouse clerk or

 4  something of that nature.

 5      Q      What were your job duties?

 6      A      My job duties was writing store orders

 7  for all materials that were received into the

 8  warehouse and typing them into the computer which

 9  would update the stock balances of items in the

10  warehouse.

11      Q      How long did you hold that job?

12      A      A long time.  I just transferred.  I

13  transferred locations.  I probably held that job

14  until sometime in the mid 90's probably, working

15  at two locations, from one location to the other.

16  I moved to the Fort Smallwood warehouse facility.

17      Q      The address that you gave us where you

18  currently reside, how long have you lived there?

19      A      Five years, almost six.

20      Q      Where did you live before that?

21      A      I lived at 2017 Gwynn Oak Avenue,
```

14

1    Baltimore, Maryland 21207.

2        Q    Now, what is your current address again,

3    Cherry Valley?

4        A    Cherry Valley Road.

5        Q    Who lives with you at Cherry Valley

6    Road?

7        A    My parents.

8        Q    And what are their names?

9        A    Gilbert and Margaret.

10        Q    How old are your parents?

11        A    My father is 72, and my mother is 68.

12        Q    During the five years that you lived at

13    Cherry Valley, did anyone else reside in the home?

14        A    No.

15        Q    How is your parents' health?

16        A    Good.

17        Q    Do they have any major illnesses?

18        A    Now?

19        Q    Now.

20        A    My father has recovered from quadruple

21    bypass surgery.  My mother has severe arthritis

15

1   which makes it difficult for her to walk at times.

2       Q    Did they have those conditions prior to

3   your termination with CPSG?

4       A    My mother did, not my father.

5       Q    Did your job title of warehouse clerk

6   change throughout that long period of time that

7   you held the job?

8       A    It did.  I don't think my title was a

9   warehouse clerk when I was at RBC.  It was a

10  warehouse clerk at the Fort Smallwood warehouse.

11      Q    Did you move back and forth between

12  those two locations during that period of time?

13      A    No.

14      Q    You worked out of RBC exclusively during

15  that period of time?

16      A    Until, well, until I moved down to the

17  Fort Smallwood warehouse.  It was basically the

18  same job, just different locations.

19            MR. HALL:  I'm sorry, could you educate

20  me on what RPC is?

21            THE WITNESS:  Rutherford Business

16

1    Center, RBC.

2              MR. HALL:  RP?

3              THE WITNESS:  RBC.

4              MS. GAUGHAN:  B, like business.

5              MR. HALL:  Thank you.

6              THE WITNESS:  I'm sorry.

7              BY MS. GAUGHAN:

8         Q    Sometime in the mid 90's, did your job

9    title change?

10        A    Well, yes.  Actually, my job -- well,

11   let me think.  Yes, it did change, but I don't

12   remember what it changed to.

13        Q    Did your job duties change at that time?

14        A    No, not really.

15        Q    Starting in mid 1999, do you know what

16   your job title was?

17        A    It was senior administrative assistant.

18             And I just remembered the name of the

19   one at RBC.  It was a receiving clerk.

20        Q    And in mid 1999, were you working

21   exclusively at the Fort Smallwood location?

17

1       A    Yes.

2       Q    Do you know when it was that you

3   transferred from RBC to Fort Smallwood on a

4   permanent basis?

5       A    No, I can't give you that date

6   specifically.

7       Q    Can you give me a time frame when that

8   might have happened?

9       A    Mid 90's.

10      Q    When that transfer occurred in the mid

11  1990's, did your job functions change?

12      A    No.

13      Q    When you transferred to Fort Smallwood

14  as a senior administrative assistant -- strike

15  that.  Let me start over.

16           As a senior administrative assistant at

17  Fort Smallwood, what were your job duties?

18      A    My job duties were to send -- do general

19  office duties per the request of the -- they

20  weren't called assistant buyers.  I don't remember

21  what their title was.  I would send out

18

1  requisitions and/or purchase orders to specified

2  vendors either for the pricing and availability of

3  or purchase of stock materials to supply the power

4  plants with what they needed to keep it up and

5  running effectively.  That was the main duty.

6        Q    In mid 1999, who was your direct

7  supervisor?

8        A    Michael Oneferu-Bey.

9        Q    Before Mr. Bey was your direct

10  supervisor, who was your direct supervisor?

11        A    I don't remember because they left.  I

12  don't remember who it was.

13        Q    Can you give me the names of any of your

14  supervision throughout your tenure at BGE other

15  than Mr. Bey?

16        A    Absolutely.  Bob Nixon, John Trabert,

17  John Grund, Selma Niemann.  I believe that's it.

18        Q    When did you --

19        A    And then Art Johnson.

20        Q    When did you work for Bob Nixon?

21        A    Probably the early 90's.

19

```
1       Q    And that would have been at RBC?

2       A    That would have been at Fort Smallwood.

3       Q    When did you work for John Trabert?

4       A    I worked for John Trabert in the early

5   90's.

6       Q    At what location?

7       A    Fort Smallwood.

8       Q    When did you work for John Grund?

9       A    John Grund, I worked for him in the

10  80's.

11      Q    At what location?

12      A    RBC.

13      Q    When did you work for Selma Niemann?

14      A    '80 to probably '82 or so.

15      Q    At what location?

16      A    Fort Smallwood Complex.

17      Q    When did you work for Art Johnson?

18      A    Art Johnson, I worked in 2000, a portion

19  of.  It was only a very short period of time, as

20  in probably several months.

21      Q    And that was at Fort Smallwood?
```

20

1    A    Yes.

2    Q    In mid 1999, when were you a senior

3 administrative assistant at Fort Smallwood, what

4 were your hours?

5    A    My hours in 1999?

6    Q    Mid 1999.

7    A    Mid 1999, I still, to the best of my

8 knowledge, still had flexible hours.  I had never

9 actually been given, prior to that, specific

10 barriers of time.

11    Q    When you say flexible hours, what range

12 are we talking about?

13    A    Probably anywhere from 6:00 to 9:30.

14 Occasionally, occasionally, very rarely, 10:00,

15 and that was a rarity.

16    Q    And after you arrived, you were expected

17 to put an eight-hour day in?

18    A    Yes.

19    Q    You were full-time employed?

20    A    Yes.

21    Q    Did there come a time when that flexible

21

1  scheduled changed?

2      A    Yes.

3      Q    When was that?

4      A    That was January of 2000.

5      Q    And how were you informed of that

6  change?

7      A    An e-mail.

8      Q    Is this the e-mail?

9      A    Uh-huh.

10     Q    You have to say yes or no.

11     A    I apologize.  Yes, that is the e-mail.

12          MS. GAUGHAN:  We're going to mark this

13  as Exhibit No. 1.

14          (Dettmer Deposition Exhibit No. 1 marked.)

15          BY MS. GAUGHAN:

16     Q    The e-mail you received was from your --

17  what's his title, Michael Bey?  Should we call him

18  work leader or supervisor?

19     A    He was a work leader.

20     Q    You received it from your work leader

21  Michael Bey, correct?

22

1       A       I think so.    I have to look at it again.

2               Yes.

3       Q       And you received that on January 6,

4       2000, correct?

5       A       Yes.

6       Q       And at that time you were told that

7       because of operating conditions you would be

8       expected to arrive at work no later than

9       8:00 a.m., correct?

10      A       Yes.

11      Q       Do you know what operating conditions

12      the e-mail refers to?

13      A       No.

14      Q       Prior to January 6, 2000, were you given

15      any indication from your supervision that your

16      flexible hours would no longer be acceptable?

17      A       Yes.

18      Q       What indication?

19      A       Michael Bey had had a conversation with

20      me in that regard that they would probably change.

21      Q       When was that?

23

```
 1     A    I don't recall.

 2     Q    Prior to January 6 of 2000, were you

 3  given any reprimand, either verbal or in writing,

 4  about your working hours?

 5     A    Any reprimands, not that I recall.

 6     Q    Were you given any warnings?

 7     A    Not that I recall.

 8     Q    Did anyone tell you that the hours you

 9  were keeping were not acceptable prior to

10  January 6, 2000?

11     A    Not that I recall.

12     Q    Are you married?

13     A    No.

14     Q    Any children?

15     A    No.

16     Q    Are you on any medications today?

17     A    Yes.

18     Q    What medications?

19     A    Effexor XR.

20     Q    Effexor?

21     A    Effexor XR.
```

24

1     Q     Anything else?

2     A     No.

3     Q     Does that medication interfere in any

4  way with your ability to testify here today

5  truthfully and completely?

6     A     It does not.

7     Q     Have you suffered any major event in

8  your personal or professional life recently that

9  would affect your ability to testify completely

10  and accurately today?

11     A     No.

12     Q     After January 6 of 2000, did you report

13  to work no later than 8:00 a.m. daily?

14     A     Run that by me again, please.

15     Q     After January 6 of 2000, did you always

16  report to work by 8:00 a.m. as you were directed

17  to do?

18     A     No, I did not.

19     Q     Do you have an independent recollection

20  of the days on which you did not report to work by

21  8:00 a.m.?

25

```
1      A    No, I don't.

