EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PHYLLIS M. DETTMER *
Plaintiff * MGJ 02-2595
vs. *
CONSTELLATION POWER SOURCE *
GENERATION, INC., *
Defendant *

* * * * * * * * * * *

DEPOSITION OF JoANN LINGNER

The Deposition of JoAnn Lingner was taken in the above-entitled matter on Tuesday, February 11, 2003, commencing at 9:50 a.m., at the G&E Building, 39 W. Lexington Street, 17th Floor, Baltimore, Maryland, 21203, and reported by Esther M. Wood, a Notary Public.

EVANS REPORTING SERVICE
Two North Charles Street, Suite 950
Baltimore, Maryland 21201
(410) 727-7100
(800) 256-8410

A Director of procurement services.

Q And how long had you been in that position?

A I'm really not sure of the date of when that title took effect.

Q I've seen documents that indicated that you took over the supervision of Ms. Dettmer in June of 1998.

A I would have taken -- Ms. Dettmer would have come under my supervision November of '97.

Ms. Dettmer would have moved to the Fort Smallwood complex, which was in the Fort Smallwood warehouse building, in June of 1998.

Q So from November 1997 until January 31st, 2001, you were her supervisor?

A I was her director, that's correct.

Q What exactly did the materials and procurement services office do?

A We were -- we are responsible for procurement, materials management and warehousing for the fossil energy business unit.

Q In that capacity, how many people did you

Q Is her job one that if she's not there, someone else has to substitute for her?

A Senior admin. assistant is a support job that supports, you know, other positions in the unit.

If the person is not there, then that support is not given, so then the people the person would be providing the support to need to then either obtain that support from other means or do it themselves.

Q During the time that you were the director, was there a period of time that unit operated on flex time?

A The unit in its entirety was never on flex time, because the material handlers are not -- their jobs do not allow them flex time.

Q What about the support staff?

A The other positions require -- require is not the right word. The other positions do have the ability of flex time and that varies.

Specifically for Phyllis' position and the other positions that she worked with with regard to

materials, there was flexibility from 6:30 in the morning to 8:00 o'clock in the morning for reporting.

Q Was there a memo sent out in January of 1999 indicating that all persons had to report by 8:00 o'clock?

A That date doesn't sound accurate. There was a memo issued, I'm not sure of the date.

Q Was there a memo sent out by Mr. Bey saying that the flex time had been terminated or been ended?

A What it stated is members of the warehouse that were working flexible hours needed to report no later than 8:00 o'clock. Now, that's not a direct quote, that's from memory.

Q I understand.

A So again, that did not apply to the material handlers, because they did not have that ability to work flex time.

Q If flex time was 6:30 to 8:00, why was it necessary to put out a memo that says everybody has to be there by 8:00 if that was already the program in place?

A No. Prior to that, Mike Bey had done it less formally, he had done it verbally.

And from my understanding and memory, that was for about -- for about a year. So that would have been for around the 1999 time frame that you referred to.

That was an informal request, informal meaning that that's what was needed, but it was never actually put in writing.

Then after several months to a year and Ms. Dettmer was not reporting by 8:00 o'clock, Michael decided, and I agree, that to be, you know, certain that everyone had the same message and it was clear, with a clear understanding of what the requirements were, Mike issued a memo to formalize the verbal request he had been making.

Q Who else would have been the recipient of that memo besides Ms. Dettmer?

A The people that worked for Mike at the time, which I believe was Art Johnson and Denise Green.

Q So there would have been a total --

Mike had issued the memo that wanted people to report by 8:00 o'clock, Phyllis had not reported by 8:00 o'clock on numerous occasions, so I spoke with Phyllis myself and asked her, you know, did she understand that she needed to be there at 8:00 o'clock and understand she still hadn't been reporting by 8:00 o'clock and so forth, and Phyllis mentioned in that meeting that she was seeing Dr. Mosko.

Q Is that the first time you've heard of him seeing her?

A Seeing Phyllis, yes.

Q She was permitted to see him during her workday, wasn't she?

A Yes.

Q And would she have to clear that time with anybody in a supervisory capacity?

A She never cleared it with me. I can't say whether she cleared it specifically with anyone else or not.

Q But nobody reported to you that she was missing during the workday and they didn't know where

assess her job performance?

A Phyllis -- Phyllis was a pleasant individual. I believe that she -- she came to work to do her job. She -- the jobs that I'm familiar with that she was given to do, as far as the product that she would produce, I would say that product was good.

With regard to timeliness of delivery, there were times -- there were issues with that.

But as far as the quality of the end product and the way she handled herself on the phone with other people and her general demeanor, I would say they were all good.

Q So based on that, what you understand of that aspect of her employment, the depression did not seem to interfere or not?

A Like I said, I could only assess what I saw, you know, as far as her job performance.

And with regard to Phyllis' statement about depression, I just don't pursue that, that's just not my area to pursue.

Q Did there come a time that you gave Ms.

would refer them to HR.

Q And when you refer to HR, would you say, go see Cindi at Smallwood or --

A Sure.

Q When did you learn that Ms. Dettmer was bisexual?

