

1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MARYLAND

2

     PHYLLIS M. DETTMER           *    ┌─────────────────┐
                                       │   **EXHIBIT**   │
3                                 *    │      _19_       │
                                       └─────────────────┘
              Plaintiff           *  Civil Action No.:

4    vs.                          *    MJG02-2595

     CONSTELLATION POWER SOURCE    *

5    GENERATION, INC.,             *

                                   *

6              Defendant           *

     *    *    *    *    *    *    *    *    *

7

8         DEPOSITION OF ROBIN MILA HALLER, Ph.D.

9

10             The Deposition of Robin Mila Haller,

11   Ph.D., was taken in the above-captioned case, on

12   Thursday, February 13, 2003, commencing at 10:00

13   a.m., at the Baltimore Gas & Electric Company, 39

14   W. Lexington Street, 17th Floor, Baltimore,

15   Maryland, and was reported by M. Dana Barber, a

16   Notary Public and Shorthand Reporter.

17

18

19             EVANS REPORTING SERVICE

               2 North Charles Street

20                  Suite 950

               Baltimore, Maryland 21201

21                (410) 727-7100

27

1    status of that relationship, if you know?

2        A.    To the best of my recollection at that

3    time, the status was that relationship was rock

4    key.

5             If I can clarify, the heading major

6    issue, that is from what she said to me.

7        Q.    You use some abbreviations throughout

8    these notes and one of them is E period O period.

9             What does that mean?

10       A.    Everyone.  I'm sorry.

11       Q.    Try again.

12       A.    In this particular case, I'm sorry, you

13   have to learn to, when people talk fast, you have

14   to learn your own shorthand.

15            Each other, in this case.  Sorry.

16       Q.    What involvement, to your knowledge, did

17   Ms. Dettmer have with the Sweet Adelines?

18       A.    To the best of my recollection, she had

19   been involved with them for fifteen, twenty years,

20   I believe.

21       Q.    And they are a singing group?

28

1    A.    Yes.

2    Q.    And at the time that you saw her in July

3  she was still a member of that group?

4    A.    Yes.

5    Q.    Did Ms. Dettmer explain for you just

6  what the singing group did?

7    A.    I believe that she probably did.  I

8  don't remember all of it.

9    Q.    Do you have a general understanding of

10  what it is they do?

11    A.    They met on a regular basis.  If I

12  remember correctly, it was a fairly large group.

13  They practiced, gave performances.

14          If I remember correctly, I believe they

15  even entered competitions.

16    Q.    To your knowledge, did Ms. Dettmer

17  travel with the group?

18    A.    I believe that she did at times.

19    Q.    Was Ms. Dettmer a member of that same

20  group throughout the course of time that you saw

21  her professionally?

40

1    A.    Not that I recall.  But I do remember

2  her saying that she felt like she needed naps

3  constantly.

4         She would come home from work and go to

5  bed and sometimes get up for dinner and go back to

6  bed until the next morning, which is not something

7  that I would consider usual or normal.

8    Q.    It looks like on August the 2nd you also

9  got some background information about her family,

10  correct?

11   A.    Yes.

12   Q.    And Ms. Dettmer lived at home, correct?

13   A.    Yes.

14   Q.    And she lived with her mother and father

15  at home, correct?

16   A.    Yes.

17   Q.    Did she report that her family life was

18  contributing in any way to her depression?

19   A.    She reported that it was getting more

20  difficult as her parents got older.

21         But to the best of my recollection, she

41

1   never directly related that to her depression.

2      Q.    And what was it about her parents

3   getting older that made it more difficult?

4      A.    Again, to the best of my recollection,

5   increasing physical disabilities, their getting

6   older, increased need for her to take care of

7   them.

8      Q.    Do you know whether this increased

9   physical disability or increased need for her to

10  care for them had any effect on her job

11  performance?

12     A.    I do not know.

13     Q.    Your notes indicate on August the 2nd of

14  2000 that Ms. Dettmer saw herself as the protector

15  and defender of the family.

