```
                                                           1
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3   PHYLLIS M. DETTMER,        *

 4           Plaintiff,         *

 5   v.                         *   Civil Action No.

     CONSTELLATION POWER            MJG02-2595

 6   SOURCE GENERATION, INC.,   *

 7           Defendant.         *

 8   *    *    *    *    *    *    *    *    *    *

 9

10            DEPOSITION OF SHEILA RHODES, M.D.

11

12            The Deposition of Sheila Rhodes, M.D.

13   was taken on Wednesday, February 12, 2003,

14   commencing at 10:00 a.m. at the Offices of

15   Baltimore Gas and Electric, 39 West Lexington

16   Street, Baltimore, Maryland, and was reported by

17   Cari M. Inkenbrandt, RPR, Notary Public.

18

19

20               EVANS REPORTING SERVICE

                  2 North Charles Street

21               Baltimore, Maryland  21201
```

EXHIBIT 29

25

1        (Rhodes Deposition Exhibit No. 5 marked.)

2             BY MR. HALL:

3     Q    Let me show you what's been marked as
4 Exhibit No. 5 and ask you if you can identify that
5 document for me, please.

6     A    Okay. I've seen this.

7     Q    And did you receive that approximately
8 the same time it's dated or --

9     A    I would think so.

10    Q    All right. Again, there's a specific
11 diagnosis in that letter. Did the medical
12 department disagree with that diagnosis?

13    A    Diagnosis of dysthymic disorder, major
14 depression, no.

15    Q    Did the medical department ever
16 administer any tests of Ms. Dettmer either in 1999
17 or 2000?

18    A    Not to my knowledge.

19    Q    Did, specifically, did Dr. Mosko
20 administer any tests to Ms. Dettmer that you're
21 aware of?

31

1    A    Well, how can I say this? Did I agree?
2 Well, my opinion on the subject may not have been
3 necessarily Dr. Dvoskin's, only because I wasn't
4 totally convinced that her lateness was due to her
5 depression, but we gave her the benefit of the
6 doubt.
7    Q    What formal training have you received
8 under the -- as to the provisions of the Family
9 and Medical Leave Act?
10    A    Attended conferences.
11    Q    How many?
12    A    Probably two.
13    Q    Since what -- over what period of time?
14    A    Over the last maybe five years.
15    Q    And how recently would the conferences
16 have been?
17    A    Probably maybe four or five years.
18    Q    Have you read any articles about the
19 implementation of FMLA?
20    A    Periodically they come through in
21 various ways, various magazines and so forth.

```
 1   Exhibit No. 7.  Is that the notes that you --

 2       A    Yes.

 3       Q    And also attending that meeting were

 4   Mr. Snyder and Ms. Lingner; is that correct?

 5       A    Correct.

 6       Q    Am I also correct that there was nobody

 7   from the HR office in attendance at that meeting?

 8       A    Not that I have here.

 9       Q    Did you tell Ms. Dettmer at that meeting

10   that the FMLA pertains to persons with serious

11   medical conditions who are incapacitated or unable

12   to work?

13       A    Correct.

14       Q    Is that your understanding of the

15   provisions of the article?

16       A    Correct.

17       Q    Can you give me an example of conditions

18   which are incapacitating so as to have met the use

19   of FMLA, in your opinion?

20       A    For instance, having pneumonia and being

21   unable to work.
```

38

1  lateness was because of her disease." We don't
2  believe that her physicians had provided
3  unequivocal proof that it was.
4      Q    What degree of proof does your office
5  require before Family Medical Leave?
6      A    The reasons were: Number one, that
7  people can be late for a variety of reasons, not
8  just depression; Phyllis had proven that she could
9  get to work on time; and thirdly, Phyllis was late
10 on medicines and off medicines, it didn't matter,
11 and the simple fact that Dr. Dvoskin had said how
12 can anybody ever really know. But we had given
13 her the benefit of the doubt. We weren't totally
14 convinced, but we gave her the benefit of the
15 doubt.
16     Q    Did your opinion and did the medical
17 department's opinion change upon Dr. Commerford's
18 letter dated December 18th?
19     A    No.
20     Q    Did your opinion change as a result of
21 Dr. Haller's note to you on December 8th?

39

```
1     A    No.

2     Q    What is the medical basis of the opinion
3  held by the office?

4     A    I thought I just said that.  Phyllis
5  could prove she could be to work on time.  She was
6  late either on medicine or off medicine.  She had
7  been given a long time to work on this condition,
8  well over a year.  And the fact of the matter is,
9  no decisions were made based on our opinions.  We
10 took that off the table, whether her lateness was
11 due to her depression.

12    Q    Did you tell her at this meeting that as
13 of January she would be held to the 8:00.

14    A    Right.

15    Q    And Mr. Snyder was pretty much at the
16 end of his rope about this situation?

17    A    The department had been tolerating it
18 for well over a year.

19    Q    Did your office, the medical office,
20 conduct any sort of testing of Ms. Dettmer after
21 receipt of the letters from Dr. Commerford, Haller
```