2      Q    Did you document that in any way?

3      A    Yes.

4      Q    In what ways did you document them?

5      A    I had a Daytimer -- a Franklin Quest

6   calendar, and I would always write in there the

7   times that I arrived and the times that I left.

8      Q    How did you report your time to your

9   employer?

10     A    Say if I arrived at 8:03 to work, I

11  would write 8:15, because we would always have to

12  do at least a quarter hour.  So it would show on

13  the record that I reported to work at 8:15 when in

14  actuality I may have gotten there at 8:03.  But

15  that was the way we were required to enter our

16  time.

17     Q    I guess my question was a little

18  confusing.  How did you enter your time?  What

19  system did you use, what process?

20     A    I'm sorry.  TES.

21     Q    And can you explain what TES is?
```

26

1      A      It's an electronic time entry system

2   which each employee was to record their start and

3   stop time on each day or any holiday that was

4   taken or vacation, RX time, things of that nature.

5      Q      And that was done by you personally,

6   correct?

7      A      Yes.

8      Q      And that's done by entering data onto a

9   database, right?

10     A      Correct.

11     Q      And throughout the period of time from

12  mid 1999 until the date of your termination, is

13  TES the system that you used for entering time?

14     A      Yes.

15     Q      And when you entered your time in TES,

16  did you always do so honestly and accurately?

17     A      Yes.

18     Q      Did there come a time when you were

19  reprimanded for your failure to report to work by

20  8:00 a.m. after January of 2000?

21     A      Yes.

27

1      Q    And when was that?

2      A    I can't give you the date specifically.

3  I don't know them.

4      Q    How were you reprimanded?

5      A    I had several meetings with my

6  supervisor and my work leader, and I received

7  corrective actions.

8      Q    Who was your supervisor?

9      A    Joann Lingner.

10      (Dettmer Deposition Exhibit No. 2 marked.)

11          BY MS. GAUGHAN:

12      Q    We've just marked a document as Exhibit

13  No. 2.  Can you identify what that is for me?

14      A    This is a corrective action --

15      Q    Can you --

16      A    -- for lateness.

17      Q    Can you define what a corrective action

18  is?

19      A    Well, what it is is a document that

20  spells out what the supposed problem is, and then

21  it also puts on there what you need to do to

28

1    correct it, correct the problem.  And then it will

2    also state on there any disciplinary actions that

3    may be taking place.

4        Q    Exhibit 2 is dated March 20 of 2000.  Do

5    you recall receiving this corrective action that

6    we've marked as Exhibit 2?

7        A    Yes, I do.

8        Q    And this corrective action states that

9    on December -- in December 1999, you were verbally

10   requested due to operating conditions to report to

11   work by 8:00 a.m. daily.  Do you agree with that?

12       A    If that's what it says, yes, I do, I

13   will.

14       Q    Because I asked you earlier if you

15   recalled any discussions prior to January, and you

16   said no.

17       A    Okay.  I guess maybe I should take

18   longer to say it, because I don't have every

19   single thing recorded in my memory.

20            MR. HALL:  That's not what she said.

21   What she said was that before January 6 letter she

29

1   was told by her supervisor.

2           MS. GAUGHAN:  Okay.  Well, let's make

3   our record nice and clear.

4           BY MS. GAUGHAN:

5       Q    Do you agree that in December of '99 you

6   were verbally requested due to operating

7   conditions to report to work by 8:00 a.m. daily?

8       A    Yes.  Michael Oneferu-Bey and I probably

9   casually discussed that.

10      Q    And this corrective action we've marked

11  as Exhibit 2 states that on January 6 a formal

12  notice was issued.  Is that the e-mail that we

13  marked as Exhibit 1?

14      A    Yes.

15      Q    And it indicates that since the formal

16  notice on January 6 you were late on January 11,

17  January 14, January 18, January 20, January 21,

18  January 26, February 2, February 3, February 7,

19  February 8, February 9, February 10, February 15,

20  February 17, February 23, February 25,

21  February 29, March 2, March 6, March 7, March 10,

30

1    March 14, and March 16.

2              Were you late on the days that I just

3    stated?

4         A    If that's what the record says, then I

5    would have to say yes.

6         Q    Do you have an independent recollection

7    of the reasons for your lateness on those specific

8    dates?

9         A    No.

10        Q    Did you document that in your calendar?

11        A    Not necessarily.

12        Q    On occasion would you document the

13   reason for your lateness in your planner?

14        A    I don't know.  I may have.

15        Q    When you received this corrective action

16   in March of 2000, was there a meeting?

17        A    I would assume there was, yes.

18        Q    Do you recall that meeting?

19        A    Not necessarily that specific one, but I

20   know that I had meetings on each corrective action

21   that I received.

31

1    Q    And on page 2 of Exhibit 2, this is your

2    signature here where it says Phyllis Dettmer,

3    correct?

4    A    Yes, it is.

5    Q    And at that time the record indicates

6    that you were given a formal warning and

7    probation, correct?

8    A    Uh-huh.

9    Q    You have to say yes or no.

10   A    Yes.  Thank you.

11   Q    Your probationary period was effective

12   March 27th, correct?

13   A    Yes.

14   Q    What does being put on probation mean?

15   A    That they were expecting me to be there

16   by that, you know, by that time that I had -- you

17   know, they never clearly stated what probation was

18   or what was required under, you know, under

19   probationary period.  They never specified.  I

20   just knew that I was in trouble.

21   Q    And you knew you had to be there by

32

1    8:00 a.m. daily, correct?

2        A    Uh-huh.

3        Q    You have to say yes or no.

4        A    Yes.  Sorry.

5        Q    It's okay it's going to happen a lot.

6        (Dettmer Deposition Exhibit No. 3 marked.)

7            BY MS. GAUGHAN:

8        Q    Can you identify what we've just marked

9    as Exhibit 3?

10       A    This is a corrective action dated

11   March 30th stating that I was given this action,

12   corrective action for excessive lateness and

13   placed on three months probation with an

14   additional improvement plan stating, as it did

15   before, that "Phyllis must start work on or before

16   8:00 a.m. daily."

17           And it was noted as a formal warning

18   with a suspension of three days, also stating that

19   "Disciplinary action may be taken if the employee

20   does not improve the lateness record, the

21   corrective action could be up to and including

33

```
1   discharge."

2       Q     Do you recall receiving that corrective

3   action we've marked as Exhibit 3?

4       A     Yes, I do.

5       Q     And was there a meeting as a result of

6   this corrective action?

7       A     Yes.

8       Q     And is this your signature on page 2 of

9   Exhibit No. 3?

10      A     Yes, it is.

11      Q     Was that a suspension without pay?

12      A     Suspensions are without pay.

13      Q     And that was effective April the 3rd of

14  2000, correct?

15      A     Uh-huh, yes.

16      (Dettmer Deposition Exhibit No. 4 marked.)

17          BY MS. GAUGHAN:

18      Q     Can you identify what we've marked as

19  Exhibit 4?

20      A     Exhibit 4 is a formal warning,

21  corrective action, dated June 7th of 2000, stating
```

34

1   that I'm given a corrective action for excessive

2   lateness and placed on three months probation.

3           And then it goes on to state that on

4   3/31 I had had been previously given a corrective

5   action for arriving at work 15 minutes late and

6   given three days off without pay.

7           Then it also states under the

8   improvement plan that "Phyllis must start on or

9   before 8:00 a.m. daily."

10          It's noted as a formal warning with an

11  extension of the probation for an additional three

12  months and suspension of three days.

13      Q    Do you recall receiving that corrective

14  action?

15      A    I do.

16      Q    And is that your signature on page 2 of

17  the exhibit?

18      A    Yes, it is.

19      Q    You were suspended for three days

20  effective June 9th of 2000, correct?

21      A    Yes.

35

1      Q      Was your -- strike that.

2             Do you recall receiving this corrective

3      action we've marked as Exhibit 4?

4      A      Yes, I do.

5      Q      And was there a meeting as a result of

6      that corrective action?

7      A      Yes.

8      Q      This corrective action we've marked as

9      Exhibit 4 is signed by Dave Snyder, correct?

10     A      Yes, it is.

11     Q      Who is Dave Snyder?

12     A      Dave Snyder was the director of fuels

13     and business planning.  That was the title of our

14     group.

15     Q      Did you meet with Mr. Snyder regarding

16     that corrective action we've marked as Exhibit 4?

17     A      Whether it was that specific one, I

18     don't recall.  I do recall having a -- requesting

19     a meeting with Dave Snyder.

20            (Dettmer Deposition Exhibit No. 5 marked.)

21                 BY MS. GAUGHAN:

36

1    Q    Can you identify what we've marked as

2  Exhibit 5?

3    A    Yes.  This is another corrective action,

4  formal warning corrective action dated

5  August 7th of 2000, with a formal warning,

6  probation for six months and a reduction in salary

7  effective August 7th, also stating that if the

8  lateness does not improve, the next corrective

9  action will be further reduction in pay or

10  discharge.

11    Q    Do you remember receiving that

12  corrective action?

13    A    I do.

14    Q    And is that your signature on page --

15    A    No, it is not.

16    Q    -- page 3?

17    A    Yes, it is.

18    Q    And you disputed this corrective action,

19  correct?

20    A    Yes, I did.

21    Q    And on what basis did you dispute it?

37

```
 1      A    I disputed that corrective action

 2  because I had, in fact, come to work by 8:00 a.m.,

 3  but I had gone directly to the mailroom at the

 4  Fort Smallwood complex rather than to my

 5  workstation looking for mail that I was to be

 6  receiving from Calvert Cliffs.