A I've never learned that, I guess. I read that with the most recent complaint. I don't know what the date of that was, but just a couple of months ago.

Q That was the first time that it's been raised with you?

A Yes.

Q Did you ever have a discussion with Dr. Mosko about Ms. Dettmer?

A With regard to what?

Q Anything that -- well, they started seeing each other in June of '98.

A The only discussion I recall was once when the discussion was with HR and Dr. Mosko showed up and I remember asking -- I remember saying, is there any

reason why this corrective action shouldn't be issued, and he said no. So that was the extent of the discussion.

Q And do you recall whether it was the suspension or the reduction of pay or the dismissal?

A No, I don't recall.

Q Were you opposed to Ms. Dettmer being given family medical leave in the period of 1999 to 2000?

A It was never something that would be an issue to me. I mean, that would not be something I would decide.

Q I didn't ask you that. I asked you were you opposed to her having that kind of leave?

A No one ever came to me and said, we want to give Phyllis Dettmer this family leave, so --

Q You were never asked?

A Right.

Q Did anybody ever come and tell you that Ms. Dettmer was going to be given a reasonable accommodation under the Americans with Disabilities Act for your position on that idea?

A I don't recall those specific words being said. I remember a period of time where we gave Phyllis a period of time, like a grace period, I guess, where her lateness and so forth would still be recorded, but no disciplinary action would be taken during that grace period.

And I'm not real sure about the date. Several months, I guess, before her termination.

Q And whose idea was the grace period, yours, Mr. Snyder, Mr. Bey or whose?

A That was a result of a teleconference meeting, and that was -- that was the decision, you know, of the group of people of the time period, and medical was involved.

Q So do you recall is that the third teleconference? We have the other two notes. Or one of the first two?

What I'm trying to get to is how many times have these teleconferences been held?

A I can't say for sure what that number was.

Q Was it more than the three that we've --

A I don't know for sure.

Q And when these meetings were conducted, was Ms. Dettmer invited to also attend?

A No.

MR. HALL: I'm pleased to have met you. We are done.

MS. GAUGHAN: I have questions, but can we take a five-minute break?

(Whereupon, recess taken -- 11:07 a.m.)

(Whereupon, after recess -- 11:13 a.m.)

EXAMINATION

BY MS. GAUGHAN:

Q Was prompt reporting an essential function of Ms. Dettmer's job?

A Yes.

Q Why?

A Senior admin. assistant is a support position, and this particular senior admin. assistant is a support position for a support organization. My entire organization is a support organization to the power plants.

So because it's a support -- because it's a support position, if the individual is not there to provide the support, then someone else has to do the particular duties, whether it be the individual themselves or if they were to somehow get someone else to provide that support to them.

Q You said that Ms. Dettmer supported the operations of the fossil division, correct?

A That's correct.

Q And what shift did the field personnel in the fossil division work?

A Generally the plants run 6:00 to 6:00 day shift on -- that's the norm.

The warehouse folks work a -- warehouse availability is 6:30 to 3:30. The majority of the warehousemen report by 7:00, one would report by 6:30.

Q And when we're talking about field people in the plant, can you describe what that is, who that is?

A Who are the plant people?

Q Yes.

A Primarily it's maintenance type of personnel

that require parts and materials. It can also involve their supervision.

Q And what do they require parts and materials for?

A To make repairs to the power plant.

Q And what is the function of the power plant?

A To generate electricity.

Q Did you have any concern about Ms. Dettmer staying late in the warehouse to make up for time lost because of lateness or absence?

A The Fort Smallwood warehouse at that time was an unsecured building with regard to you could get to that building without necessarily going through security.

And -- but even still, the building was basically unattended after 3:30, 4:00 o'clock in the day. So from a safety aspect, whether it just be an individual alone on a regular basis, it's just not a safe situation. If nothing else, a person could fall or have a health problem and no one would virtually know about it.

Q Are the lateness and absence policies of the company documented in the employee manual?

A With regard to -- yes. Yes.

Q You were asked whether you had any dealings directly with the medical department, and you said no, but then you also said there were these teleconferences.

Can you clarify what connection or communication you had with medical?

A When I responded that I had no direct -- what was the word?

Q Dealings.

A Dealings with the medical department, I interpreted that that I never initiated, picked up the phone and called directly and said, what's your opinion. For that, my dealings were through HR.

But I did, in fact, attend conferences which were attended by various people which included medical. So with that regard, I did deal directly.

Q You were asked when you first learned that Ms. Dettmer was bisexual, and you said that you read a

complaint a couple of months ago.

Is that the complaint that is the subject of this lawsuit that we're here for today?

A Yes. You made contact with me, and at our meeting, you showed me that complaint.

Q So when I told you was the first time that you knew she was bisexual?

A Yes, that's correct.

MS. GAUGHAN: That's all I have.

(Whereupon, Lingner Deposition Exhibit Number 12 was marked for identification.)

EXAMINATION

BY MR. HALL:

Q Ms. Lingner, let me show you what has been marked as Deposition Exhibit Number 12 and ask you if you could read that to yourself, please.

A Okay.

Q Angie Williams is in the medical department, is she not?

A Yes, she is. She works at the Fort Smallwood complex, the dispensary.