16           Is that fair?

17     A.    That's correct.

18     Q.    What does she mean by that?

19     A.    I'm sorry, I'm trying to remember.

20     Q.    Take your time.

21     A.    I think that based on her experiences

1    A.    It has to do with taking a look at what

2  a person is thinking, because what you think

3  determines how you feel.

4          And if we can recognize and alter some

5  of our thoughts, we can change how we feel then.

6    Q.    You next saw her on September the 12th

7  of 2000?

8    A.    Yes.

9    Q.    And at that time she reported she was

10  doing okay?

11    A.    Yes.

12    Q.    What does she mean when she says, I'm

13  doing okay?

14    A.    I don't recall right now.

15    Q.    Ms. Dettmer reported to you at that time

16  conversations she had had with people at her

17  employment, right?

18    A.    Yes.

19    Q.    Is there anything about what they told

20  you that you didn't write down or that you

21  remember independently?

1      Q.     So at this point in September of 2000,

2   was Ms. Dettmer of the opinion that she was

3   capable of performing other employment outside of

4   Constellation Power Source?

5      A.    Yes.

6      Q.     Was it your opinion that she was able to

7   perform a job outside of the company?

8      A.    I believe that she was capable of

9   performing it, most jobs.

10     Q.    Okay.

11     A.    Outside of the company.

12     Q.    Now, there is some notes after that

13   comment about seeking other employment, that there

14   are some financial considerations, correct?

15     A.    That was part of our discussion, yes.

16     Q.    And she related to you financial

17   concerns that she had about leaving her job,

18   right?

19     A.    Yes.

20     Q.    You wrote down here that one of her

21   choices was, quote, stay and be miserable.

```
 1  her employers wanted her to be at work by 8:00,
 2  and that was how she needed to keep her job, then
 3  that was what she needed to work on doing.
 4      Q.    So was it fair to say then on September
 5  the 12th of 2000 you thought she was capable of
 6  being there at 8:00 in the morning?
 7      A.    Yes.
 8      Q.    It looks like you and Phyllis came up
 9  with a plan on how to accomplish that.  Fair to
10  say?
11      A.    Yes, we came up with a plan to try to
12  accomplish that, yes.
13      Q.    And what was your plan?
14      A.    The plan was to try to find a way that
15  she could get an adequate amount of sleep and
16  still manage to get up in the morning.
17            I don't know, you want me to list?
18      Q.    Yes, I do.  I don't want you just to
19  read it though.
20            But to me it's just, I just want to know
21  what the plan was.
```

79

1           And to change a mindset like that would

2   require the breaking of that cycle.

3           So I did have my doubts about whether

4   she was capable of doing that.

5       Q.    What can you do to break the cycle?

6       A.    Medication helps.  Sometimes the

7   behavior first then can cause a change in the

8   mindset.

9           You know, if she had been able to get

10  herself up regularly, then that has an effect, oh,

11  well, yeah, I can do it, so then I am just going

12  to get up.

13          Sometimes it, depending on the person,

14  is just a matter of will.  But that's the rare

15  person.

16      Q.    You next saw Ms. Dettmer on the 27th of

17  September, 2000?

18      A.    Yes.

19      Q.    Again, at this time she is reporting she

20  has good and bad days?

21      A.    Yes.

1        Q.    And that last week she had been in

2   Florida for ten days?

3        A.    Yes.

4        Q.    And that was with her singing group for

5   competition?

6        A.    Yes.

7        Q.    Can you read the bottom sentence for me?

8        A.    Um-hum.  The last line says, because

9   they are in same circles.

10       Q.    And "they" is Janet and Claudia?

11       A.    Yes.

12       Q.    You wrote down in your notes, situation

13   is stressful, hurtful, sad, confusing.

14             Is this her personal problems with Janet

15   that you are referring to there?

16       A.    Yes, her relationship difficulties.

17       Q.    You also wrote in here, P is getting up

18   in a.m.