 7          (Dettmer Deposition Exhibit No. 6 marked.)

 8              BY MS. GAUGHAN:

 9      Q    Can you identify what I've marked as

10  Exhibit 6?

11      A    Yes.  This is a formal warning

12  corrective action dated September 11th stating

13  that I had been given three corrective actions,

14  had been on six months probation and had been

15  suspended twice.

16              And it notes my attendance history as 32

17  days late, 11 days sick, 7 partial vacation days,

18  7 call-in/vacation days, 2 partial RX days, 6 RX

19  days, and I stated previously 6 days suspension,

20  and 8 scheduled vacation days.

21              And it says on here under improvement
```

38

1   plan that I need to improve my attendance and

2   start work on or before 8:00 a.m.

3         It's noted as a formal warning, and then

4   stating that I've been given additional

5   accommodation with no discipline action for

6   attendance and lateness history for the period of

7   8/7 through October 9th.  However, she's expected

8   to report and start her work before 8:00 a.m.  All

9   absences, partial or full days, including

10  lateness, will continue to be documented as

11  appropriate.

12     Q   Do you recall receiving that corrective

13  action?

14     A   I do.

15     Q   Did you sign that on page 2?

16     A   Yes, I did.

17     Q   Was there a meeting as a result of that

18  corrective action?

19     A   Yes.

20        (Dettmer Deposition Exhibit No. 7 marked.)

21              BY MS. GAUGHAN:

39

1      Q      Can you identify what I've marked as

2   Exhibit No. 7?

3      A      This is a formal warning corrective

4   action dated November 3rd, and in it it states

5   that I am unreliable, noting times that I failed

6   to report by 8:00 a.m., stating that's the latest

7   in a series of 34 separate occasions of which I

8   failed to arrive in a timely manner.

9              It's stating that I'm violating the

10   warehouse team start time as announced in January.

11              It states that on a specific arrival

12   time I had been stuck in traffic for over an hour.

13   And it states that 15 minutes prior to my work

14   time I called Art Johnson to let him know.  And

15   then it states that another lateness was due to

16   traffic.

17              It's talking about continual lateness

18   and unacceptable behavior, that I had been issued

19   corrective actions for repetitive lateness on the

20   following dates, and then it lists them, saying

21   that each one specifically set forth an

40

1    improvement plan.

2          And then it states that despite these

3    corrective actions that I continued to be late for

4    34 separate occasions, and despite being warned

5    and disciplined on several occasions I continued

6    to fail to abide by the no later than 8:00 a.m.

7    start time.

8          And then under improvement plan it

9    states that I must be there on or before

10   8:00 a.m., and that if I anticipate that I'll be

11   late or absent from work I must contact immediate

12   supervision no later than 7:30.

13         If I'm to be late or absent due to

14   illness, I must contact the environmental health

15   and safety unit of Constellation Energy Group.

16         It's a formal warning, probation,

17   reduction in pay.  And it says if I continue to

18   report late or does not follow requirements,

19   improvement plan, further action, including

20   discharge, may be administered.

21         And it is my signature on page 2.

41

1      Q      You recall receiving that corrective

2  action?

3      A      Yes, I do.

4      Q      Was there a meeting as a result of that

5  corrective action?

6      A      Yes.

7      (Dettmer Deposition Exhibit No. 8 marked.)

8           BY MS. GAUGHAN:

9      Q      Can you identify what we've marked as

10  Exhibit 8.

11     A      Corrective action plan dated

12  January 30th, '01.  Let's see.  It says that I

13  continue to demonstrate unreliability and

14  unpredictability.

15           And then it goes on to discuss the

16  reduction in pays, the probation time, and

17  scheduled latenesses or unscheduled latenesses,

18  and that in lieu of administering the formal

19  corrective actions, lateness, meeting held, again

20  to stress the importance of reporting on or before

21  that time.

42

1              Let's see.  But I was granted a grace

2    period for improvement but that since the

3    December 8th meeting I had been out sick and was

4    late to work, and despite five previous corrective

5    actions, and they are dated, having been

6    administered for being continually irregular and

7    unreliable and despite being warned and

8    disciplined on five different occasions, I

9    continued to fail to abide by the 8:00 a.m.

10   required report time of no later than 8:00 a.m.

11              Infractions:  Regular reliable

12   attendance essential to job function.  I continued

13   to demonstrate unacceptable behavior in the areas

14   of reliability and dependability.  And all this

15   prevents me from meeting my essential job

16   functions.  And there is no improvement plan.

17      Q    Did you receive a copy of Exhibit 8?

18      A    I believe I did.

19      Q    To summarize, you received seven

20   corrective actions for your lateness and absence,

21   correct?

43

1     A     If that's what you have there, yes.

2     Q     You were placed on probation three times

3   for excessive lateness and absence?

4     A     Yes.

5     Q     You were suspended on two occasions for

6   excessive lateness and absence?

7     A     Yes.

8     Q     And then eventually you were terminated

9   for excessive lateness and absence, right?

10    A     Yes.

11    Q     You received one reduction in pay for

12  excessive lateness and absence?

13    A     That's correct.

14    Q     Do you recall what the reduction was?

15    A     I think it was 5 percent.

16    Q     Do you believe that it was necessary for

17  you to perform the essential functions of your job

18  for you to be at work by 8:00 in the morning?

19    A     No.

20    Q     Why not?

21    A     Because, to the best of my knowledge,

44

1    the only thing that was said to me in regard to

2    essential job functions was there was a report

3    that was printed out every morning that was given

4    to the purchasing assistants to note them of

5    specific items that were needed to be replaced in

6    the warehouse as stock items.  Other than that, my

7    job function did not require me to have regular

8    contact with plant personnel or warehouse

9    personnel.

10        Q    Did that report have a name?

11        A    It did, but I don't recall what the name

12    of it was.

13        Q    Was it your job to print out that

14    report?

15        A    Yeah, they had asked me to do that.

16        Q    And these were items that were required

17    for operation of the power plants?

18        A    Yeah, items that they would need, stock

19    items that were carried in stock that they may

20    have ordered to replenish stock that they may be

21    holding over at the power plant.

45

1     Q    Do you know what the shifts were for

2  plant personnel?

3     A    No.

4     Q    You said that you were told about this

5  report.  Who told you?

6     A    Mike Oneferu-Bey I believe was the

7  individual that requested that I run that report

8  every morning.

9     Q    We talked about one corrective action

10  that you disputed.  Other than that one, do you

11  disagree that you were late or absent on any of

12  the dates that are specified in those corrective

13  action reports?

14     A    No.

15     Q    Did there come a time when you expressed

16  to any of your supervision that your lateness or

17  absence was due to a medical condition?

18     A    Absolutely.

19     Q    Do you know when that was?

20     A    I could not give you the specific dates,

21  no.  They were early on in the year.

46

1      Q     Was it prior to the issuance of the

2   first corrective action, which appears from the

3   record to be March the 20th of 2000?

4      A     I believe that prior to the March

5   corrective action, I believe -- and I don't have

6   that written down, I'm just going by my own

7   recollection -- that I had conversed with my work

8   leader Michael Oneferu-Bey and told him about my

9   problem and, you know, that I was trying very hard

10  to meet their request or their direction but I was

11  having a difficult time with it and, you know,

12  that it was embarrassing.  But prior to that, he

13  was the only person that I had discussed it with.

14           And I believe that on the first

15  corrective action where Joann Lingner and Michael

16  Oneferu-Bey were present I discussed it with Joann

17  Lingner and informed her of the problem.

18     Q     You're saying problem.  Can you define

19  what that is?

20     A     Depression.

21     Q     And did you use that word when you

47

1    talked with Mr. Bey and Ms. Lingner?

2        A    Yes.

3        Q    And what did you tell them -- strike

4    that.

5             What effect did you tell them your

6    depression was having on your ability to get to

7    work on a timely and regular basis?

8        A    I honestly don't recall the whole

9    conversation.  I just remember telling them about

10   the depression and that I do recall telling her,

11   but I don't know in what manner it was that I said

12   it, that that was the reason, you know, that I was

13   not -- I was not trying to disregard her orders or

14   anything like that, and that I was trying to do

15   what they asked but it was very difficult because

16   of this and that I was seeing somebody about it.

17            And then her comment to me after I

18   stated that to her was, "Phyllis, I see what road

19   you're going down, and I can tell you you're not

20   going to make it."

21       Q    This was in --

48

1    A    And that that was her response to me

2    after I had that discussion.

3    Q    This was in March of 2000?

4    A    Yes.

5    Q    Did you notify anyone other than Michael

6    Bey and Joann Lingner of your medical condition?

7    A    Prior to March, I don't believe I had.

8    Q    How about after March?

9    A    Yes.

10    Q    Who?

11    A    Because I was in very unfamiliar

12    territory and I didn't know where to turn, I had

13    been told of a therapist that the company had that

14    they could provide, and I thought that that would

15    be a good starting point for me, so I made contact

16    with Ray Mosko.

17    Q    Do you know when you first made contact

18    with Ray Mosko?

19    A    I'm not positive.  It may have been

20    April maybe, somewhere between April and May

21    probably.

49

1      Q     Who is Ray Mosko?

2      A     Ray Mosko, I don't know what his

3   official title was, but he is connected to the

4   medical department, and my understanding is he was

5   a therapist.

6      Q     During what period of time did you --

7   well, strike that.  Let me ask it a

8   little different.

9            You contacted Ray Mosko for the purpose

10   of getting counseling for your depression,

11   correct?

12     A     Yes, or finding out what was wrong,

13   specifically what was wrong.

14     Q     On what periodic basis did you see

15   Mr. Mosko?

16     A     Sometimes it was like every other week

17   and sometimes once a month.

18     Q     And when you would see Mr. Mosko, what

19   sort of treatment or --

20     A     We would talk.  He was the one -- Ray

21   Mosko was the individual that truly identified the

50

1    depression and contacted my general practitioner

2    about putting me on medication.  That's when -- at

3    that point is when there was some official

4    documentation as to the depression.

5        Q    Other than Michael Bey and Joann Lingner

6    and Ray Mosko, is there anyone at the company who

7    you notified about your depression?

8        A    No, I didn't.

9        Q    Did you ever talk to Dave Snyder about

10   it?

11       A    I talked to Dave Snyder in the later

12   part of the year after corrective actions had been

13   issued, and I spoke with him after I received the

14   one corrective action which I disputed.  And at

15   that time he and I had a lengthy conversation, and

16   prior to my breaking down and telling him about my

17   depression, he had never heard about it prior to

18   that date.  Joann Lingner had never informed him.

19       Q    Do you know about what date this was?

20       A    It was right around the date.  I know

21   that I called him the same day that I received the

51

1    corrective action to make an appointment with him.

2    And I can't say whether I met him on the same day

3    or if it was the latter part of that week.  All I

4    know is that I called him, and it was either that

5    day or shortly after, that we met.

6        Q    The corrective action which you dispute

7    was August the 7th of 2000; does that sound about

8    the right time?

9        A    Sure.

10       Q    Did you ever talk to Dr. Rhodes about

11   your depression?

12       A    No, the only personnel from medical I

13   had ever seen besides Ray Mosko was Angie

14   Williams.

15       Q    Did you talk to Angie Williams about

16   your depression?

17       A    A little bit, not a whole lot, because

18   my understanding was that that was a personal

19   thing and wasn't something that everybody needed

20   to know about.  But she was -- you know, I had

21   made her aware of it, but I don't remember at what

52

1    point in time that was.

2        Q    Is there anyone else here at the company

3    that you talked to about your depression that we

4    haven't identified?

5        A    Casually I spoke with Jim Jester who was

6    a co-worker.  And I had spoken also with a

7    co-worker Denise Green, but most of my

8    conversations were with Jim Jester.

9        Q    Was Jim Jester or Denise Green at any

10   time your supervisor?

11       A    No, just co-workers.

12       Q    Anybody else that you spoke with about

13   your depression that we haven't identified?

14       A    I had very casually and somewhat briefly

15   spoken with Art Johnson about it prior to him

16   becoming my work leader, but he was very

17   uncomfortable with hearing about it, so we didn't

18   speak about it very much.  And Betsy Stewart as

19   well, I had spoken with her.

20       Q    Who is Betsy Stewart?

21       A    Betsy Stewart was also a co-worker.

53