19       A.    Um-hum, yes.

20       Q.    What did she report to you about that?

21       A.    She reported to me that she was managing

82

```
 1      A.      If I remember correctly, she was not

 2  getting out of bed to turn off the second alarm

 3  clock.

 4      Q.      But despite that she was still able to

 5  get up and get to work on time?

 6      A.      That is what she told me, yes.

 7      Q.      And she told you with one exception

 8  because she was late because of the weather?

 9      A.      Yes.

10      Q.      You next saw Ms. Dettmer on October the

11  10th?

12      A.      Yes.

13      Q.      I'm sorry, you next saw Ms. Dettmer on

14  October the 11th; is that right?

15      A.      That's correct.

16      Q.      And she reported she wasn't feeling

17  physically well for the last week, correct?

18      A.      Yes.

19      Q.      What physical problem was she having?

20      A.      I don't recall.  Something like a cold

21  sort of thing, if I remember.
```

83

1      Q.      **Your** notes refer to a grace period.

2   What does that mean?

3      A.      I believe I remember her telling me that

4   she had been told she had until October 9th as

5   opposed to the end of September to make sure that

6   she was at work on time.

7      Q.      You wrote in this October 11th note that

8   P has been getting to work on time except for two

9   days from traffic, correct?

10     A.      Yes.

11     Q.      And is that something that she reported

12  to you?

13     A.      Yes.

14     Q.      You wrote here, I still think Joanne is

15  out to get me for whatever reason, and you put

16  quotes around that.

17             So I'm assuming that that's a direct

18  quote from Ms. Dettmer, correct?

19     A.      Yes.

20     Q.      Can you read the last sentence in that

21  page for me?

1    also the competition for the job.

2        Q.    She told you she was bored at work; is

3    that right?

4        A.    Yes.

5        Q.    Did she explain what that meant or why

6    she was bored?

7        A.    Not that I remember.

8        Q.    She also reported to you on October the

9    25th, 2000 that she hadn't been late at all,

10   right?

11       A.    Yes.

12       Q.    Now, there is a yellow sticky below

13   that.

14             I guess that indicates that you got a

15   call from Ms. Dettmer on November the 6th; is that

16   right?

17       A.    Right.

18       Q.    And --

19       A.    Returned on the 7th.

20       Q.    I think it says, talk about disability.

21             Is that what that says?

1    A.   Yes.

2        Q.   She told you at that point she had

3    consulted with two attorneys about her situation,

4    right?

5    A.   Yes.

6        Q.   And she explained to you that her job at

7    PetSmart was three or four days a week working

8    five to six hours each day, right?

9    A.   Yes.

10       Q.   And that she didn't find that was too

11   taxing on her, right?

12   A.   Right.

13       Q.   And you wrote a note down here, can we

14   work at work.

15            What does that mean?

16   A.       What that means is that anything that

17   occurs -- it's two things.  One is she didn't have

18   any actual work to take home with her.

19            And the other is that nothing that

20   occurred at her job at PetSmart was anything that

21   she thought about, ruminated over, or anything

EVANS REPORTING SERVICE

1  like that, when she was not there.

2      Q.    Can you read the last sentence of that

3  page for me?

4      A.    Actions comma what P thought comma and

5  what P planned to do.

6      Q.    On December 6th she reported to you that

7  she plans to go out with her friends Janet and

8  Claudia to have dinner and drinks, correct?

9      A.    Correct.  Before their rehearsal.

10     Q.    On December the 7th your notes reflect

11  that you had a phone conversation with Ms.

12  Dettmer; is that right?

13     A.    Yes.

14     Q.    And she reported the results of a

15  meeting that she had with HR, correct?

16     A.    Yes.

17     Q.    And indicated that she wanted you to

18  write a letter, right?

19     A.    Yes.

20            (Dr. Haller Deposition Exhibit Number 6

21  was marked for identification.)

1           BY MS. GAUGHAN:

2     Q.    And in response to her request, did you

3   write what we have just marked as Exhibit Number

4   6?

5     A.    Yes.

6     Q.    You wrote in this letter, her tardiness

7   at work is not something over which she has

8   complete control.