```
1      Q    Anybody else?

2      A    No.  Excuse me there was one other

3  person.  I had had a casual conversation with Fred

4  Bursner who was a co-worker and a friend out in,

5  he worked in the warehouse facility.  And we were

6  casually speaking one day, and I was probably very

7  down or frustrated, and I was talking with a

8  friend about it.  And I told him about my

9  depression, and he responded to me, he said,

10  "Phyllis, I didn't know."  He said, "I'm really

11  sorry to hear that.  I didn't know you were having

12  that problem."  And that was the extent of our

13  conversation.

14     Q    Anybody else?

15     A    No.

16     Q    Did there come a time when you requested

17  some accommodation for your depression from

18  anybody in management?

19     A    Yes, I did.

20     Q    When was that?

21     A    I don't recall the dates.
```

54

```
 1      Q    Who did you make the request of?

 2      A    Actually, it was probably Joann Lingner

 3  and Dave Snyder.

 4      Q    And what did you ask them for?

 5      A    Oh, excuse me.  I did also ask at a

 6  later date.  I spoke with Cynthia Lewis requesting

 7  FMLA.  And there was one point I believe I sent an

 8  e-mail and I cannot -- I don't know what I did

 9  with it, but I had sent an e-mail requesting FMLA

10  and was denied.  And through Cynthia Lewis I had

11  also requested FMLA and was denied.  I was just

12  told no.

13      Q    Okay.  I'm going to go back a little bit

14  because I think things got mixed up there.

15      A    Sure.

16      Q    I originally asked did you request an

17  accommodation for your depression, and you said

18  yes but you couldn't recall when, and you asked

19  Joann Lingner and Dave Snyder, correct?

20      A    Yes.

21      Q    What accommodation did you ask Joann
```

55

1    Lingner and Dave Snyder for?

2         A    I just asked them for time while I

3    was -- while I was trying to get some control over

4    the depression, if that was possible.  The only

5    accommodation that I was asking them for was, you

6    know, to allow me, you know, at least up until

7    9:30 or even a half hour, and I was denied that

8    because Joann Lingner said, "If I give you a half

9    hour then you're just going to come in later than

10   that."

11        Q    And then you said you asked Cindy Lewis

12   for FMLA, correct?

13        A    Yes.

14        Q    What specifically did you ask her for?

15        A    I had a meeting with Cynthia Lewis, and

16   I asked her to go to the powers that be and that I

17   was requesting FMLA.  I was requesting to have my

18   pay reinstated.  I was requesting to be

19   compensated for the six days of suspension that I

20   had received because all of it was -- you know, it

21   wasn't right.

56

1          And I felt that I should receive an

2   accommodations because I was trying very hard to

3   meet their requests and I was -- my problem and my

4   disease was being ignored.  And they just

5   continued putting more pressure on me and more

6   pressure and more pressure on me.  And it

7   wasn't -- it wasn't helping, it wasn't getting any

8   better.

9          And Cynthia Lewis said to me, "Well, why

10  are you coming to me with this?"

11      Q    You said you asked her for FMLA.  What

12  do you mean by that?

13      A    The Family Medical Leave Act.  I was

14  asking for accommodation for my time, for my late

15  arrival in the mornings.  I wasn't asking for days

16  off.  I wasn't asking for months off or anything

17  of that nature.  I was just asking them to

18  accommodate me with the FMLA while I was working

19  through the depression to try and get it under

20  control.

21      Q    So let me see if I got this right.

57

1   You're saying that you asked for FMLA

2   specifically?

3        A    Well, intermittent FMLA.

4        Q    Okay.  That's what I'm getting at.

5        A    Yes.

6        Q    You wanted to be allowed to come in late

7   under FMLA?

8        A    Yes.

9        Q    Did you tell Cindy Lewis specifically

10  how late you wanted to be allowed to come in?

11       A    No, and she didn't ask.

12       Q    You said that you asked Joann Lingner

13  and Dave Snyder for time to get control over your

14  depression.  Did you give a specific time frame

15  that you were looking for?

16       A    No, because I don't think you can

17  actually give that a time frame.

18       Q    Do you know when you talked to Cindy

19  Lewis?

20       A    November or December, I'm not sure.

21       Q    Of 2000?

58

```
 1      A    Yes.

 2      Q    Did you have a meeting with Barbara

 3   Cannon?

 4      A    Yes, I did.

 5      Q    Who is Barbara Cannon?

 6      A    Barbara Cannon was a member of human

 7   relations or human resources group.

 8      Q    Why did you meet with Barbara Cannon?

 9      A    I met with Barbara Cannon because I felt

10   as though there had been a breach of

11   confidentiality by Joann Lingner specifically,

12   which also included Dave Snyder, too, in fact, and

13   to see if there was anything that I could do about

14   it.

15      Q    What breach of confidentiality by

16   Ms. Lingner or Mr. Snyder?

17      A    I was running an errand over at the Fort

18   Smallwood Complex, and I happened to be standing

19   in the lobby at the receptionist desk as Joann

20   Lingner and Dave Snyder came walking through the

21   back end of the lobby where Joann Lingner was
```

59

```
1    discussing me with Dave Snyder about my corrective

2    actions, etc., etc.  And she was speaking loudly

3    walking through the lobby.  When she saw me

4    standing there, she immediately got very, very

5    quiet and then disappeared.