9           Is that right?

10    A.    Yes.

11    Q.    Looking at it conversely, does that mean

12  that she does have some control over it?

13    A.    Some, yes.

14    Q.    And is there some way to define the

15  amount of control she has over it?

16    A.    I think the amount of control she has

17  over it is fluid, depending on how she is feeling,

18  both physically and psychologically, and what has

19  happened in the days surrounding.

20    Q.    When did you next see Ms. Dettmer?

21    A.    December 20th.

1   bit here.  They will, something --

2        A.    Look at everything.

3        Q.    Again in three months?

4        A.    Yes.

5        Q.    So your understanding at this time in

6   December of 2000 is that there was no action going

7   to be taken at that time but there was going to be

8   another three-month period where they would

9   evaluate her?

10       A.    My understanding at the time was that

11  things had been put on hold and that she had been

12  told that they were going to wait three months and

13  see what happened, yes.

14       Q.    Okay.  And it states here, they may

15  attribute problems to depression and --

16       A.    Maybe pull corrective actions from her

17  file.

18       Q.    And that's what Phyllis told you?

19       A.    Yes.

20       Q.    She reported to you that on December

21  20th, she had been on time or early for at least

96

1  the last three weeks.

2           Is that right?

3     A.   Yes.

4     Q.   And that she was doing well with her new

5  work leader Art Johnson, correct?

6     A.   So far, yes.

7     Q.   She reported to you that she had plans

8  to go to a New Year's party; is that right?

9     A.   Yes.

10    Q.   And that she plans to be with her family

11 at the holidays, Christmas holidays?

12    A.   Tentative plans.

13    Q.   When did you next see Ms. Dettmer?

14    A.   January 3rd, 2001.

15    Q.   And again, it looks like my date here is

16 crossed off.  If it's okay with everybody I'm

17 going to just put 1-3 on Exhibit 2.

18           Can you read what the bottom of that

19 page says?

20    A.   New Year's resolution, every day is

21 going to be a good day.

101

1              Your next visit was February 14th of

2    2001, right?

3      A.    Yes.

4      Q.    And at that point she told you she quit

5    the chorus, right?

6      A.    Yes.

7      Q.    And that was because of the chorus

8    politics that we talked about earlier, right?

9      A.    Yes.

10     Q.    And the bottom of that page is cut off.

11           What does it say?

12     A.    She has no -- it's a dollar sign -- for

13   money coming in now.

14     Q.    You wrote down here, she doesn't want to

15   be an administrative assistant anymore.

16           Is that something she told you?

17     A.    Yes.

18     Q.    Why didn't she want to do that job

19   anymore, do you know?

20     A.    I believe that at that moment she felt

21   that she did not want to work with the kind of

103

1    that she cancelled, she had no insurance, she had

2    a new job, she was on the road a lot and did not

3    know when she would be available to come in.

4        Q.    Are you aware of what Ms. Detmer's

5    current condition is with respect to any mental

6    impairment or condition?

7        A.    No.

8        Q.    Do you agree that with appropriate

9    treatment most people with depression can be

10   helped?

11       A.    Yes.   With appropriate treatment and

12   time.

13       Q.    Was Ms. Dettmer ever late for an

14   appointment with you?

15       A.    Usually I note that at the top.  I would

16   say, ten minutes late.  So I don't believe that

17   she was.

18             Or if she was, it was no more than five

19   minutes or so, because that I would not note.

20       Q.    Does any part of your practice involve

21   evaluation of patients for disability?

1  problematic can be attention and concentration

2  difficulties, focusing.

3          So that may or may not have been an

4  issue.  But I don't know because I wasn't there.

5      Q.    Did Ms. Dettmer ever report to you that

6  anybody had complained about her attention or

7  focus or concentration at work?

8      A.    She reported to me that her work was

9  considered adequate, at least.

10          MS. GAUGHAN:  Okay.  That's all.

11          (Thereupon, at 12:30 p.m. the deposition

12  was concluded.)

13        -      -      -      -      -      -

14

15

16

17

18

19

20

21