6        Q    Would it be inappropriate for

7    Ms. Lingner to talk to Mr. Snyder about something

8    under corrective action?

9        A    No.

10       Q    Then I don't understand why you feel

11   there was some breach of confidentiality.

12       A    Because it's private and it shouldn't

13   be, anything like that shouldn't be discussed

14   around just general employees.

15       Q    Okay.  So you weren't upset that she was

16   talking to Mr. Snyder, you were upset that she was

17   talking about it in the lobby; is that fair?

18       A    Exactly.

19       Q    And you said you asked Barbara Cannon if

20   something could be done?

21       A    Uh-huh.
```

60

1      Q      You have to say yes or no.

2      A      Yes.

3      Q      What specifically were you asking her

4   for?

5      A      I wanted to -- I was trying to find out

6   if I had any recourse because things are supposed

7   to be, there are certain things that are supposed

8   to be confidential.  Just like when a person is

9   issued a corrective action, that's all done behind

10  closed doors and is confidential.  Any discussion

11  regarding that prior to one being given I would

12  feel should also be handled in the same manner.

13            And I was trying to find out if I had

14  any recourse to her speaking with Mr. Snyder

15  openly about any corrective actions against me in

16  public, if I had any recourse to that.  I was

17  trying to get some information to see if there was

18  any steps that I could, appropriate steps that I

19  could take to, you know, to let her know that that

20  was inappropriate and maybe to be reprimanded for

21  that because it's just wrong.

61

1      Q     What do you believe it is about your

2    depression that caused you to be late or absent

3    from work?

4      A     It took every bit of energy I had just

5    to get out of bed every day.

6      Q     Did you take any measures to help assist

7    you in getting to work on a timely basis?

8      A     Sure did.

9      Q     What did you do?

10      A     Set alarm clocks, went to bed earlier.

11    I even at times had my dad or my mom, you know,

12    give me a yell.

13      Q     Do you believe that your depression

14    interfered with your ability to do your job?

15      A     To perform -- let me ask you for some

16    clarification.  Are you asking if it prevented me

17    from performing the general functions of my job?

18      Q     Yes.

19      A     No.  I worked very hard to make sure

20    that my work was not affected.

21      Q     Your job was clerical in nature; is that

62

1  fair to say?

2      A    Yes.

3      Q    So I assume you know how to type, right?

4      A    Yes.

5      Q    And you know how to use a computer?

6      A    Yes.

7      Q    What sort of computer applications are

8  you versed in?

9      A    Microsoft Word, I have used Excel, I

10  have used minimally Power Point.

11      Q    Do you know how fast you can type?

12      A    No.

13      Q    After you came here to the company, did

14  you receive any special training or schooling or

15  anything like that?

16      A    In clerical activities?

17      Q    In any kind of job-related activity.

18      A    I took some classes.

19      Q    What kind of classes?

20      A    I had taken a couple Excel courses, I

21  had taken time management courses, dealing with

63

1    difficult people courses, things of that nature.

2    And then, of course, everybody had to take courses

3    when they changed the computer system over and we

4    went to BIS and had to learn how to use that

5    system, which was basically like a data entry type

6    system.

7        Q    Was part of your job communicating with

8    vendors?

9        A    Absolutely.

10       Q    And would you do that in writing and

11   over the phone?

12       A    Yeah, most of that would be over the

13   phone.  Any communication that I had with them of

14   a paper nature would be the creation of

15   requisitions or purchase orders.

16       Q    Did you have to meet personally with any

17   vendors?

18       A    Very, very rarely.

19       Q    Are you working now?

20       A    Yes, I am.

21       Q    What are you doing?

64

1      A     I am a support staff specialist for Holy

2   Cross Hospital.

3      Q     When did you obtain that job?

4      A     August 12th of this year, of 2002.

5      Q     What are your job duties?

6      A     I support the nurses in the office.  I

7   occasionally get some stationery supplies for

8   them.  I will order materials, sales materials

9   that we use.  I keep all of the records on any

10  sales, breast pump rentals, things of that nature.

11     Q     Is your job clerical in nature?

12     A     Yes.  Answer phones, take messages,

13  write letters, thing like that.

14         (Dettmer Deposition Exhibit No. 9 marked.)

15            BY MS. GAUGHAN:

16     Q     Can you identify what we've marked as

17  Exhibit No. 9?

18     A     This is what I was looking for that I

19  couldn't find.  Yeah, this was -- this was a

20  letter that I had sent to -- an e-mail to Dr.

21  Sheila Rhodes and copied to Joann Lingner, Dave

65

1    Snyder and Cynthia Lewis formally requesting

2    intermittent FMLA while I continued treatment for

3    major depression.

4       Q     Did you get a response to that e-mail?

5       A     No.

6       Q     Did you meet with Dr. Rhodes after you

7    sent that e-mail?

8       A     This was -- I was called to a meeting,

9    and I don't recall off the top of my head the date

10   of it.  I was called to a meeting that had Dave

11   Snyder, Joann Lingner, Dr. Sheila Rhodes, myself,

12   and I can't remember if there was anybody else in

13   there or not.

14         And I wasn't sure initially what the

15   meeting was about, but I do believe it came out --

16   I don't know why, initially why I was being called

17   to a meeting, but if my memory serves me

18   correctly, the medical department was telling

19   me -- Dr. Rhodes was saying to me that they didn't

20   feel that the FMLA was required and therefore they

21   would not support my request.

66

1           (Dettmer Deposition Exhibit No. 10 marked.)

2                BY MS. GAUGHAN:

3      Q    Can you identify what we've marked as

4  Exhibit No. 10?

5      A    This was a little letter from Joann

6  Lingner dated September 25th regarding call-in of

7  unscheduled time off and stating that on

8  September, that effective September 22nd and

9  continuing through the end of 2000 that any

10 call-ins for vacation/RX time were not permitted,

11 that all my vacation and RX time must be scheduled

12 and approved in advance, and that the approval

13 must be obtained from a member of supervision.

14 And all -- and be advised that all call-in for

15 sickness must occur prior to the start time of

16 8:00.

17     Q    Why was that letter issued; do you know?

18     A    My personal opinion?

19          MR. HALL:  No.  She asked you:  Do you

20 know why it was done?

21          THE WITNESS:  Okay.  I will assume that

67

```
1   she did it because she -- no.  No.  I'm not going

2   make any assumptions.  No, I don't know why she

3   did it.

4            BY MS. GAUGHAN:

5       Q    Prior to September 25th of 2000, were

6   there times where you would call in for vacation

7   or RX time the day that you were requesting that

8   time off?

9       A    Oh, sure.

10      Q    Do you know how frequently that

11  occurred?

12      A    No, not offhand.

13      Q    And this is your signature on

14  Exhibit 10?

15      A    Yes, it is.

16      Q    Was there a meeting with any of your

17  supervision regarding this issue?

18      A    I don't recall.

19           (Recess taken from 11:20 a.m. to 11:34 a.m.)

20           (Dettmer Deposition Exhibit No. 11 marked.)

21               BY MS. GAUGHAN:
```

68

```
1        Q     Let's identify some of the documents

2   that were provided to me by your attorney.  Can

3   you tell me what Exhibit No. 11 is?

4        A     This is a copy of absence data for a

5   specific employee, and it shows the dates of the

6   absence, whether it was sickness, vacation or

7   holiday pay.  And this was dated from, looks like

8   January of 2000 to January 5th of 2001.

9        Q     Have you seen that before today?

10       A     I don't recall.

11       Q     At any time while you were employed

12  here, did you request a run of your absence data?

13       A     Oh, I may have.  I did it for myself.  I

14  did it for other people, too, because I usually

15  kept the time and vacation hours for people and

16  stuff like that.

17       Q     Oh, you were able to do that as part of

18  your job?

19       A     Yes.

20       Q     And that Exhibit 11, is that your

21  absence data?
```

69

1    A    Yes, that's what it states.

2    (Dettmer Deposition Exhibit No. 12 marked.)

3    BY MS. GAUGHAN:

4    Q    Can you identify what we marked as

5 Exhibit 12?

6    A    Yes, this is a log in/out record that I

7 had done for the year of 2000, you know, just

8 stating what my times were, what times I put in,

9 what time I actually arrived, any vacation hours I

10 took, things like that.

11    Q    Now, that isn't a CPSG record, right?

12    A    No, no.

13    Q    That's just something you did for

14 yourself?

15    A    Yes.

16    Q    When did you create that?

17    A    Shoot, I don't recall.

18    Q    Why did you do it?

19    A    So I would have it, so it would all be

20 right there in front of me in case it came up.

21    Q    How did you put that together?

70

1      A      I used the information that I had

2   probably, you know, from writing my hours and

3   stuff down in my planner.

4          (Dettmer Deposition Exhibit No. 13 marked.)

5              BY MS. GAUGHAN:

6      Q      Exhibit 13, is that the planner that

7   you're referring to?

8      A      Yes.

9      Q      And that's for the year 2000?

10      A      Uh-huh.

11      Q      You have to say yes or no.

12      A      Yes.  Sorry.

13      Q      Is that all your handwriting in there?

14      A      Yes.

15      Q      Did you make the notes, the daily notes

16   that you have in that planner at or around the

17   date that's specified?  For example, if you have a

18   date in there, a January 13th entry, is that

19   something you probably wrote down around

20   January 13th?

21      A      Yes.

71

1     Q    Have you had a chance to review that

2  planner before it was produced to me?

3     A    No.

4     Q    Do you know if there is anything in

5  there that you wrote down that is inaccurate or

6  incorrect?

7     A    I have no idea.

8     Q    When you would make entries in your

9  planner, would you try to be as accurate and

10  correct as you could?

11     A    Oh, absolutely, because it was only for

12  my own personnel use anyway.

13     (Dettmer Deposition Exhibit No. 14 marked.)

14         BY MS. GAUGHAN:

15     Q    Can you identify what we've marked as

16  Exhibit 14?

17     A    January 2000 -- oh, this is 2001, and it

18  has copies of my monthly calendars in it.

19     Q    Is that your planner for the year 2001?

20     A    Yes.

21     Q    And is that your handwriting in there?

72

1    A    Yes.

2    Q    And did you make those entries

3    contemporaneously with the dates that are listed

4    in there as well?

5    A    Yes.

6    Q    When you made those entries, did you try

7    it be as accurate and correct as you could be?

8    A    Uh-huh.

9    Q    You have to say yes or no.

10    A    Yes.

11    (Dettmer Deposition Exhibit No. 15 marked.)

12        BY MS. GAUGHAN:

13    Q    Can you identify what is marked as

14    Exhibit 15?

15    A    This was the BGE Employee Handbook.

16    Q    Is that your handbook?

17    A    It was, yes.

18        MR. HALL:  Counsel, just for the record,

19    these are the documents that we arranged to have

20    copied by the independent copier that was sent to

21    you, correct?

73

1          MS. GAUGHAN:  Correct.

2          MR. HALL:  Okay.

3          BY MS. GAUGHAN:

4     Q    Do you know when you got that handbook

5  that we marked as Exhibit 15?

6     A    Well, it appears to be dated -- because,

7  as you know, several of them had gone out.  The

8  initial date on this was May of 1999.

9     Q    Now, that says BGE Employee Handbook,

10  but that was also your handbook as a CPSG

11  employee, correct?

12     A    Correct.

13     Q    When did you first believe that you were

14  having problems with depression?

15     A    I'm not really sure.  I knew there was

16  something wrong, but I didn't know what it was.

17  And that had been several years prior to

18  documentation.

19     Q    And you said that you went to see Ray

20  Mosko.  Did you seek out any other medical

21  treatment?

74

```
1      A      Prior to him?

2      Q      Yeah.

3      A      No.

4      Q      How about after him?

5      A      Yes.

6      Q      What medical treatment?

7      A      I went to a -- I chose an independent

8  therapist.

9      Q      And who was that?

10     A      Robin Haller.

11     Q      Do you know when you saw Robin Haller?

12     A      Not right off the top of my head, no.

13     Q      Are you still seeing Robin Haller?

14     A      Not as yet.  I just recently have my

15 benefits.

16     Q      Other than Robin Haller and Ray Mosko,

17 did you see anyone for your depression?

18     A      Yes.

19     Q      Who?

20     A      Christine Commerford.

21     Q      Are you still seeing Dr. Commerford?
```

75

1      A    Yes.

2      Q    Did you see anybody else for your

3  depression besides Mosko, Haller and Commerford?

4      A    Yes.  The company requested that I see a

5  Dr. Dvoskin.

6      Q    Anybody else?

7      A    No.

8      Q    What sort of treatment did you receive

9  from these individuals?

10     A    Well, I didn't receive any treatment

11  from Dr. Dvoskin.  Dr. Dvoskin was someone that I

12  went to per the request of the medical department

13  of CPSG. Ray Mosko was the first person I sought

14  help from, and he felt very strongly as though I

15  should be on medication, so we contacted -- he

16  contacted my general practitioner, Dr. Christine

17  Commerford, who prescribed the medication, and has

18  to date been keeping tabs.

19     Q    And what does Robin Haller do?

20     A    Robin Haller is a therapist.

21     Q    So that would be just talking?

76

1      A     Yes.

2      Q     Anybody else that you've seen that we

3    haven't identified for depression?

4      A     No.

5      Q     Do you have any other medical conditions

6    besides depression currently?

7      A     No.

8      Q     Did you have any medical conditions

9    while you were employed at CPSG during the period

10    of May '99 to your termination that interfered

11    with your ability to do your job?

12      A     You mean was I ever sick; is that what

13    you're asking me?

14      Q     I'm asking for medical problems you had

15    during that period of time.

16      A     Yes.

17      Q     What problems?

18      A     I had flu, numerous intestinal

19    difficulties, I had back problems, muscular.

20      Q     Anything else?

21      A     I had diverticulosis.

77

1    Q    Anything else?

2    A    No.

3    (Dettmer Deposition Exhibit No. 16 marked.)

4         BY MS. GAUGHAN:

5    Q    I'm going to show you what I marked as

6    Exhibit 16.  Have you ever seen this before?

7    A    No, no, I've never seen that.

8    Q    There did come a time when you filed a

9    complaint with the EEOC, correct?

10   A    That's correct.

11   (Dettmer Deposition Exhibit No. 17 marked.)

12        BY MS. GAUGHAN:

13   Q    Is Exhibit No. 17 a copy of that

14   complaint?

15   A    Yes, it is.

16   Q    And is the handwriting that's in Exhibit

17   No. 17 your handwriting?

18   A    Yes, it is.

19   Q    Did you prepare that document with

20   anyone's assistance?

21   A    No.

78

1       Q       Did you refer to any records while you

2  were preparing it?

3       A       Probably.

4       Q       Do you know what records?

5       A       Just anything I may have had.  I may

6  have gone back and referenced from my calendar.

7               (Dettmer Deposition Exhibit No. 18 marked.)

8               BY MS. GAUGHAN:

9       Q       And is Exhibit 18 the notice that you

10  received from the EEOC that your claim had been

11  denied?

12      A       Yes.

13      Q       Do you know when you received that?

14      A       No.

15      Q       Do you know how you received that?

16      A       In the mail.

17      Q       In addition to being late because of

18  your depression, did you take time off from work

19  because of it?

20      A       Because of my depression?

21      Q       Uh-huh.

79

1    A    Yes.

2    Q    Do you know when you took time off

3  because of your depression?

4    A    No.

5    Q    Would you take a whole day off because

6  of your depression?

7    A    Yes.

8    Q    Would you take off more than one day in

9  a row because of it?

10    A    I don't know.

11    Q    Would you take off less than a day

12  because of it?

13    A    I don't think so.

14    Q    On occasions where you were late, did

15  you try to take vacation time to make up for that

16  lateness time?

17    A    At the end of a week, you know, if I

18  hadn't gotten enough hours, if I hadn't gotten

19  enough hours in by the end of the week, I would

20  use some vacation time to make up the difference

21  in the hours.

80

1    Q    Would you use RX time to make up the

2 difference in the hours?

3    A    No, I don't think we were allowed to do

4 that.

5    Q    And can you explain what RX time is?

6    A    RX time is time that the company gives

7 to the employee, I believe it used to be an

8 allotment of ten days per year, that is personal

9 time that you can take off without pay.

10    Q    After you were terminated from CPSG, did

11 you gain new employment?

12    A    Yes, I did.

13    Q    When was that?

14    A    Off the top of my head, I don't know.

15    Q    What job did you obtain?

16    A    I took a job with Advanced Water

17 Solutions.

18    Q    What did you do for them?

19    A    I did in-home sales.

20    Q    How long did you work there?

21    A    Three months.

81

1      Q      Why did you leave there?

2      A      Because I found that it wasn't the kind

3   of work that I should be doing.

4      Q      Why not?

5      A      Because I refused myself to hard-sale

6   elderly people for something that they didn't need

7   to live.

8      Q      Did you have any problems with lateness

9   or absence in that job?

10     A      I had some lateness problems.

11     Q      What were the hours that you worked for

12   Advanced Water Solutions?

13     A      I don't even remember.

14     Q      Was it full-time or part-time?

15     A      It was full-time.

16     Q      Did you get to make your own schedule

17   with that job or did they have set hours?

18     A      They had set hours, at least as far as

19   the morning went, for sales meetings.

20     Q      Do you remember what time the sales

21   meetings were?

82

1    A    No.

2    Q    Who did you work for there?

3    A    A guy named Chad.  I don't even remember

4    his last name.

5    Q    Where is that located?

6    A    It used to be located in Annapolis

7    Junction.  I don't think their office is there any

8    longer.

9    Q    Where else have you worked since you

10   left employment here?

11   A    I worked for the American Institute of

12   Certified Public Accounts on a temporary basis.

13   Q    Do you know when you worked for them?

14   A    I think I worked for them off and on

15   from May through July of 2001.

16   Q    What did you do for them?

17   A    I was an assistant meeting planner and

18   secretary to the vice president of taxation.

19   Q    Was that a full-time or part-time job?

20   A    The hours were full-time.

21   Q    What were the hours?

83

```
1      A      Nine to five.

2      Q      Where is it located?

3      A      Washington D.C.

4      Q      Did you have any problems with absence

5  or lateness on that job?

6      A      No.

7      Q      Where else have you worked?

8      A      I worked for Giant Foods.

9      Q      When did you work for them?

10     A      I left in August of 2002, and I'm not

11 quite sure when I started.  Maybe in -- let me

12 think.  August maybe.

13     Q      2001?

14     A      Yes.

15     Q      What did you do for Giant?

16     A      I was a cashier.

17     Q      Where was that located?

18     A      It was located in Ellicott City.

19     Q      Full-time or part-time?

20     A      Part-time.

21     Q      What were the hours?
```

84

1      A      They varied.

2      Q      Varied along what lines?

3      A      I could have been there anywhere from --

4   I did some work that required me to be there at

5   4:00 or 5:00 in the morning on occasion.

6   Sometimes I worked nights.  Sometimes I worked

7   afternoons.  Occasionally I worked mornings.  It

8   just varied.

9      Q      Did you have any problems with lateness

10   or absence on that job?

11      A      Yes.

12      Q      Why did you leave that job?

13      A      Because I found full-time employment.

14      Q      Is that with Holy Cross?

15      A      Yes.

16      Q      Have you had any other employment since

17   you left Constellation?

18      A      I had still been working with PETsSMART.

19      Q      Now, that job, I believe, you started

20   before you were terminated?

21      A      That's correct.

85

1      Q     Do you know when you started that job?

2      A     No, I don't remember.

3      Q     What PETsSMART did you work at?

4      A     Ellicott City -- or Catonsville.

5      Q     What did you do for PETsSMART?

6      A     I was a cashier.

7      Q     How long did you work there?

8      A     I don't know if it was -- I think it was

9   less than a year.

10     Q     Did you continue with that employment

11   after your termination from CPSG?

12     A     Yes.

13     Q     Before you were terminated, what hours

14   would you keep at PETsSMART?

15     A     They varied.  They were some evenings

16   and weekends.

17     Q     How many hours a week?

18     A     That varied, also.  It wasn't a lot.

19     Q     Can you give me some idea what we're

20   talking about?

21     A     It could have been 12 hours, maybe

86

1    anywhere between maybe 12 and 15 hours a week,

2    depending, and that's a guestimate.

3         Q    Are there any other jobs you held since

4    you were terminated?

5         A    No.

6         Q    Was there ever a period of time where

7    your supervision gave you a grace period to

8    improve your latenesses?

9         A    Yes.

10         Q    When was that?

11         A    I couldn't tell you offhand.

12         Q    And when I say grace period, can you

13    define what that means for me?

14         A    I'm not really sure, since they wound up

15    punishing me for it anyway.

16         Q    Well, but you said there was some grace

17    period.  Explain what that is for me.

18         A    Supposedly the grace period, to the best

19    of my knowledge, was allowing me time to work on

20    getting to work on time, or they still expected me

21    to get to work on time, but supposedly -- my

87

1   understanding was supposedly I wouldn't be

2   reprimanded if I were late.

3        Q    Why were you given a grace period?

4        A    Don't know.

5        Q    Did there come a time when you were

6   given some leeway because you were changing

7   medications?

8        A    Supposedly they had mentioned that.

9        Q    Is that the grace period?

10       A    I'm not really sure.

11       Q    But you do recall at some point there

12   was some flexibility because you were going

13   through some medication issues?

14       A    There was a couple-day period.

15       Q    Were you ever late for your appointments

16   with any of your treaters, any of your doctors?

17       A    I don't know.

18       Q    While you were employed at

19   Constellation, did you ever look for other

20   employment inside the company?

21       A    Yes.

88

1    Q    Can you tell me what efforts you took to

2  do that?

3    A    I applied for the jobs that I was

4  interested in, filled out applications.

5    Q    And how did you learn about jobs you

6  were interested in?

7    A    From the posting board.

8    Q    What's the posting board?

9    A    The posting board is a board that is

10  specifically designated for display of job

11  opportunities that the company provides.

12    Q    And when you say posting board, are we

13  talking about a physical board?

14    A    Yes.

15    Q    Did you ever --

16    A    With plastic slots.

17    Q    Did you ever look for postings on the

18  computer, company site?

19    A    I don't recall.

20    Q    Did you apply for other positions?

21    A    Yes.

89

1    Q    How many?

2    A    I don't know.

3    Q    What kind of positions?

4    A    They were probably in the administrative

5    field, clerical field, all within the purchasing

6    venue.

7    Q    Why were you looking for another job?

8    A    Because I wanted to make more money.  I

9    wanted to improve, as anybody else.

10    Q    Would these jobs be a promotion?

11    A    Yes, some, most.

12    Q    Did you look for other employment

13    because you wanted to get away from the

14    supervision that you had at Fort Smallwood?

15    A    Not that I recall.

16    Q    Did you ever tell anyone that you

17    thought your supervisors were out to get you?

18    A    Yes, I did.

19    Q    Who did you tell that to?

20    A    I told that to Dr. Dvoskin.  I probably

21    shared that with Ray Mosko, Dr. Haller and maybe

90

1    Dr. Commerford.

2        Q    What supervisors were you talking about?

3        A    Joann Lingner.

4        Q    Why did you think Joann Lingner was out

5    to get you?

6        A    Because that's what she had demonstrated

7    to me.

8        Q    In what way?

9        A    In her actions and in her words, and

10   also the fact that Michael Oneferu-Bey verified

11   the fact that she was trying to get rid of me.

12       Q    What actions?

13       A    One was the fact, I think very clear,

14   that as she was talking with Dave Snyder about all

15   of my lack of attention toward the managers I

16   guess, she failed to inform him that there was a

17   medical problem.

18       Q    I didn't catch that.

19       A    Okay.  She failed to inform her

20   supervisor, the director of our department, that I

21   had a medical problem.  She was only informing him

91

1    of all the things that I was doing wrong, for one.

2       Q    Anything else?

3       A    I think, too, she made it very clear to

4    me what her plan was when I had my first meeting

5    with her at the corrective action in March when,

6    even after I told her about my depression, she

7    said to me that she saw what road I was going down

8    and that I wasn't going to make it.

9       Q    Anything else?

10      A    Those are the only two that come to

11   mind.

12      Q    And you said that Michael Bey told you

13   something?

14      A    Yeah, I had had a conversation with him

15   in his office.  We were discussing how I was doing

16   and, you know, and how I was trying to, you know,

17   do what they wanted me to do and all that, and I

18   told him that I felt that Joann had a problem with

19   me and I felt like she was trying to get me and I

20   didn't understand why.  And he agreed that that's

21   what she was doing.

92

1      Q      He agreed to what?

2      A      That she was trying to get rid of me.

3      Q      Why?

4      A      I don't know why.

5      Q      What route would you take to get from

6   your home to work?

7      A      795 to 695 to Exit 1, down Fort

8   Smallwood Road.

9      Q      Sometimes were your latenesses caused by

10  heavy traffic?

11     A      There were some times, yes.

12     Q      And in the morning, it's not unusual to

13  see heavy traffic along that route, is it?

14     A      No, not at all.

15     Q      It's not unusual to see accidents along

16  that route, is it?

17     A      You could say that about any road.

18     Q      So it's true, then, that it's not

19  unusual to have accidents along the route that you

20  took to work in the morning?

21     A      Not on a regular basis.

93

1    Q    But there were accidents, correct?

2    A    Yes.

3    Q    And sometimes those accidents would

4  cause your tardiness to work; is that correct?

5    A    That's correct.

6    Q    Was it ever expressed to you that there

7  was some concern, some safety concern with having

8  you work by yourself in the warehouse at the end

9  of your shift?

10    A    Yeah, that was mentioned to me.

11    Q    Why was there a concern for your safety?

12    A    I don't really know.

13    Q    What was expressed to you?

14    A    They said that they didn't feel

15  comfortable with me being in the warehouse myself

16  because I was a woman.

17    Q    When you -- well, let me ask you this:

18  Were there times you would come late and make up

19  time during the end of the day?

20    A    Oh, absolutely.

21    Q    And when you did that, would you be

94

1   alone in the warehouse?

2       A    There were some times, yes.

3       Q    Were you having any personal problems

4   that were precipitating your depression?

5       A    Explain.

6       Q    During the period of time from May of

7   '99 till your termination in 2001, were you having

8   any problems in your personal life that were

9   affecting your depression?

10      A    Oh, yes.

11      Q    What sort of problems?

12      A    I had a relationship with somebody that

13  was -- that had been coming apart.

14      Q    Anything else?

15      A    Yeah, financial difficulties.

16      Q    What was causing your financial

17  problems?

18      A    Well, one of the things with depression

19  is that you start out and you don't realize that

20  you try to do things and buy things to make

21  yourself feel better, and then after you buy them

95

1    you still don't feel better.  But I was able to

2    pay my bills.  That was not a major difficulty,

3    even though it was tight.

4              But then my depression got so that I

5    didn't even want to -- I didn't do anything.  I

6    didn't pay my bills.  I didn't do anything.  And

7    it got so that I couldn't -- that I was getting

8    that I couldn't keep up with them because I was so

9    far behind.

10        Q    Were you unhappy with your work?

11        A    No.

12        Q    Were you bored with your job?

13        A    Probably.

14        Q    Why were you bored with your job?

15        A    I had been doing the same thing for a

16   long time.

17        Q    Who at Constellation did you talk to

18   about your sexuality?

19        A    Ray Mosko.

20        Q    Anybody else?

21        A    No.

96

1    Q    To your knowledge, did Ray Mosko divulge

2  that information to anybody?

3    A    I think so.

4    Q    To whom?

5    A    I think he discussed it with Joann

6  Lingner.

7    Q    Anybody else?

8    A    That I don't know.

9    Q    And what makes you think he divulged it

10  to Joann Lingner?

11    A    Well, I know that he had several

12  conversations with Joann Lingner regarding me

13  without my permission.  And I got this through

14  Dave Snyder, the department manager, that Ray

15  Mosko had told Joann Lingner who told Dave Snyder

16  that I was immature.  Now, on a work, professional

17  level, I don't display that, and he would have to

18  give some basis for that statement.

19         And I know for a fact that he talked

20  about other people to me, which only confirmed to

21  me that he was doing the same regarding me to

97

1   other people.

2       Q    Did Ray Mosko ever tell you that he told

3   anyone that you were bisexual?

4       A    No.

5       Q    Did Joann Lingner ever tell you that Ray

6   Mosko told her that you were bisexual?

7       A    No.

8       Q    Did Dave Snyder ever say that he heard

9   from Ray Mosko or Joann Lingner that you were

10  bisexual?

11      A    No.

12      Q    Do you have anything in writing that

13  indicates that anyone, other than Ray Mosko, was

14  aware of your sexuality?

15      A    No.

16      Q    Did anyone ever tell you that that

17  information was divulged?

18      A    No.

19      Q    Did you file bankruptcy?

20      A    Yes, I did.

21      Q    When did you do that?

98

1       A    I try to forget about those things.  It

2  will take me a minute to try and remember.  I

3  don't recall.

4       Q    Was it after you were terminated?

5       A    Oh, yes.

6       Q    Was it here in Maryland Federal Court?

7       A    Yes.

8       Q    In your conversations with your

9  management about your job performance and your

10  eventual termination, did anyone express to you

11  that there was any issue with respect to your age?

12       A    No.

13       Q    Do you have any written evidence that

14  you were terminated because of your age?

15       A    No.

16       Q    I'm going to show you answer to

17  interrogatory No. 22.  These are questions which I

18  sent to your attorney which he prepared responses

19  to, which I believe you signed and sent back.

20  Interrogatory No. 22 talks about a specific

21  incident.

99

1      A      Yes.

2      Q      Can you tell me what you recall about

3  that incident?

4      A      Yeah.  We were having lunch for

5  Secretaries' Day, and it was Joann Lingner,

6  myself, Mike Oneferu-Bey, Franko Murphy and George

7  Montgomery.  And we were just having lunch, and

8  somehow the conversation came up about a fellow

9  employee who has suffered from depression, which

10  was not necessarily common knowledge.  Mike

11  Jefferies had never discussed it with me himself.

12  But through their conversation, they were talking

13  about -- Joann was talking about his medication

14  and laughing about his depression and things of

15  that nature, making a joke of it.

16      Q      In what way?

17      A      Just in her comments and her laughter.

18  There's nothing funny about it.

19      Q      What comment did she make?

20      A      I can't remember.  That was a long time

21  ago.

100

```
 1      Q    I see you have some involvement with a

 2  chorus or music of some sort?

 3      A    I did, yes.

 4      Q    What is that?

 5      A    It was a barbershop Sweet Adeline

 6  chorus.

 7      Q    When were you a member of that?

 8      A    I was a member of that chorus from

 9  September of 1977 through February of 2001.

10      Q    And what did you do with that chorus,

11  because I'm not familiar with it?

12      A    I sang.

13      Q    I guess they performed?

14      A    Uh-huh.

15      Q    You have to say yes or no.

16      A    Yes.

17      Q    And where did they perform?

18      A    Different places.  It all depended on

19  who hired the group.

20      Q    How often did they perform?

21      A    It varied.  There was no set schedule.
```

101

1       Q       How often did you practice?

2       A       The chorus rehearsed every week.

3       Q       Did you also perform with a quartet or

4  trio?

5       A       A quartet, yes.

6       Q       And they would have regular practices?

7       A       Uh-huh, or they were scheduled anyway.

8       Q       And you would keep track of all those

9  appointments in your calendar, correct?

10      A       Uh-huh.

11      Q       You have to say yes or no.

12      A       Yes.

13      Q       At some point you also started keeping a

14  diary; is that right?

15      A       Not a diary per se.  I made some

16  notations.

17      Q       And they were kept in your calendar,

18  too?

19      A       Yeah.

20      Q       Those notations would be kept kind of

21  like a diary, though; is that fair to say?

102

1    A    Yeah, I guess.  I just noted down some

2    feelings or things that may have occurred.

3    Q    Would you write in that after the day

4    was over when you got home from work?

5    A    No.

6    Q    When would you write in it?

7    A    Sometimes in the morning when I arrived

8    at work, or when I had been harassed at work or

9    something like that I would make a notation of it.

10    Q    Did you keep the calendar at your job?

11    A    Huh?

12    Q    Did you keep the calendar at your work

13    or did you take it home with you?

14    A    No, I took it to work every day because

15    I listed all my daily functions in there.

16    Q    Did you participate in company-sponsored

17    events involving mentoring?

18    A    Yes.

19    Q    Tell me what your involvement was with

20    that?

21    A    There was a program that they had at the

103

1    elementary school not that far from the office

2    where they wanted volunteers from the company, at

3    least from our area, within the fossil division,

4    to help at the elementary school in different, in

5    all different facets, depending on the school's

6    needs and what your abilities were.  And for the

7    company, because they didn't, to my knowledge, at

8    that time they didn't have a whole lot of people

9    signing up, I signed up because I thought that it

10   was important that we look, you know, that we look

11   good within the community and be involved in the

12   community.

13        Q    And as a volunteer, what did you do?

14        A    I worked with kindergarten children on

15   occasion.

16        Q    And when you say worked with, you'd help

17   them with their reading or letters or --

18        A    Or their, whatever task that their

19   teacher had given them, whether it was drawing

20   something, something of that nature.  Really easy

21   stuff.

104

1    Q    Do you participate in any sort of

2    athletic or physical activities?

3    A    No.

4    Q    Did you do that at all ever?

5    A    Yes.

6    Q    What sort of things did you do?

7    A    I used to play softball.

8    Q    When was that?

9    A    Pardon me?

10    Q    When did you play softball?

11    A    Since I was a kid.

12    Q    Until when?

13    A    I don't know.  After I was 16 years old

14    I didn't play for a couple years, then I played

15    for a few years with an adult group, and then I

16    played for the company for a short period of time.

17    Q    Did you play softball during the period

18    May '99 to the date of your termination?

19    A    No, I don't think so.

20    Q    Any other athletics?

21    A    I had played racquetball some years ago.

105

1     Q     When did you stop doing that?

2     A     And bowling.

3     Q     When did you stop playing racquetball?

4     A     I had stopped playing racquetball some

5 years ago.

6     Q     When did you stop bowling?

7     A     A couple years ago.

8     Q     Were you in a league?

9     A     Yes.

10     Q     Sometimes did the weather cause your

11 lateness to work?

12     A     Yes.

13     Q     Bad weather like rain or snow or

14 something like that?

15     A     Yes.

16     Q     Do you know how many miles it is from

17 your home to your work, at least during the period

18 of time we're talking about?

19     A     About 32, approximately.

20     MR. HALL:  I'm sorry, is that round trip

21 or one way?

106

1          THE WITNESS:  One way.

2          BY MS. GAUGHAN:

3      Q    And do you know how many miles it was

4    from your home to RBC when you used to work there?

5      A    About, estimating, about 12.

6      Q    Was your lateness ever caused by car

7    trouble?

8      A    Yes.

9      Q    During the period of time May '99 to the

10   date of your termination, did you ever go away on

11   vacation?

12     A    Uh-huh.

13     Q    You have to say yes or no.

14     A    Yes.

15     Q    Where did you go?

16     A    Ocean City or Florida.

17     Q    Did you travel with your singing group?

18     A    Yes.

19     Q    And where did you go with the singers?

20     A    Florida or Pennsylvania.

21         MS. GAUGHAN:  Those are all the

107

1    questions I have.  Thank you.

2              THE WITNESS:  You're welcome.

3              MR. HALL:  We'll waive.

4        (The deposition concluded at 12:32 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21